CLOSED, DISCMAG, JURY, PATENT

# U.S. District Court [LIVE]
## Eastern District of TEXAS LIVE (Marshall)
## CIVIL DOCKET FOR CASE #: 2:06-cv-00223-TJW-CE

| | |
|---|---|
| Rembrandt Technologies, LP v. Charter Communications, Inc., et al | Date Filed: 06/01/2006 |
| Assigned to: Judge T. John Ward | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Charles Everingham | Nature of Suit: 830 Patent |
| Cause: 35:271 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

**Rembrandt Technologies, LP**              represented by    **Robert M Parker**
Parker, Bunt & Ainsworth, P.C.
100 E Ferguson
Suite 1114
Tyler, TX 75702
903/531-3535
Fax: 9035339687
Email: rmparker@pbatyler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
McKool Smith - Marshall
P O Box O
Marshall, TX 75671
US
903/927-2111
Fax: 903/927-2622
Email: sbaxter@mckoolsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
McKool Smith
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-4000
Fax: 2149784044
Email: bcaldwell@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Charles Ainsworth**
Parker Bunt & Ainsworth
100 E Ferguson
Suite 1114

Tyler, TX 75702
US
903/531-3535
Fax: 903/533-9687
Email: charley@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Franklin Jones, Jr**
Jones & Jones - Marshall
201 W Houston St
PO Drawer 1249
Marshall, TX 75670
903/938-4395
Fax: 9039383360
Email: maizieh@millerfirm.com
*ATTORNEY TO BE NOTICED*

**Jeffrey A Carter**
McKool Smith - Dallas
300 Crescent Court
Suite 1200
Dallas, TX 75201
214/978-4006
Fax: 12149784044
Email: jcarter@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**John Franklin Garvish, II**
McKool Smith - Austin
300 W 6th St
Ste 1700
Austin, TX 78701
512/692-8731
Fax: 512/692-8744
Email: jgarvish@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Robert Christopher Bunt**
Parker, Bunt & Ainsworth, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
903/531-3535
Fax: 903/533-9687
Email: rcbunt@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Thomas Guy Fasone, III**
McKool Smith
300 Crescent Court
Suite 1500

Dallas, TX 75201
214/978-4000
Email: tfasone@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Travis Gordon White**
McKool Smith
300 W 6th St
Ste 1700
Austin, TX 78701
512/692-8701
Email: gwhite@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Charter Communications, Inc.,**                    represented by    **Allen Franklin Gardner**
Potter Minton PC
110 N College
Suite 500
PO Box 359
Tyler, TX 75710-0359
903/597-8311
Email: allengardner@potterminton.com

*ATTORNEY TO BE NOTICED*

**Bradford P Lyerla**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: blyerla@marshallip.com
*ATTORNEY TO BE NOTICED*

**Charles Edward Juister**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: cjuister@marshallip.com
*ATTORNEY TO BE NOTICED*

**Diane DeVasto**
Potter Minton

110 N. College Street, Suite 500
Tyler, Tx 75702
US
903-597-8311
Fax: 903-593-0846
Email:
dianedevasto@potterminton.com
*ATTORNEY TO BE NOTICED*

**Gregory E Stanton**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: gstanton@marshallip.com
*ATTORNEY TO BE NOTICED*

**Jon-Thomas Bloch**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: jbloch@marshallip.com
*ATTORNEY TO BE NOTICED*

**Kevin D Hogg**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 317/474-0448
Email: khogg@marshallip.com
*ATTORNEY TO BE NOTICED*

**Margaret Lynn Begalle**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: Mbegalle@marshallip.com
*ATTORNEY TO BE NOTICED*

**Paul Bryan Stephens**

Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: pstephens@marshallip.com
*ATTORNEY TO BE NOTICED*

**William Joseph Kramer**
Marshall Gerstein & Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606-6357
312/474-6300
Fax: 312/474-0448
Email: wkramer@marshallip.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Charter Communications Operating,**     represented by  **Allen Franklin Gardner**
**LLC**                                                    (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Bradford P Lyerla**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Charles Edward Juister**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Diane DeVasto**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Gregory E Stanton**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Jon-Thomas Bloch**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kevin D Hogg**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Margaret Lynn Begalle**
                                                           (See above for address)

*ATTORNEY TO BE NOTICED*

**Paul Bryan Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Joseph Kramer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cox Communications, Inc.**
*TERMINATED: 09/19/2006*

represented by **Candice C Decaire**
Kilpatrick Stockton LLP - Atlanta
1100 Peachtree St
Ste 2800
Atlanta, GA 30309-4530
404/815-6033
Fax: 404/541-3218
Email:
cdecaire@kilpatrickstockton.com

**Leroy M Toliver**
Kilpatrick Stockton
1100 Peachtree St
Suite 2800
Atlanta, GA 30309
404/815-6483
Fax: 404/541-3274
Email: btoliver@kilpatrickstockton.com

**Michael Edwin Jones**
Potter Minton PC
110 N College
Suite 500
PO Box 359
Tyler, TX 75710-0359
903/597/8311
Fax: 9035930846
Email: mikejones@potterminton.com

**Mitchell G Stockwell**
Kilpatrick Stockton LLP
1100 Peachtree St
Ste 2800
Atlanta, GA 30309-4530
404/815-6214
Fax: 14048156555
Email:
mstockwell@kilpatrickstockton.com

**Defendant**

**Cox Enterprises, Inc,.**                represented by    **Candice C Decaire**
*TERMINATED: 09/19/2006*                                   (See above for address)

                                                           **Leroy M Toliver**
                                                           (See above for address)

                                                           **Michael Edwin Jones**
                                                           (See above for address)

                                                           **Mitchell G Stockwell**
                                                           (See above for address)

**Defendant**

**Coxcom, Inc.,**                         represented by    **Allen Franklin Gardner**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Candice C Decaire**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Diane DeVasto**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Leroy M Toliver**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Michael Edwin Jones**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Mitchell G Stockwell**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Tonya R Deem**
                                                           Kilpatrick Stockton LLP NC
                                                           1001 W Fourth Street
                                                           Winston-Salem, NC 27101
                                                           336-607-7485
                                                           Fax: 336-607-7500
                                                           Email: tdeem@kilpatrickstockton.com
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**CSC Holdings, Inc.**

**Defendant**

**Cablevision Systems Corporation**

**Defendant**

**All Defendants**

**Movant**

**Coxcom, Inc.,**

**Movant**

**Comcast Cable Communications, LLC**

**Movant**

**Comcast Corporation**

**Movant**

**Comcast of Plano, LP**

**Counter Claimant**

**Charter Communications, Inc.,**              represented by   **Michael Edwin Jones**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Charter Communications Operating, LLC**       represented by   **Michael Edwin Jones**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Rembrandt Technologies, LP**

**Counter Claimant**

**Coxcom, Inc.,**

V.

**Counter Defendant**

**Rembrandt Technologies, LP**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 06/01/2006 | 1 | COMPLAINT against Cablevision Systems Corporation, Charter Communications, Inc.,, Charter Communications Operating, LLC, Cox Communications, Inc., Cox Enterprises, Inc,., Coxcom, Inc.,, CSC |

|  |  | Holdings, Inc. (Filing fee $ 350.) , filed by Rembrandt Technologies, LP. (Attachments: # 1 Civil Cover Sheet)(ehs, ) (Entered: 06/02/2006) |
|---|---|---|
| 06/01/2006 |  | DEMAND for Trial by Jury by Rembrandt Technologies, LP. (ehs, ) (Entered: 06/02/2006) |
| 06/01/2006 | 2 | Form mailed to Commissioner of Patents and Trademarks. (ehs, ) (Entered: 06/02/2006) |
| 06/02/2006 |  | Filing fee: $ 350.00, receipt number 2-1-1540 (ehs, ) (Entered: 06/06/2006) |
| 06/28/2006 | 3 | NOTICE of Attorney Appearance by Franklin Jones, Jr on behalf of Rembrandt Technologies, LP (Jones, Franklin) (Entered: 06/28/2006) |
| 07/06/2006 | 4 | MOTION to Withdraw as Attorney by Rembrandt Technologies, LP. (Bunt, Robert) Additional attachment(s) added on 7/7/2006 (mll, ). (Entered: 07/06/2006) |
| 07/11/2006 | 5 | ORDER granting 4 Motion to Withdraw Fish & Richardson PC as Attorney. Signed by Judge Leonard Davis on 7/10/06. (fnt, ) (Entered: 07/11/2006) |
| 07/24/2006 | 16 | APPLICATION to Appear Pro Hac Vice by Attorney Leroy M Toliver for Coxcom, Inc.,; Cox Communications, Inc. and Cox Enterprises, Inc,.. (ch, ) (Entered: 08/07/2006) |
| 07/24/2006 |  | Pro Hac Vice Filing fee paid by Toliver; Fee: $25, receipt number: 6-1-6091 (ch, ) (Entered: 08/07/2006) |
| 07/24/2006 |  | Summons Issued as to All Defendants. (ehs, ) (Entered: 09/06/2006) |
| 07/25/2006 | 6 | NOTICE of Designation of Attorney in Charge to Samuel Franklin Baxter on behalf of Rembrandt Technologies, LP (Baxter, Samuel) (Entered: 07/25/2006) |
| 07/25/2006 | 7 | NOTICE of Attorney Appearance by Travis Gordon White on behalf of Rembrandt Technologies, LP (White, Travis) (Entered: 07/25/2006) |
| 07/25/2006 | 8 | NOTICE of Attorney Appearance by Jeffrey A Carter on behalf of Rembrandt Technologies, LP (Carter, Jeffrey) (Entered: 07/25/2006) |
| 07/25/2006 | 9 | NOTICE of Attorney Appearance by Bradley Wayne Caldwell on behalf of Rembrandt Technologies, LP (Caldwell, Bradley) (Entered: 07/25/2006) |
| 07/25/2006 | 10 | NOTICE of Attorney Appearance by John Franklin Garvish, II on behalf of Rembrandt Technologies, LP (Garvish, John) (Entered: 07/25/2006) |
| 07/26/2006 | 15 | APPLICATION to Appear Pro Hac Vice by Attorney Mitchell G Stockwell for Coxcom, Inc.,; Cox Communications, Inc. and Cox Enterprises, Inc,.. (ch, ) (Entered: 08/07/2006) |
| 07/26/2006 |  | Pro Hac Vice Filing fee paid by Stockwell; Fee: $25, receipt number: 2-1-1728 (ch, ) (Entered: 08/07/2006) |

| 08/02/2006 | 12 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Cablevision Systems Corporation served on 7/28/2006, answer due 8/17/2006. (ehs, ) (Entered: 08/04/2006) |
|---|---|---|
| 08/02/2006 | 14 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Charter Communications Operating, LLC served on 7/28/2006, answer due 8/17/2006. (ehs, ) (Entered: 08/04/2006) |
| 08/04/2006 | 11 | NOTICE of Attorney Appearance by Michael Edwin Jones on behalf of Cox Communications, Inc., Cox Enterprises, Inc,., Coxcom, Inc., (Jones, Michael) (Entered: 08/04/2006) |
| 08/04/2006 | 13 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Charter Communications, Inc., served on 7/28/2006, answer due 8/17/2006. (ehs, ) (Entered: 08/04/2006) |
| 08/07/2006 | 17 | APPLICATION to Appear Pro Hac Vice by Attorney Candice C Decaire for Coxcom, Inc.,; Cox Communications, Inc. and Cox Enterprises, Inc,.. (ch, ) (Entered: 08/10/2006) |
| 08/07/2006 | | Pro Hac Vice Filing fee paid by Decaire; Fee: $25, receipt number: 2-1-1763 (ch, ) (Entered: 08/10/2006) |
| 08/07/2006 | 21 | APPLICATION to Appear Pro Hac Vice by Attorney Candice C Decaire for Coxcom, Inc.,; Cox Communications, Inc. and Cox Enterprises, Inc,.APPROVED (poa, ) (Entered: 08/14/2006) |
| 08/07/2006 | | Pro Hac Vice Filing fee paid by Decaire; Fee: $25, receipt number: 2-1-1763 (poa, ) (Entered: 08/14/2006) |
| 08/09/2006 | 18 | E-GOV SEALED SUMMONS Returned Executed Certified Mail by Rembrandt Technologies, LP. Cox Communications, Inc. served on 8/2/2006, answer due 8/22/2006. (ch, ) (Entered: 08/10/2006) |
| 08/09/2006 | 19 | E-GOV SEALED SUMMONS Returned Executed Certified Mail by Rembrandt Technologies, LP. Coxcom, Inc., served on 8/2/2006, answer due 8/22/2006. (ch, ) (Entered: 08/10/2006) |
| 08/09/2006 | 20 | E-GOV SEALED SUMMONS Returned Executed Certified Mail by Rembrandt Technologies, LP. CSC Holdings, Inc. served on 7/31/2006, answer due 8/21/2006. (ch, ) (Entered: 08/10/2006) |
| 08/17/2006 | 22 | *Defendants' Charter Communications, Inc. and Charter Communications Operating LLC* ANSWER to Complaint , *Affirmative Defenses and*, COUNTERCLAIM against Rembrandt Technologies, LP by Charter Communications, Inc.,, Charter Communications Operating, LLC.(Jones, Michael) (Entered: 08/17/2006) |
| 08/17/2006 | 26 | APPLICATION to Appear Pro Hac Vice by Attorney Bradford P Lyerla for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Lyerla; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/24/2006) |

| | | |
|---|---|---|
| 08/17/2006 | 27 | APPLICATION to Appear Pro Hac Vice by Attorney Kevin D Hogg for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Hogg; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | 28 | APPLICATION to Appear Pro Hac Vice by Attorney William Joseph Kramer for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Kramer; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | 29 | APPLICATION to Appear Pro Hac Vice by Attorney Paul Bryan Stephens for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Stephens; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/24/2006) |
| 08/17/2006 | 30 | APPLICATION to Appear Pro Hac Vice by Attorney Margaret Lynn Begalle for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Begalle; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Begalle; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | 31 | APPLICATION to Appear Pro Hac Vice by Attorney Gregory E Stanton for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Stanton; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | 32 | APPLICATION to Appear Pro Hac Vice by Attorney Charles Edward Juister for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Juister; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | 33 | APPLICATION to Appear Pro Hac Vice by Attorney Jon-Thomas Bloch for Charter Communications, Inc., and Charter Communications Operating, LLC. (ch, ) (Entered: 08/25/2006) |
| 08/17/2006 | | Pro Hac Vice Filing fee paid by Bloch; Fee: $25, receipt number: 6-1-6391 (ch, ) (Entered: 08/25/2006) |
| 08/18/2006 | 23 | E-GOV SEALED SUMMONS Returned Executed by Rembrandt Technologies, LP. Cox Enterprises, Inc,. served on 8/8/2006, answer due 8/28/2006. (ehs, ) (Entered: 08/18/2006) |

| 08/21/2006 | 24 | ***FILED IN ERROR; PLEASE IGNORE***<br><br>MOTION for Extension of Time to File Answer */Respond to Rembrandt Technologies, LP's Complaint for Patent Infringement* by Cox Communications, Inc., Cox Enterprises, Inc,., Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order Granting Agreed Motion to Extension of Time to Respond to Rembrandt Technologies, LP's Complaint for Patent Infringement)(Stockwell, Mitchell) Modified on 8/28/2006 (mpv, ). (Entered: 08/21/2006) |
|---|---|---|
| 08/21/2006 | 25 | ***FILED IN ERROR; ATTY USED WRONG EVENT TO DOCKET; PLEASE IGNORE***<br><br>***FILED IN ERROR. Document # 24, Motion for Extension of Time to File Answer/Respond to Rembrandt Technologies, LP's Complaint for Patent Infringement. PLEASE IGNORE.***<br><br>*Agreed Motion for Extension of Time to Respond to Rembrandt Technologies, LP'S Complaint for Patent Infringement* (Attachments: # 1 Text of Proposed Order Granting Agreed Motion for Extension of Time to Respond to Rembrandt Technologies, LP's Complaint for Patent Infringement)(Decaire, Candice) Modified on 8/28/2006 (mpv, ). (Entered: 08/21/2006) |
| 08/21/2006 | 34 | ***REPLACES #24 & #25***<br><br>MOTION for Extension of Time to File Answer/Respond re 1 Complaint, by Cox Communications, Inc., Cox Enterprises, Inc, Coxcom, Inc. (Attachments: # 1 Text of Proposed Order) (mpv, ) Modified on 8/28/2006 (mpv, ). (Entered: 08/28/2006) |
| 08/21/2006 | | ***FILED IN ERROR. Document # 24, MOTION for Extension of Time to File Answer /Respond to Rembrandt Technologies, LP's Complaint for Patent Infringement. PLEASE IGNORE. REPLACED BY #34***<br><br>(mpv, ) (Entered: 08/28/2006) |
| 08/21/2006 | | ***FILED IN ERROR. Document # 25, Agreed Motion for Extension of Time to Respond to Rembrandt Technologies, LP'S Complaint for Patent Infringement. PLEASE IGNORE. DOCKETED INCORRECTLY BY ATTORNEY AS NOTICE OF DOCKET CORRECTION; REPLACED BY #34***<br><br>(mpv, ) (Entered: 08/28/2006) |
| 08/29/2006 | 35 | ORDER granting 34 Motion for Extension of Time to Answer. Dft's Cox Communications, Inc., Coxcom, Inc., and Cox Enterprises, Inc. Deadline to answer Pla's Complaint is 9/27/06 . Signed by Judge Leonard Davis on 8/29/06. (ch, ) (Entered: 08/29/2006) |
| 08/29/2006 | | Answer Due Deadline Updated for Cox Communications, Inc. to |

| | | |
|---|---|---|
| | | 9/27/2006; Cox Enterprises, Inc,. to 9/27/2006; Coxcom, Inc., to 9/27/2006. (ch, ) (Entered: 08/29/2006) |
| 09/06/2006 | 36 | NOTICE of Voluntary Dismissal by Rembrandt Technologies, LP (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 09/06/2006) |
| 09/08/2006 | 37 | CORPORATE DISCLOSURE STATEMENT filed by Rembrandt Technologies, LP (Baxter, Samuel) (Entered: 09/08/2006) |
| 09/11/2006 | 38 | *** FILED IN ERROR - PLEASE IGNORE - TO BE REFILED ***ANSWER to Counterclaim, COUNTERCLAIM against Rembrandt Technologies, LP by Rembrandt Technologies, LP.(Baxter, Samuel) Modified on 9/11/2006 (rml, ). (Entered: 09/11/2006) |
| 09/11/2006 | | ***FILED IN ERROR. Document # 38, Answer & Crossclaim. PLEASE IGNORE.*** <br><br> (rml, ) (Entered: 09/11/2006) |
| 09/11/2006 | 39 | ***REPLACES #38*** <br><br> RESPONSE to 22 Answer to Complaint, Counterclaim,, *PLAINTIFF'S REPLY TO DEFENDANTS' ANSWER AND COUNTERCLAIMS* by Rembrandt Technologies, LP. (Baxter, Samuel) Modified on 9/12/2006 (mpv, ). (Entered: 09/11/2006) |
| 09/19/2006 | 40 | ORDER dismissing defts Cox Communications, Inc. and Cox Enterprises, Inc. without prejudice. Signed by Judge Leonard Davis on 9/19/06. (ehs, ) (Entered: 09/19/2006) |
| 09/20/2006 | 41 | ORDER - the court transfers this case to the Honorable T. John Ward. Signed by Judge Leonard Davis on 9/20/06. (ch, ) (Entered: 09/20/2006) |
| 09/21/2006 | 42 | NOTICE of Attorney Appearance by Robert Christopher Bunt on behalf of Rembrandt Technologies, LP (Bunt, Robert) (Entered: 09/21/2006) |
| 09/21/2006 | 43 | NOTICE of Attorney Appearance by Charles Ainsworth on behalf of Rembrandt Technologies, LP (Ainsworth, Charles) (Entered: 09/21/2006) |
| 09/27/2006 | 44 | Second MOTION for Extension of Time to File Answer *to Rembrandt Technologies, LP's Complaint for Patent Infringement* by Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order Granting Motion for Extension of Time to Answer)(Decaire, Candice) (Entered: 09/27/2006) |
| 09/28/2006 | 45 | ORDER granting 44 Motion for Extension of Time to Answer. Deadline extended to 10/6/06 for deft Coxcom, Inc. to answer . Signed by Judge T. John Ward on 9/28/06. (ehs, ) (Entered: 09/28/2006) |
| 09/28/2006 | | Answer Due Deadline Updated for Coxcom, Inc., to 10/6/2006. (ehs, ) (Entered: 09/28/2006) |
| 10/06/2006 | 46 | ANSWER to Complaint *and*, COUNTERCLAIM against Rembrandt Technologies, LP by Coxcom, Inc.,.(Jones, Michael) (Entered: |

| | | 10/06/2006) |
|---|---|---|
| 10/16/2006 | 47 | NOTICE of Voluntary Dismissal by Rembrandt Technologies, LP (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 10/16/2006) |
| 10/18/2006 | 48 | CORPORATE DISCLOSURE STATEMENT filed by Charter Communications, Inc.,, Charter Communications Operating, LLC identifying Charter Communications, Inc. as Corporate Parent. (Jones, Michael) (Entered: 10/18/2006) |
| 10/24/2006 | 49 | CORPORATE DISCLOSURE STATEMENT filed by Coxcom, Inc., identifying Cox Communications, Inc., a wholly owned subsidiary of Cox Enterprises, Inc. as Corporate Parent. (Toliver, Leroy) (Entered: 10/24/2006) |
| 10/27/2006 | 50 | ANSWER to Counterclaim by Rembrandt Technologies, LP.(Baxter, Samuel) (Entered: 10/27/2006) |
| 10/30/2006 | 55 | APPLICATION to Appear Pro Hac Vice by Attorney Tonya R Deem for Cox Communications. (ch, ) (Entered: 01/09/2007) |
| 10/30/2006 | | Pro Hac Vice Filing fee paid by Deem; Fee: $25, receipt number: 1-1-3130 (ch, ) (Entered: 01/09/2007) |
| 11/13/2006 | 51 | ORDER - granting 47 Notice of Voluntary Dismissal. Dft Cablevision Systems Corporation and CSC Holdings, Inc. are dismissed without prejudice. Signed by Judge T. John Ward on 11/13/06. (ch, ) (Entered: 11/13/2006) |
| 12/14/2006 | 52 | MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(2) and Brief in Support* by Coxcom, Inc.,. (Attachments: # 1 Exhibit 1 - Order USA Video case# 2 Exhibit 2 - Spalding Declaration# 3 Exhibit 3 - Website# 4 Text of Proposed Order)(Jones, Michael) (Entered: 12/14/2006) |
| 12/21/2006 | 53 | Consent MOTION for Extension of Time to File Response/Reply *MOTION TO EXTEND TIME TO RESPOND TO MOTION TO DISMISS OF COXCOM, INC.* by Rembrandt Technologies, LP. (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 12/21/2006) |
| 12/29/2006 | 54 | ORDER granting 53 Consent MOTION for Extension of Time to File Response/Reply *MOTION TO EXTEND TIME TO RESPOND TO MOTION TO DISMISS OF COXCOM, INC.* Responses due by 1/10/2007. Signed by Judge T. John Ward on 12/29/06. (ch, ) (Entered: 12/29/2006) |
| 01/10/2007 | 56 | RESPONSE in Opposition re 52 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(2) and Brief in Support* filed by Rembrandt Technologies, LP. (Attachments: # 1 Affidavit of Jeffrey A. Carter# 2 Exhibit A# 3 Affidavit of Anthony Joseph Magee# 4 Exhibit A# 5 Exhibit B# 6 Exhibit C# 7 Exhibit D Part 1# 8 Exhibit D Part 2# 9 Exhibit E Part 1# 10 Exhibit E Part 2# 11 Exhibit F# 12 Exhibit G# 13 Exhibit H# 14 Exhibit I# 15 Exhibit J# 16 Exhibit K# 17 Exhibit L# 18 |

| | | |
|---|---|---|
| | | Exhibit M# 19 Exhibit N# 20 Exhibit O# 21 Exhibit P# 22 Exhibit Q# 23 Exhibit R# 24 Exhibit S# 25 Exhibit T# 26 Exhibit U Part 1# 27 Exhibit U Part 2# 28 Exhibit V)(Baxter, Samuel) (Entered: 01/10/2007) |
| 01/22/2007 | 57 | MOTION for Extension of Time to File Response/Reply as to 52 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(2) and Brief in Support* by Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 01/22/2007) |
| 01/23/2007 | 58 | ORDER granting 57 Motion for Extension of Time to File Reply in support of motion to dismiss. Responses due by 1/26/2007. Signed by Judge T. John Ward on 1/23/07. (ehs, ) (Entered: 01/23/2007) |
| 01/26/2007 | 59 | REPLY to Response to Motion re 52 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(2) and Brief in Support* filed by Coxcom, Inc.,. (Attachments: # 1 Supplemental Declaration of J. Spalding# 2 Exhibit 1# 3 Exhibit 2# 4 Exhibit 3# 5 Exhibit 4A-D)(Jones, Michael) (Entered: 01/26/2007) |
| 01/29/2007 | 60 | NOTICE of Attorney Appearance by Allen Franklin Gardner on behalf of Charter Communications, Inc.,, Charter Communications Operating, LLC (Gardner, Allen) (Entered: 01/29/2007) |
| 01/29/2007 | 61 | NOTICE of Attorney Appearance by Allen Franklin Gardner on behalf of Coxcom, Inc., (Gardner, Allen) (Entered: 01/29/2007) |
| 02/05/2007 | 62 | REPLY to Response to Motion re 52 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(2) and Brief in Support SURREPLY IN OPPOSITION TO COXCOM INC.'S MOTION TO DISMISS COMPLAINT FOR LACK OF PERSONAL JURISDICTION* filed by Rembrandt Technologies, LP. (Baxter, Samuel) (Entered: 02/05/2007) |
| 03/02/2007 | 63 | MOTION to Consolidate Cases by Charter Communications, Inc.,, Charter Communications Operating, LLC, Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order)(DeVasto, Diane) (Entered: 03/02/2007) |
| 03/08/2007 | 64 | NOTICE of Hearing: Scheduling Conference set for 4/3/2007 at 2:00 PM in Ctrm 106 (Marshall) before Judge T. John Ward. (shd, ) (Entered: 03/08/2007) |
| 03/09/2007 | 65 | NOTICE by Coxcom, Inc., *of Filing Motion for Transfer and Consolidation of Rembrandt Technologies, LP Patent Litigation Pursuant to 28 U.S.C. 1407* (Attachments: # 1 MDL Motion for Transfer and Consolidation# 2 Motion Ex. A# 3 Motion Ex. B# 4 MDL Memorandum# 5 MDL Exhibit List# 6 MDL Notice of Appearance# 7 MDL Corporate Disclosure# 8 MDL Certificate of Service)(Stockwell, Mitchell) (Entered: 03/09/2007) |
| 03/09/2007 | 66 | Additional Attachments to Main Document: 65 Notice (Other), Notice (Other).. (Attachments: # 1 MDL Ex. 1# 2 MDL Ex. 2# 3 MDL Ex. 3# 4 MDL Ex. 4# 5 MDL Ex. 5# 6 MDL Ex. 6# 7 MDL Ex. 7# 8 MDL Ex. 8# 9 MDL Ex. 9# 10 MDL Ex. 10# 11 MDL Ex. 11# 12 MDL Ex. 12# 13 MDL Ex. 13# 14 MDL Ex. 14# 15 MDL Ex. 15# 16 MDL Ex. 16# 17 |

|  |  |  |
|---|---|---|
|  |  | MDL Ex. 17# 18 MDL Ex. 18# 19 MDL Ex. 19# 20 MDL Ex. 20# 21 MDL Ex. 21# 22 MDL Ex. 22# 23 MDL Ex. 23# 24 MDL Ex. 24# 25 MDL Ex. 25# 26 MDL Ex. 26# 27 MDL Ex. 27# 28 MDL Ex. 28# 29 MDL Ex. 29# 30 MDL Ex. 30# 31 MDL EX. 31# 32 MDL Ex. 32# 33 MDL Ex. 33# 34 MDL Ex. 34# 35 MDL Ex. 35# 36 MDL Ex. 36# 37 MDL Ex. 37# 38 MDL Ex. 38# 39 MDL Ex. 39# 40 MDL Ex. 40# 41 MDL Ex. 41# 42 MDL Ex. 42# 43 MDL Ex. 43)(Stockwell, Mitchell) (Entered: 03/09/2007) |
| 03/14/2007 | 67 | NOTICE of Scheduling conference, proposed deadlines for docket control order and discovery. Scheduling Conference set for 4/3/07 at 2:00 pm, in Marshall, Tx (djh, ) (Entered: 03/14/2007) |
| 03/19/2007 | 68 | RESPONSE in Opposition re 63 MOTION to Consolidate Cases *filed by Rembrandt Technologies, LP*. (Baxter, Samuel) (Entered: 03/19/2007) |
| 03/26/2007 | 69 | Consent MOTION for Leave to File Excess Pages by Charter Communications, Inc.,, Charter Communications Operating, LLC, Coxcom, Inc.,. (Attachments: # 1 Text of Proposed Order # 2 Exhibit 1) (DeVasto, Diane) (Entered: 03/26/2007) |
| 03/29/2007 | 70 | NOTICE by Charter Communications, Inc.,, Charter Communications Operating, LLC, Coxcom, Inc., *of Developments in Related Cases* (Attachments: # 1 Order Staying Civil Actions)(Jones, Michael) (Entered: 03/29/2007) |
| 03/30/2007 | 71 | NOTICE by Rembrandt Technologies, LP *Joint Notice of Conference Regarding Proposed Discovery Order and Docket Control Order* (Attachments: # 1 Text of Proposed Order Proposed Discovery Order and Docket Control Order)(Carter, Jeffrey) (Entered: 03/30/2007) |
| 04/02/2007 | 72 | ORDER granting 69 Motion for Leave to File Excess Pages concerning deft's reply memorandum in support of motion to consolidate cases for pretrial proceedings. Signed by Judge T. John Ward on 4/2/07. (ehs, ) (Entered: 04/02/2007) |
| 04/02/2007 | 73 | REPLY to Response to Motion re 63 MOTION to Consolidate Cases *filed by Charter Communications, Inc.,, Charter Communications Operating, LLC, Coxcom, Inc.,*. (DeVasto, Diane) (Entered: 04/02/2007) |
| 04/03/2007 | 74 | ORDER referring case to Magistrate Judge Charles Everingham in accordance with the assignments made by General Order 07-03. The magistrate judge shall conduct pre-trial proceedings pursuant to 28 USC 636. Signed by Judge T. John Ward on 4/2/07. (ch, ) (Entered: 04/03/2007) |
| 04/05/2007 | 75 | NOTICE by Rembrandt Technologies, LP *NOTICE OF FILING OPPOSITION TO COXCOM'S MOTION FOR TRANSFER AND CONSOLIDATION OF REMBRANDT TECHNOLOGIES, LP PATENT LITIGATION* (Attachments: # 1 Reasons Why Oral Argument Should be Heard in Opposition to CoxCom's Motion for Transfer and Consolidation# 2 Response to CoxCom's Motion for Transfer and Consolidation# 3 Rembrandt's Brief in Opposition to CoxCom's Motion |

| | | |
|---|---|---|
| | | for Transfer and Consolidation# 4 Exhibit List# 5 Exhibit 1# 6 Exhibit 2# 7 Exhibit 3# 8 Exhibit 4# 9 Exhibit 5# 10 Exhibit 6# 11 Exhibit 7# 12 Exhibit 8# 13 Exhibit 9# 14 Exhibit 10# 15 Exhibit 11# 16 Exhibit 12# 17 Exhibit 13# 18 Proof of Service)(Baxter, Samuel) (Entered: 04/05/2007) |
| 04/12/2007 | 76 | RESPONSE to 65 Notice (Other), Notice (Other) *Response to the Motion to Consolidate Cases* by Comcast Cable Communications, LLC, Comcast Corporation, Comcast of Plano, LP. (Doan, Jennifer) Amended Certificate of Service added on 4/13/2007 (mpv, ). Modified on 4/13/2007 (mpv, ). (Entered: 04/12/2007) |
| 04/12/2007 | 77 | SUR-REPLY to Reply to Response to Motion re 63 MOTION to Consolidate Cases *filed by Rembrandt Technologies, LP*. (Baxter, Samuel) (Entered: 04/12/2007) |
| 04/18/2007 | 78 | NOTICE by Charter Communications, Inc.,, Charter Communications Operating, LLC, Coxcom, Inc., *Notice of Development* (Attachments: # 1 Notice of Hearing)(Gardner, Allen) (Entered: 04/18/2007) |
| 04/19/2007 | 79 | ORDER REGARDING THE PROTECTIVE ORDER AND DOCUMENT PRODUCTION. Signed by Judge Charles Everingham on 4/18/07. (ch, ) (Entered: 04/19/2007) |
| 04/19/2007 | 80 | DOCKET CONTROL ORDER Respond to Amendeding Pleadings 11/30/07. Amended Pleadings due by 11/16/2007. Discovery due by 5/14/2008. Joinder of Parties due by 5/3/2007.Claims Construction Hearing set for 2/13/2008 - 2/14/08 9:00 AM before Judge T. John Ward. Motions in limine due by 7/21/2008. Proposed Pretrial Order due by 7/21/2008. Jury Selection set for 8/4/2008 9:00AM before Judge T. John Ward. Pretrial Conference set for 7/24/2008 9:30 AM before Judge T. John Ward. Privilege Logs to be exchanged by parties 6/4/07. All other deadlines are set forth herein. Signed by Judge Charles Everingham on 4/19/07. (ch, ) (Entered: 04/19/2007) |
| 04/24/2007 | 81 | NOTICE by Rembrandt Technologies, LP *NOTICE REGARDING THE PROTECTIVE ORDER* (Attachments: # 1 Attachment A)(Baxter, Samuel) CORRECTED PROPOSED ORDER added on 4/25/2007 (mpv, ). Modified on 4/25/2007 (mpv, ). (Entered: 04/24/2007) |
| 04/24/2007 | 82 | NOTICE by Rembrandt Technologies, LP *NOTICE REGARDING ELECTRONIC PRODUCTION* (Baxter, Samuel) (Entered: 04/24/2007) |
| 04/25/2007 | | NOTICE re 81 Notice (Other) CORRECTED PROPOSED PROTECTIVE ORDER NOW ATTACHED. (mpv, ) (Entered: 04/25/2007) |
| 04/30/2007 | 83 | Minute Entry for proceedings held before Judge Charles Everingham : Scheduling Conference held on 4/30/2007. (Court Reporter Debbie Latham.)(delat, ) (Entered: 04/30/2007) |
| 05/03/2007 | | TRANSCRIPT of Proceedings held on 4/3/07 before Judge Chad Everingham. Court Reporter: Transcriber/Susan Simmons. (lss) (Entered: |

| | | 05/03/2007) |
|---|---|---|
| 05/03/2007 | 85 | NOTICE by Rembrandt Technologies, LP *PLAINTIFF REMBRANDT TECHNOLOGIES, LP'S NOTICE OF COMPLIANCE WITH PATENT RULES 3-1 AND 3-2* (Baxter, Samuel) (Entered: 05/03/2007) |
| 05/03/2007 | 86 | NOTICE by Charter Communications, Inc.,, Charter Communications Operating, LLC *of Disclosures* (Gardner, Allen) (Entered: 05/03/2007) |
| 05/04/2007 | 87 | NOTICE of Disclosure by Coxcom, Inc.,, Coxcom, Inc.,, Coxcom, Inc.,, *Notice of Service of Initial Disclosures* (Stockwell, Mitchell) (Entered: 05/04/2007) |
| 05/04/2007 | 88 | NOTICE of Disclosure by Rembrandt Technologies, LP (Baxter, Samuel) (Entered: 05/04/2007) |
| 05/04/2007 | 89 | PROTECTIVE ORDER. Signed by Judge Charles Everingham on 5/4/07. (ehs, ) (Entered: 05/04/2007) |
| 05/18/2007 | 90 | NOTICE of Disclosure by Rembrandt Technologies, LP (Baxter, Samuel) (Entered: 05/18/2007) |
| 06/04/2007 | 91 | Joint MOTION to Amend/Correct *the Docket Control Order to Move the Date for Exchanging Privilege Logs* by Rembrandt Technologies, LP. (Attachments: # 1 Text of Proposed Order)(Carter, Jeffrey) (Entered: 06/04/2007) |
| 06/06/2007 | 92 | ORDER granting 91 Motion to Amend/Correct. Docket Control Order is amended to move the date for parties to exchange privilege logs to 7/10/07. Signed by Judge Charles Everingham on 6/5/07. (ch, ) (Entered: 06/06/2007) |
| 06/08/2007 | 93 | NOTICE of Attorney Appearance by Thomas Guy Fasone, III on behalf of Rembrandt Technologies, LP (Fasone, Thomas) (Entered: 06/08/2007) |
| 06/12/2007 | 94 | NOTICE of Disclosure by Rembrandt Technologies, LP (Baxter, Samuel) (Entered: 06/12/2007) |
| 06/14/2007 | 95 | NOTICE of Disclosure by Charter Communications, Inc.,, Charter Communications Operating, LLC *P.R. 3-3 and P.R. 3-4* (Gardner, Allen) (Entered: 06/14/2007) |
| 06/14/2007 | 96 | NOTICE of Disclosure by Coxcom, Inc., *P.R. 3-3 and P.R. 3-4* (Gardner, Allen) (Entered: 06/14/2007) |
| 06/21/2007 | 97 | NOTICE by All Defendants *of Multi-District Litigation Developments Pursuant to Local Rule CV-42* (Attachments: # 1 Exhibit A)(Gardner, Allen) (Entered: 06/21/2007) |
| 06/27/2007 | 98 | Interdistrict transfer to the District of Delaware, Wilmington, De. Purusant to letter Elizabeth Dinan was notified. Certified copy of Docket Sheet, Complaint, Transfer Order and Letter were mailed to the Federal Blding, Lockbox 18, 844 N. King Street Wilmington, DE(ch, ) Additional attachment(s) added on 6/28/2007 (ch, ). Modified on 6/28/2007 (ch, ). (Entered: 06/27/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/02/2007 13:26:08 | | | |
| **PACER Login:** | ud0037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:06-cv-00223-TJW-CE |
| **Billable Pages:** | 10 | **Cost:** | 0.80 |


COMMUNICATIONS


N❍RTEL

## WHITEPAPER: Circuit Switch to VoIP Evolution Plan

# INTRODUCTION

**COX TELEPHONY MARKETS\***



Cox Digital Telephone service is available to more than 6.5 million homes in Orange County and San Diego, Calif.; Phoenix and Tucson, Ariz.; Omaha, Neb.; Meriden, Conn.; Rhode Island statewide; New Orleans, Baton Rouge and Lafayette, La.; Oklahoma City and Tulsa, Okla; Wichita, Kansas; West Texas; and Hampton Roads, Roanoke and Northern Virginia. Cox will launch the service in additional markets in 2005.

\* As of February 2005. West Texas includes 5 geographically dispersed locations, including: Lubbock, Amarillo, Midland, Abilene and San Angelo.

Cox Communications has grown from a single-service cable television company into a multi-service broadband communications provider. Via its flexible and powerful broadband delivery network, Cox provides a number of communications and entertainment services, including but not limited to digital cable television, high-definition television, entertainment on demand, high-speed Internet and telephone service in most of its residential and commercial markets. Cox uses the power of its broadband platform to create multiple revenue streams, but also to create long-term customer relationships by offering bundled services to customers. Cox has had impressive penetration growth in these new services.

Cox's telephone business, in particular, has distinguished the company from its peers. In the mid 1990s, Cox began installing telecom equipment in select markets, preparing to capitalize on new business opportunities made available per the Telecommunications Act of 1996. Cox first launched local phone service in 1997 in Orange County, California. Today, Cox Digital Telephone has more than 1.2 million residential customers and more than 100,000 business location customers across 17 telephone markets. For two consecutive years, Cox received the highest honor in J.D. Power and Associates' Residential Local Telephone Customer Satisfaction Study℠ in the Western Region (2003 and 2004). In a separate study, Cox's bundled customers nationwide ranked Cox highest for customer satisfaction in J.D. Power and Associates' 2004 Residential Long Distance Telephone Service℠ study.

In Cox's whitepaper, "VoIP: Ready for Prime Time" (May 2004), the company outlined its telephone strategy and how Voice over Internet Protocol (VoIP) technology complements circuit-switch technology by enabling it to introduce phone services to new telephone markets without stranding the circuit-switch investments. It further stated "The company will not abandon its circuit-switched business. Cox will completely utilize the capacity of existing switches."





Further, Cox believes that VoIP provides an economically efficient method to support the exponential growth it is experiencing in its mature circuit-switch markets. This whitepaper will provide an update on Cox's successful strategy to leverage its installed based of circuit switches and migrate the growth in legacy telephone markets to a complementary VoIP overlay.

## SITUATION

Fundamental to Cox's operational strategy for telephone service is its commitment to leverage the flexibility it has built into its network to remain a customer-driven, efficient and successful provider in the telecommunications marketplace. In doing so, Cox first embraced VoIP technology to deliver long distance traffic over its own IP backbone network. While originally built for high-speed Internet access, today Cox's national long distance VoIP solution is based on a converged packet core that successfully transports a growing number of its long distance customer calls via its national backbone, effectively reducing reliance on third-party wholesale providers.

As a successful telecom provider with impressive customer growth in 17 telephone markets (circuit switch and VoIP), Cox's telephony infrastructure today includes:

- **Circuit Switches.** Two dozen circuit switches provide primary line residential and commercial services in Orange County and San Diego, California;  Phoenix and Tucson, Arizona; Omaha, Nebraska; Metro Hartford, Connecticut; Rhode Island statewide; Hampton Roads and Fairfax County, Virginia; New Orleans, Louisiana; Oklahoma City; and Wichita, Kansas.
- **Softswitches.** A softswitch provides primary line services via VoIP technology to residential and commercial customers in Roanoke, Virginia; Tulsa, Oklahoma; Baton Rouge, Louisiana; five cities in West Texas; and Lafayette/Southwest Louisiana.
- **Long Distance.** A VoIP long distance solution riding over Cox's national IP backbone connects all the circuit switch and VoIP markets together.

 

## THE CHALLENGE

With five VoIP technology markets already commercially deployed and continuous growth in mature circuit-switch markets, Cox sought a solution that would enable it to move a high volume of new line growth over to VoIP in a rapid timeframe, allowing it to reap the benefits of lower capex while ensuring future growth.

Extensive modeling showed that evolving the existing circuit switches referenced above to simultaneously provide both Time Division Multiplexed (TDM) and VoIP support was more cost effective than overlaying new softswitches in TDM markets. The model also suggests that Cox would not have to reproduce interconnection and E911 facilities, rate center connections and back-office infrastructure. In some cases, SS7 links, associated infrastructure and connectivity to as many as 35 different rate centers would have needed to be duplicated.

## THE SOLUTION

In choosing to evolve the majority of its circuit switches to hybrid TDM/VoIP switches, Cox has opted to keep its TDM lines in place until migration is fully warranted. In doing so, Cox will add new lines on the VoIP side of the same processor. As a result, Cox can achieve the best time-to-market, leverage its existing processors and immediately realize the new economies of VoIP. Further, by upgrading at least 10 Nortel Digital Multiplex Systems (DMSs) to Nortel Communication Server (CS) 2000 hybrids, Cox expects to bring more than 50 percent of its new growth lines to VoIP by the end of 2005. Such growth will meet the increasing demand in the current Cox markets.

Nortel will provide Cox with a PacketCable™ compliant solution, including the CS 2000 platform integrated with Nuera Communications BTX media gateways. Nortel's cable VoIP solution will enable Cox to offer the same high-quality, full-featured telephony services that residential and business customers have come to expect from Cox. In addition, Cox will utilize the enhanced infrastructure to offer VoIP services to business customers over its metropolitan fiber assets by using integrated access devices to reach PBX connections. This deployment also positions Cox to add rich multimedia services in the future, further enhancing the communication capabilities for its customers.

 

Cox expects to realize significant cost savings as a result of this network migration. The PacketCable qualified VoIP solution will allow Cox to take full advantage of its existing network architecture and continue growing its network with VoIP while transitioning to a packet-based architecture throughout its network. The demonstrated capacity of the solution and strong scalability mean that, in the long term, Cox will be able to continue to grow the number of lines beyond even the largest circuit switch.

### Circuit Switch to VoIP Evolution Plan



There are six steps which Cox and Nortel are following to implement this strategy.

1. Upgrade circuit switches to the required hardware baseline to support VoIP.
2. Upgrade core software to a VoIP-enabled load in an overnight process.
3. Add VoIP hardware components: media gateway controller blades and media gateways.
4. Establish connectivity to the VoIP-ready IP "bearer" packet network.
5. Reconfigure operating system applications to support VoIP, including provisioning and connectivity to network operations center for alarms.
6. Complete pre-In-service testing.





With meticulous preparation, the actual upgrade is transparent to subscribers. Further, it has no impact on the feature-rich solution and does not impose network affecting changes to external carriers, billing or routing. In addition, Cox's experience with the hybrid CS 2000 solution dates back to 2003, when a new switch was deployed for TDM line growth and a VoIP long distance solution.

The distributed architecture of voice over packet networks enables separation of the call control and signaling from the actual call switching fabric and bearer path to improve scalability and allow carriers to distribute parts of the network for efficiency and greater geographic reach. With a distributed architecture, Cox can locate media gateways and media terminal adapters (MTAs) remotely from call control and signaling resources. The combination of increased call server scale, greater geographic reach and distributed gateways enables Cox to enter markets at low initial line sizes, since existing softswitches can be shared across a larger number of sites.

## CONCLUSION

In the near term, Cox has chosen to cap its Class 5 TDM investment and grow using packet technology, with 10 circuit switch to VoIP hybrid migrations already in progress. Some new telephony markets are planned to be served by the VoIP hybrid solution leveraging the geographic reach of the architecture.

For the long term, Cox will continue to evaluate the merits of a full conversion from circuit to packet to attain the basic operational savings attributable to packet technology, including reduced real estate, power, transport, line operations costs and operational savings from a simplified and/or flattened network.

Nortel and the Nortel logo are trademarks of Nortel Networks, Nuera is the registered trademark of Nuera Communications Inc.
PacketCable is the trademark of Cable Television Laboratories, Inc.

 





Copyright 1998-2004 Cox Communications, Inc.
Visitor agreement | Policies | EEO public file reports

**Cox.net** | **Careers** | **Diversity** | **Search cox.com** | **Contact us**

Back

ADVISORY/Cox Communications Issues a Whitepaper: Circuit Switch to Voice over Internet Protocol (VoIP) Evolution Plan

**ISSUE:** Cox believes that VoIP provides an economically efficient method to support the exponential growth it is experiencing in its mature circuit-switch markets. How will the company move a high volume of new line growth over to VoIP?

**NEWS:** Today, Tuesday, March 1, Cox Communications Inc. and Nortel announced the availability of a whitepaper outlining their solution for evolving circuit switches to hybrid Time Division Multiplexed (TDM)/VoIP switches.

**PERSPECTIVE:** In choosing to evolve the majority of its circuit switches to hybrid TDM/VoIP switches, Cox has opted to keep its TDM lines in place until migration is fully warranted. In doing so, Cox can achieve the best time-to-market, leverage its existing processors and immediately realize the new economies of VoIP. Nortel's cable VoIP solution will enable Cox to offer the same high-quality, full-featured telephony services that residential and business customers have come to expect from Cox.

**WHO:** Albert Young, Cox's director of network switching engineering, Jay Rolls, Cox's vice president of telephone and data engineering and Jim Dondero, Nortel's vice president of carrier packet networks – global solutions marketing, will be available today for interviews.

**WHERE:** The whitepaper is available online at http://www.cox.com/about/newsroom/reports.asp

**CONTACT:** Cox Communications, Bobby Amirshahi, 404-843-7872, Bobby.Amirshahi@Cox.com or Nortel, Christie Blake, 978-288-8439, christbl@nortel.com

**About Cox Communications (www.cox.com)**
Cox Communications Inc. is a multi-service broadband communications company with approximately 6.6 million total customers, including approximately 6.3 million basic cable subscribers. The nation's third-largest cable television provider, Cox offers analog cable television under the Cox Cable brand as well as digital video service under the Cox Digital Cable brand. Cox provides an array of other communications and entertainment services including local and long-distance telephone under the Cox Digital Telephone brand, high-speed Internet service under the Cox High Speed Internet brand, video on demand programming under the Entertainment on Demand brand, digital video recorders, high-definition television and home networking. Commercial voice and data services are offered via Cox Business Services. Local cable advertising, promotional opportunities and production services are sold under the Cox Media brand. Cox is an investor in programming services including Discovery Communications Inc. Cox Communications is a wholly-owned subsidiary of Cox Enterprises Inc.

# EXHIBIT B

to

**USA VIDEO TECHNOLOGY CORPORATION'S (1) SUPPLEMENTAL
OPPOSITION TO COX COMMUNICATION, INC.'S MOTION TO DISMISS
AND (2) REPLY IN SUPPORT OF ITS MOTION TO AMEND**

John Spalding

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

fcCOPY

USA VIDEO TECHNOLOGY          )
CORPORATION,                  )
                              )
        Plaintiff,            )
                              ) CASE
        vs.                   ) NO. 2:06-CV-00239-RHC
                              )
TIME WARNER, INC., COX        )
COMMUNICATIONS, INC.;         )
CHARTER COMMUNICATIONS,       )
INC.; COMCAST CABLE           )
COMMUNICATIONS, LLC;          )
COMCAST OF RICHARDSON,        )
LP; COMCAST OF PLANO, LP;     )
AND COMCAST OF DALLAS, LP,    )
                              )
        Defendants.          )
_____/


DEPOSITION OF
JOHN SPALDING, ESQ.

October 5, 2006
9:00 a.m.

Kilpatrick Stockton
1100 Peachtree Street
Suite 2800
Atlanta, Georgia


Reported By:
Mary K. Caldwell, CSR
Georgia #B-1325
Esquire Deposition Services
Atlanta Office Job #422391
Phone - 404.872.7890

Page 18

1    How do you — how do you justify those two
2    statements?
3    A   Cox Communications, Inc., did not own any
4    or operate any assets in Texas. All the assets and
5    all the franchises were held, at the time of the
6    sale, by another entity.
7    Q   However, revenues from those franchises
8    did flow eventually to Cox Communications, Inc.?
9    A   Revenues from the customers went to Cox
10   Southwest Holdings, L.P.
11   Q   And did any revenue from that company go
12   to Cox Communications, Inc.?
13   A   As the parent of Cox Southwest Holdings --
14   I don't know. I know that revenue went to
15   Cox Southwest Holdings. Beyond that, I'm not sure
16   I'm able to answer your question.
17   Q   Who would know that information within Cox
18   Communications, Inc.?
19   A   Our vice-president of accounting.
20   Q   Did you have any discussions with him in
21   preparation for this deposition?
22   A   Yes.
23   Q   And what is his name? And could you spell
24   it, too, just --
25   A   Bill Fitzsimmons, F-I-T-Z-S-I-M-M-O-N-S

Page 19

1    (spelling).
2    Q   Do you know if Cox maintains any control
3    over Cox Southwest Holdings?
4    A   Cox Southwest Holdings is owned by -- is
5    a -- is a subsidiary of Cox Communications, Inc.
6    Q   Does Cox Southwest Holdings still exist?
7    A   Yes.
8    Q   Was it sold?
9    A   No.
10   Q   But it's still owned by Cox
11   Communications, Inc.?
12   A   Yes.
13   Q   What is the role of Cox Southwest Holdings
14   within Cox Communications, Inc., now that the Texas
15   affiliates have sold their assets in Texas?
16   A   It holds, and will hold, the Henderson
17   franchise until the franchise expires.
18   Q   And do you know specifically when in 2007
19   it will expire?
20   A   March 2007. I don't know the exact day
21   within March.
22       MS. LIPSKI: Would you mark this as
23   Exhibit 2, please?
24       (Thereupon, marked for identification
25   purposes, Plaintiff's Exhibit No. 2.)

Page 20

1    BY MS. LIPSKI:
2    Q   Have you seen this document before?
3    A   (Witness reviews document).
4        I saw the final draft of this document,
5    but I actually have not seen the signed of it.
6    Q   Were you involved in drafting this
7    document?
8    A   Yes.
9    Q   Are you familiar with the contents of this
10   document?
11   A   Yes.
12   Q   This document states that there is an
13   error in your declaration.
14       How was this error discovered?
15   A   In preparing for this deposition, it was
16   discovered.
17   Q   And was it discovered by you?
18   A   It was.
19   Q   And was this discovery based on personal
20   knowledge or documents?
21   A   It was based on personal knowledge.
22   Q   Was it -- was it based on your personal
23   knowledge or was it based on discussions you had
24   with people within your company?
25   A   When I was preparing for the deposition, I

Page 21

1    reviewed the statement. Something popped in my mind
2    that I thought I should look into, and I looked into
3    it.
4    Q   How did your preparation for the
5    deposition differ from your preparation for the
6    declaration, writing the information for the
7    declaration?
8    A   It really wasn't very different. I used
9    my personal knowledge, I reviewed my personal
10   knowledge, and I consulted people in the company who
11   also had knowledge regarding the matter.
12   Q   What exactly triggered your recognition
13   that there was an error -- or your recognition that
14   you should investigate further?
15   A   Just something jogged my memory.
16   Q   What further investigation came about
17   because of this jog in your memory?
18   A   I had discussions with engineers within
19   the company that I had not had prior to the
20   declaration.
21   Q   And what did those engineers tell you?
22   A   They told me that, as part of the national
23   IP backbone, that there was a node in Dallas -- that
24   there was a node as part -- the backbone had a node
25   in Dallas, Texas.

Page 22

1  Q  What do you mean by node?
2  A  A place where telecommunications -- a
3  place where our backbone interconnected with --
4  really a junction with our -- within our backbone.
5  Q  And that begs the question: What do you
6  mean by backbone?
7  A  A network of circuits and equipment to
8  carry the Internet protocol traffic for Cox.
9  Q  What is Internet protocol traffic?
10  A  It's really digitized packets that are
11  transported and are interpreted through a -- an
12  Internet protocol, standard Internet protocol.
13  Q  Is this part of providing cable services?
14  A  No.
15  Q  What is a point of presence, as referenced
16  in this letter, Exhibit 2?
17  A  It's a location.
18  Q  A location of what?
19  A  It's a location where we have servers and
20  routing equipment.
21  Q  And are these servers and routing
22  equipment contained in a building? I would assume
23  so.
24  A  They are in a building.
25  Q  Is the building owned by Cox

Page 23

1  Communications, Inc.?
2  A  It is not.
3  Q  And this building is in Dallas, Texas?
4  A  Yes.
5  Q  Is this building rented?
6  A  No.
7  Q  Who owns the building?
8  A  I believe it's owned by a company named
9  Equinix.
10  Q  Why were these assets not sold when the
11  other Texas assets were sold?
12  A  Because this point of presence supported
13  the national backbone, regardless of whether we had
14  cable systems in Texas or not.
15  Q  What is the relationship between Cox
16  Communications, Inc., and Equinix, I believe, the
17  company that owns the building?
18  A  There is no relationship.
19  Q  But you're not renting the building from
20  Equinix to store your servers and other equipment
21  in?
22  A  Space is leased within the building. The
23  building itself is not rented.
24  Q  Okay. What portion of CoxCom's national
25  network traffic is routed through Dallas, Texas?

Page 24

1  A  I don't know.
2  Q  Do any employees of Cox work in the space
3  rented in Dallas, Texas, or is it simply for storing
4  equipment?
5  A  Prime -- it is -- it is for storing
6  equipment, and we have no employees residing in that
7  area.
8  Q  Do you have any employees residing in
9  Texas?
10  A  No.
11  Q  Do any employees service the equipment in
12  Dallas?
13  A  Occasionally, employees will service the
14  equipment.
15  Q  And where would those employees typically
16  live?
17  A  Atlanta.
18  Q  And what exactly --
19  What would be the job title of these
20  employees? What exactly would they do?
21  A  They would be engineers.
22  Q  You mentioned earlier that you didn't know
23  what portion of CoxCom's national network traffic
24  was routed through Dallas.
25  Who within Cox would know that informa-

Page 25

1  tion?
2  MR. STOCKWELL: Can you -- can you pause
3  for just a minute, please.
4  MS. LIPSKI: Sure.
5  (Whereupon, Mr. Stockwell views
6  court reporter's computer
7  screen.)
8  MS. LIPSKI: Could you read back the last
9  question?
10  (Thereupon, the designated
11  portion was read back by the
12  court reporter.)
13  MS. LIPSKI: Could you read back the two
14  prior questions?
15  (Thereupon, the designated
16  portion was read back by the
17  court reporter.)
18  BY MS. LIPSKI:
19  Q  You mentioned that you didn't know what
20  portion of CoxCom's national network traffic was
21  routed through Dallas.
22  Who within Cox would know that informa-
23  tion?
24  A  I think Larry Dexter, director of
25  transport.

John Spalding                                                                October 5, 2006

Page 50

```
 1      further question by way of clarification. This
 2      is Jody Goldstein.
 3                  RECROSS-EXAMINATION
 4      BY MS. GOLDSTEIN:
 5      Q   You said CoxCom, Inc., had filed tax
 6      returns in Texas previously.
 7           Had Cox Communications, Inc., ever filed
 8      tax returns in Texas?
 9      A   No.
10           MS. GOLDSTEIN: Thanks.
11      (Deposition concluded at approximately 10:50 a.m.)
12               - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 52

```
 1      Reason for change:_____
 2      Page_____Line_____should read:_____
 3      Reason for change:_____
 4      Page_____Line_____should read:_____
 5      Reason for change:_____
 6      Page_____Line_____should read:_____
 7      Reason for change:_____
 8      Page_____Line_____should read:_____
 9      Reason for change:_____
10      Page_____Line_____should read:_____
11      Reason for change:_____
12      Page_____Line_____should read:_____
13      Reason for change:_____
14      Page_____Line_____should read:_____
15      Reason for change:_____
16      Page_____Line_____should read:_____
17      Reason for change:_____
18
19
20                  _____
                         Signature
21
22      _____, Notary Public.
23      This, the _____ day of _____, 200____.
24      My Commission Expires:_____
25      FILE NO.:422391          MKC
```

Page 51

```
 1          ERRATA SHEET
 2          Pursuant to Rule 30(7)(e) of the Federal
 3      Rules of Civil Procedure and/or Georgia Code
 4      Annotated 81A-130(B)(6)(e), any changes in form or
 5      substance which you desire to make to your
 6      deposition testimony shall be entered upon the
 7      deposition with a statement of the reasons given for
 8      making them.
 9          To assist you in making any such
10      corrections, please use the form below. If
11      supplemental or additional pages are necessary,
12      please furnish same and attach them to this Errata
13      Sheet.
14              * * *
15          I, the undersigned, John Spalding, do
16      hereby certify that I have read the foregoing
17      deposition and that, to the best of my knowledge,
18      said deposition is true and accurate (with the
19      exception of the following corrections listed
20      below).
21      Page_____Line_____should read:_____
22      Reason for change:_____
23      Page_____Line_____should read:_____
24      Reason for change:_____
25      Page_____Line_____should read:_____
```

Page 53

```
 1           CERTIFICATE
 2
 3      STATE OF GEORGIA:
 4      NEWTON COUNTY:
 5
 6          I, Mary K. Caldwell, a Certified Shorthand
        Reporter in and for the State of Georgia, do hereby
 7      certify:
 8          That prior to being examined, the witness
        named in the foregoing deposition was by me duly
 9      sworn to testify to the truth, the whole truth, and
        nothing but the truth.
10
            That said deposition was taken before me
11      at the time and place set forth and was taken down
        by me in shorthand and thereafter reduced to
12      computerized transcription under my direction and
        supervision, and I hereby certify the foregoing
13      deposition is a full, true and correct transcript of
        my shorthand notes as taken.
14
            I further certify that I am not of kin or
15      counsel to the parties in the case, and I am not in
        the regular employ of counsel for any of the said
16      parties, nor am I in any way financially interested
        in the result of said case.
17
            IN WITNESS WHEREOF, I have hereunto
18      subscribed my name this 9th day of October, 2006.
19
20
21
22
23      _____
        MARY K. CALDWELL, CSR #B-1325
24
25
```

John Spalding                                                                October 5, 2006

Page 54

```
 1            DISCLOSURE
 2   STATE OF GEORGIA  )   DEPOSITION OF:
 3   COUNTY OF NEWTON  )   JOHN SPALDING, ESQ.
 4       Pursuant to Article 8.B of the Rules and
     Regulations of the Board of Court Reporting of the
 5   Judicial Council of Georgia, I make the following
     disclosure:
 6
         I am a Georgia Certified Court Reporter.
 7   I am here as a representative of Esquire Deposition
     Services.
 8
         Esquire Deposition Services was contacted
 9   by the offices of Goldstein, Faucett & Prebeg to
     provide court-reporting services for this
10   deposition. Esquire Deposition Services will not be
     taking this deposition under any contract that is
11   prohibited by O.C.G.A. 15-14-37 (a) and (b).
12       Esquire Deposition Services has no
     contract or agreement to provide court-reporting
13   services with any party to the case, any counsel in
     the case or any reporter or reporting agency from
14   whom a referral might have been made to cover this
     deposition.
15
         Esquire Deposition Services will charge
16   its usual and customary rates to all parties in the
     case, and a financial discount will not be given to
17   any party in this litigation.
18       This, the 9th day of October, 2006.
19
20
21
22
23
     _____
     Mary K. Caldwell
24   Certified Shorthand Reporter, #B-1325
25
```

713.524.4600                        Esquire Deposition Services              713.524.4651
3401 Louisiana Suite 300                 Houston T.X. 77002                  1.800.767.9532

15  (Page 54)

John Spalding

Page 54

1        DISCLOSURE
2   STATE OF GEORGIA   )   DEPOSITION OF:
3   COUNTY OF NEWTON   )   JOHN SPALDING, ESQ.
4        Pursuant to Article 8.B of the Rules and
    Regulations of the Board of Court Reporting of the
5   Judicial Council of Georgia, I make the following
    disclosure:
6
         I am a Georgia Certified Court Reporter.
7   I am here as a representative of Esquire Deposition
    Services.
8
         Esquire Deposition Services was contacted
9   by the offices of Goldstein, Faucett & Prebeg to
    provide court-reporting services for this
10  deposition. Esquire Deposition Services will not be
    taking this deposition under any contract that is
11  prohibited by O.C.G.A. 15-14-37 (a) and (b).
12       Esquire Deposition Services has no
    contract or agreement to provide court-reporting
13  services with any party to the case, any counsel in
    the case or any reporter or reporting agency from
14  whom a referral might have been made to cover this
    deposition.
15
         Esquire Deposition Services will charge
16  its usual and customary rates to all parties in the
    case, and a financial discount will not be given to
17  any party in this litigation.
18       This, the 9th day of October, 2006.
19
20
21
22
23
    _____
    Mary K. Caldwell
24  Certified Shorthand Reporter, #B-1325
25

# Exhibit 1

to

**COX COMMUNICATIONS, INC.'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL
OPPOSITION AND SURREPLY IN SUPPORT OF ITS MOTION TO DISMISS**

John Spalding

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TEXAS
                MARSHALL DIVISION


USA VIDEO TECHNOLOGY          )
CORPORATION,                  )
                              )
     Plaintiff,               )
                              ) CASE
     vs.                      ) NO. 2:06-CV-00239-RHC
                              )
TIME WARNER, INC., COX        )
COMMUNICATIONS, INC.;         )
CHARTER COMMUNICATIONS,       )
INC.; COMCAST CABLE           )
COMMUNICATIONS, LLC;          )
COMCAST OF RICHARDSON,        )
LP; COMCAST OF PLANO, LP;     )
AND COMCAST OF DALLAS, LP,    )
                              )
     Defendants.              )
_____/


              DEPOSITION OF
            JOHN SPALDING, ESQ.


              October 5, 2006
                9:00 a.m.


            Kilpatrick Stockton
          1100 Peachtree Street
                Suite 2800
             Atlanta, Georgia




Reported By:
Mary K. Caldwell, CSR
Georgia #B-1325
Esquire Deposition Services
Atlanta Office Job #422391
Phone - 404.872.7890
```

John Spalding                                                    October 5, 2006

| Page 46 | Page 48 |
|---|---|
| 1    (Thereupon, marked for identification | 1    MS. LIPSKI: I don't have any further |
| 2  purposes, Plaintiff's Exhibit No. 13.) | 2  questions. |
| 3  BY MS. LIPSKI: | 3    MS. GOLDSTEIN: Thank you for your time. |
| 4    Q  Referring now to Exhibit 13, what | 4  We appreciate it. |
| 5  relationship, if any, would this company have with | 5    MR. STOCKWELL: I have a -- I have a few I |
| 6  any Cox company? | 6  want to put on the record. |
| 7    A  No relationship, because this entity does | 7    MS. GOLDSTEIN: Okay. |
| 8  not exist any longer. | 8    DIRECT EXAMINATION |
| 9    (Thereupon, marked for identification | 9  BY MR. STOCKWELL: |
| 10  purposes, Plaintiff's Exhibit No. 14.) | 10    Q  Mr. Spalding, this is Mitch Stockwell. |
| 11  BY MS. LIPSKI: | 11  Just a couple of points of clarification. |
| 12    Q  Referring to Exhibit 14, what relation- | 12    First, who owns and operates the Internet |
| 13  ship, if any, does exist or did exist with this | 13  backbone that you were talking about earlier today? |
| 14  company between itself and Cox? | 14    A  CoxCom, Inc. |
| 15    A  No relationship exists because this entity | 15    Q  Next, I want to talk a little bit about |
| 16  no longer exists. | 16  some of the details of corporate formalities. Hang |
| 17    (Thereupon, marked for identification | 17  on. Let me get to my list of questions here. |
| 18  purposes, Plaintiff's Exhibit No. 15.) | 18    What sort of corporate formalities are |
| 19  BY MS. LIPSKI: | 19  maintained vis-a-vis CoxCom, Inc., versus Cox |
| 20    Q  Referring to Exhibit 15, is there any | 20  Communications, Inc.? |
| 21  relationship between this entity and Cox? | 21    A  They each have their separate boards, |
| 22    A  No. This entity no longer exists. | 22  separate officers, separate board meetings, separate |
| 23    (Thereupon, marked for identification | 23  resolutions. |
| 24  purposes, Plaintiff's Exhibit No. 16.) | 24    Q  What about the books and records of the |
| 25  BY MS. LIPSKI: | 25  two companies? How are those kept? |

| Page 47 | Page 49 |
|---|---|
| 1    Q  Referring now to Exhibit 16, what, if any, | 1    A  Separate corporate books and records. |
| 2  relationship exists between this company and Cox? | 2    Q  Are there any common business departments |
| 3    A  (Witness reviews document). | 3  between CoxCom, Inc., and Cox Communications, Inc.? |
| 4    This entity was either sold in the May | 4    A  No. CoxCom, Inc., is out in the field |
| 5  transaction or the assets held by this entity were | 5  operating the businesses, and their business |
| 6  sold in the May transaction. | 6  departments are out in the field. And Cox |
| 7    Q  And what are you basing that on? | 7  Communications, Inc.'s, business departments are in |
| 8    A  The fact that all Texas operating assets | 8  Atlanta. |
| 9  were sold in the May transaction. | 9    Q  What Texas tax returns have been filed by |
| 10    Q  With the exception of Henderson, the | 10  Cox Communications, Inc.? |
| 11  Henderson franchise? | 11    A  None. |
| 12    A  With the exception of Henderson. | 12    Q  Does CoxCom, Inc., file tax returns |
| 13    Q  And when you refer to operating assets, | 13  separately from Cox Communications, Inc.? |
| 14  you're not referring to the Dallas hub? | 14    A  In many states, yes. |
| 15    A  I am not referring to the Dallas hub. | 15    Q  What about in Texas? |
| 16    Q  How would you define operating assets? | 16    A  When it was still operating in Texas, |
| 17    A  Assets used to deliver services to our | 17  CoxCom, Inc., did file tax returns in Texas. |
| 18  customers in Texas. | 18    Q  How would you characterize the level of |
| 19    MS. LIPSKI: Okay. I think we're going to | 19  CoxCom, Inc.'s, capitalization? |
| 20  take a short break, but we should almost be | 20    A  Very strong, has its own assets, its own |
| 21  done. | 21  equipment, its own plant, everything it needs to |
| 22    THE WITNESS: Okay. | 22  operate the business. |
| 23    MR. STOCKWELL: Okay. | 23    MR. STOCKWELL: Thank you, no further |
| 24    (Whereupon, there was a recess | 24  questions. |
| 25  in the deposition.) | 25    MS. GOLDSTEIN: Let me just ask one |

UNITED STATES DISTRICT COURT
FOR THE FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff(s), | ) ) | |
| v. | ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) | Case No.: 2-06CV-239 (RC) |
| Defendant(s). | ) ) ) ) ) | |

## SUPPLEMENTAL DECLARATION OF JOHN SPALDING

1.    I, John Spalding, am employed by Cox Communications, Inc., as Vice President, Government Affairs. My responsibilities include oversight of mergers and acquisitions and corporate records with respect to Cox Communications, Inc. and its affiliates / subsidiaries.

2.    Cox Communications, Inc. was incorporated in Delaware, has its principal place of business in Atlanta, Georgia, and does not do business in Texas. Indeed, for at least the past ten years, Cox Communications, Inc. has not done business in Texas. Cox Communications, Inc. has no assets in Texas. Cox Communications, Inc. does not provide, and for at least the past ten years has not provided, cable television services or "video-on-demand" services in Texas.

3.  Cox Communications, Inc.'s affiliate / subsidiary CoxCom, Inc. does not do business in Texas and has no assets in Texas. CoxCom, Inc. does not provide cable television services or "video-on-demand" services in Texas.

4.  As of December 31, 2003 / January 1, 2004, Cox Southwest Holdings, L.P. assumed ownership of all of the assets of any of Cox Communications, Inc.'s affiliates / subsidiaries that then owned assets in Texas.

5.  Cox Southwest Holdings, L.P. sold all of its Texas assets under an Asset Transfer Agreement dated October 31, 2005. The sale closed on May 5, 2006. The sole exception to the sale was the Henderson, Texas cable television franchise, which is under third party management pursuant to a Management Agreement dated May 5, 2006. Cox Southwest Holdings, L.P. was not able to transfer the Henderson franchise, which expires in 2007, solely because the Henderson city government withheld its consent to the transfer.

6.  None of the affiliates / subsidiaries of Cox Communications. Inc. have ever provided "video-on-demand" services in Texas.

7.  I have reviewed the records attached to Plaintiff's Response to Cox Communications, Inc.'s Motion to Dismiss. Those records do not relate to Cox Communications. Inc., but rather to various entities "doing business as" "Cox Communications" and, in at least one case, to an entity that is completely unrelated to Cox Communications. Inc. or any of its affiliates / subsidiaries. I note also that Plaintiff attached at least one record pertaining to Arkansas, rather than Texas.

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 6, 2006.

John Spalding

Cox Communications - Cable, High Speed Internet and Telephone services in Cox Communications



**COX** COMMUNICATIONS
*Your Friend in the Digital Age*

For Home | For Business | Order Services | View / Pay Bill | Customer Support |

Login to view/pay your bill
Need password?    Forgot password?
Adjust Service in your area ▾    Zipcode    **LOGIN ▸**

## West Texas

**For Home**
Cable
Digital Cable
High Speed Internet
Telephone
Pay Per View
DVR

Check out our
**Special Offers**
on Cox Services

*EasyPay*
Sign up here for an
easier way to pay

**Cable**
ORDER NOW
Learn More
Channel lineup
Pricing
Special Offers

**Digital Cable**
ORDER NOW
Learn More
HDTV / DVR / PPV
Pricing
Special Offers

**Digital Telephone**
ORDER NOW
Learn More
Features
Pricing
Special Offers

**High Speed Internet**
ORDER NOW
Learn More
Premier Tier
Pricing
Special Offers

### Let us show you how you can SAVE!
☐ Try our NEW bundle analyzer!
Tell us what products you
currently have, if any, and we
will build a package for you!

You can even order **Digital
Telephone** online!

It's Fast, Easy, and Secure!

Get started now by clicking the
My Savings button.

⊠ Cox Digital
Suite

⊠ Cox Digital
Suite

**My Savings ▸▸**

**Bundle your services with Cox...**
Bundle your services with Cox and get
3 great products for less than $99. You
get Cox Digital Telephone Unlimited
Connection Plan, Cox High Speed
Internet with speeds up to 4 Meg
Download, Cox Cable Service with
your local channels all with No Long
Term Contracts.

**Find it Fast:**
Quick Links ▾
Product Information ▾

© 1998-2006 Cox Communications, Inc.   Policies
Visitor Agreement | Privacy Policy | Parental Control

Cox.net | Careers | Diversity | Newsroom | Search Cox.com | Contact us

Case 2:07-cv-00480-GMS-CE   Document 56-22   Filed 06/28/2007   Page 2 of 20



**COX**
COMMUNICATIONS

*Your Friend in the Digital Age.*

| For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

# Order Online

1 **AVAILABLE SERVICES** · 2 GETTING STARTED · 3 FEATURED OFFERS · 4 ADDITIONAL OFFERS · 5 SET UP · 6 ACCEPT OFFER · 7 REVIEW PLACE ORDER



## Step One:
## Check Available Services

Please enter your address to find out which Cox services are available to you.

- **Business customers**, please contact **Cox Business Services** for ordering information. Service availability and pricing reflect residential services only.

**We're sorry. We are unable to find this address in our system. Please check the address name and numbers carefully. Do not include directional suffixes or prefixes (i.e., SW, east, North, etc.) in the Street name.**

* Street number [ 108 ]   123

* Street name [ High ]   Mansell

Street type [ Street ▾ ]   3C

Apartment number [          ]   02879

* ZIP code [ 75652 ]

[ CONTINUE ▸ ]



📱 Why Order Online?

- It's quick and convenient
- It's 100% secure
- Build the package you want
- See all of your options
- Get web-only special offers



VeriSign
Secured

VERIFY ›

**Special Instructions:**
- Do not include directional prefixes or suffixes (i.e. SW, east, North, etc.) in the street name.

**Disclaimer:**
- The availability of services, offers, and pricing in this order process reflect residential

Cox Communications

services only. Business customers should visit **Cox Business Services**

Cox.net | Careers | Diversity | Newsroom | Search cox.com | Contact us

© 1998-2006 Cox Communications, Inc.      Policies
Visitor Agreement | Privacy Policy | Parental Control





For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox

## Texas

1 **AVAILABLE SERVICES** 2 **GETTING STARTED** 3 **FEATURED OFFERS** 4 **ADDITIONAL OFFERS** 5 **SET UP** 6 **ACCEPT OFFER** 7 **PREVIEW / PLACE ORDER**

**Step Two:**
② **Getting Started**



☐ Cox Basic or Standard Cable

☐ Cox Digital Cable

☐ Cox High-Speed Internet

☑ I have no Cox services yet

By selecting the Cox Services you currently have, we can present our featured offers and calculate your total savings.

**[ CONTINUE ]**

💻 Why Order Online?

- It's quick and convenient
- It's 100% secure
- Build the package you want
- See all of your options
- Get web-only special offers

VeriSign Secured
VERIFY

**Special Instructions:**
- Select the service you currently receive at your home so we can customize your offer.
- Select Basic or Standard Cable if you currently receive either level of service.

**Disclaimer:**
- Not all services are available in all areas.

© 1998-2006 Cox Communications, Inc. | Policies
Visitor Agreement | Privacy Policy | Parental Control

Cox.net | Careers | Diversity | Newsroom | Search cox.com | Contact us

COX COMMUNICATIONS

Your Friend in the Digital Age.

| For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

## Texas

1 AVAILABLE SERVICES    2 GETTING STARTED    3 FEATURED OFFERS    4 ADDITIONAL OFFERS    5 SET UP    6 ACCEPT OFFER    7 REVIEW PLACE ORDER

### Step Three:
### Add Featured Offers

Please select the service(s) you wish to add by choosing one of our featured offers.



Basic or Standard Cable    +    Digital Cable    +    High Speed Internet

| | |
|---|---|
| 1st year's Savings up to* | $120 |
| Monthly price ** | $102.09 |

Your best value

**SELECT ▶**

**Add Total Home Package**

Order Full Basic/Standard Cable, Cox Digital Cable and High Speed Internet today and SAVE!
Offer details, terms and conditions.

* Maximum 1st year's savings are the sum of any installation fees that have been waived or discounted plus any service discounts including short term promotional service discounts and any additional discounts for subscribing to 2 or more Cox services. Click "Select" button for more details.

** Monthly Price above is the standard monthly service rate for the advertised services, less any short term promotional price discounts, and less any additional discounts for subscribing to 2 or more Cox services. This rate excludes any additional charges for existing Cox services, equipment rentals or purchases, other features or services added, taxes, and surcharges. After the promotional period, regular rates apply. Click the "Select" button for detail pricing information.

C²

### Total Home Package

**Why order "Your best value"?**
- Standard Cable
  - Dozens of channels
- Digital Cable
  - Access to 200+ channels
- High Speed Internet
  - Preferred Service is at least 2.5 times faster than 1.5 Mbps DSL or 170 times faster than dial-up

**Advantages**
- All services on one bill
- One local service provider



### Build Your Own Bundle

Build your own bundle by adding an individual service or services. Select from the list below:

- ☐ Standard Cable
- ☐ Digital Cable
- ☐ High Speed Internet

**CONTINUE ▶**

Case 2:07-cv-00480-DMC-CE Document 15-22 Filed 06/28/2007 Page 66 of 120

Basic or Standard Cable    +    High Speed Internet

1st year's Savings up to★ ≫ $120

Monthly price★★ $82.94

Order Full Basic/Standard Cable and Cox High Speed Internet today and SAVE! Offer details, terms and conditions.

★ Maximum 1st year's savings are the sum of any installation fees that have been waived or discounted plus any service discounts including short term promotional service discounts and any additional discounts for subscribing to 2 or more Cox services. Click 'Select' button for more details.

★★ Monthly Price above is the standard monthly service rate for the advertised services, less any short term promotional price discounts, and less any additional discounts for subscribing to 2 or more Cox services. This rate excludes any additional charges for existing Cox services, equipment rentals or purchases, other features or services added, taxes and surcharges. After the promotional period, regular rates apply. Click the "Select" button for detail pricing information.

Add Standard Cable, High Speed Internet

[SELECT ▶]

or

Basic or Standard Cable    +    Digital Cable

Monthly price★★ ≫ $61.14

Order Full Basic/Standard Cable and Cox Digital Cable today and SAVE! Offer details, terms and conditions.

★★ Monthly Price above is the standard monthly service rate for the advertised services, less any short term promotional price discounts, and less any additional discounts for subscribing to 2 or more Cox services. This rate excludes any additional charges for existing Cox services, equipment rentals or purchases, other features or services added, taxes and surcharges. After the promotional period, regular rates apply. Click the "Select" button for detail pricing information.

VeriSign Secured
VERIFY▸

Add Standard Cable, Digital Cable

SELECT ►

OR



**High Speed Internet**

Monthly
price ** » **$49.95**

Cox High Speed Internet delivers everything the Internet was meant to be at lightning-fast speed! Offer details, terms and conditions

- High Speed Internet
- No phone line required - never miss a call!
- Access to email anytime, anywhere with WebMail
- 7 email addresses with 100MB of Personal WebSpace per email address
- FREE 24x7 Technical Support by phone or online chat

** Monthly Price above is the standard monthly service rate for the advertised services, less any short term promotional price discounts, and less any additional discounts for subscribing to 2 or more Cox services. This rate excludes any additional charges for existing Cox services, equipment rentals or purchases, other features or services added, taxes, and surcharges. After the promotional period, regular rates apply. Click the "Select" button for detail pricing information.

Add High Speed Internet

SELECT ►

OR

**Basic or Standard Cable**

Monthly
price ** » **$41.99**

Order Full Basic/Standard Cable today and SAVE! Offer details, terms and conditions

** Monthly Price above is the standard monthly service rate for the advertised services, less any short term promotional price discounts, and less any additional discounts for subscribing to 2 or more Cox services. This rate excludes any additional charges for existing Cox services.

equipment rentals or purchases, other features or services added, taxes, and surcharges. After the promotional period, regular rates apply. Click the "Select" button for detail pricing information.

## Add Standard Cable

[ SELECT ▸ ]

Select an individual service that you would like to order below:



**Standard Cable**



**Digital Cable**



**High Speed Internet**

**Disclaimer:**
- Prices reflect only the items listed. If you select additional services or equipment, prices will vary.
- Prices do not reflect applicable fees, taxes, or surcharges.

| Cox.net | Careers | Diversity | Newsroom | Search cox.com | Contact us |

© 1998-2006 Cox Communications, Inc.   Policies
Visitor Agreement | Privacy Policy | Parental Control

**COX** *Your Friend in the Digital Age*
COMMUNICATIONS

| For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

Login to view/pay your bill

Need password? | Forgot password?

Find service in your area ▾ | Zipcode | **LOGIN ►**

TEXAS

## Customer Support

*Just like a true friend,*
Cox is here for you 24/7

**Support Home**
Billing support
Ordering support
Technical support
Contact us

Check out our
**Special Offers**
on Cox Services

**EasyPay**
Sign up here for an
easier way to pay

### Cox Instant Answers™
Ask our virtual customer service representative and get instant answers 24/7!

### Technical Support
· Cable and Digital Cable
NEW!
· DVR (*Interactive Tutorials*)
· High Speed Internet

### Billing
· How EasyPay works
· Paying your bill
· Combining billing statements
· Reading your bills

### View and Pay Your Bill
· Set up your cox.com password to view and pay your bill, check your balance, set up email bill reminders and stop your paper bill. Learn more.

### Order / Upgrade Services
· Find out what services are available at your address, check special offers, and order online 24/7. Learn more.

**Related Information**
· Service assurance plan
· Tips for avoiding email hackers
· Take Charge! How to manage content available to your family on TV, the Internet, and phone.

**Announcements**
· New services available or coming soon
· Learn more about 24/7

© 1998-2006 Cox Communications, Inc. Policies
Visitor Agreement | Privacy Policy | Parental Control

| Cox.net | Careers | Diversity | Newsroom | Search Cox.com | Contact us |

# COX
COMMUNICATIONS

*Your Friend in the Digital Age*

For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

**TEXAS**

Login to view/pay your bill    [ LOGIN ▶ ]
Need password?    Forgot password?

Find service in your area  ⌄  | Zipcode

*Just like a true friend,*
**Cox is here for you 24/7**

## Support Home
Billing Support
View / pay bill
EasyPay
Payment options
Flexible bill statement
How to read your bill

Check out our
**Special Offers**
on Cox Services

**EasyPay**
Sign up here for an
easier way to pay

# Billing Support

## Ways to Pay Your Bill

- Pay by phone
- Pay by mail
- Pay in person
- Pay automatically with EasyPay
- Pay online with Cox.com View/Pay Bill

**Pay by Phone**
Call our Cox Automated Phone service to pay your bill by phone, 24/7. Also:

- Check your account balance
- Make a payment from your bank account or credit card

The Automated Phone number can be found on the Contact US page.

**Pay by mail**

To mail your payment, detach the payment coupon from your billing statement, enter the amount of your payment on the coupon, and send that to us along with your check or money order. Our mailing address is listed on the Contact US page.

**Pay in person**

We have a variety of walk-in locations and payment centers where you can pay your bill in person. To find the location nearest you, visit our Contact Us page. These centers:

- Accept cash, check, or money orders
- Many accept credit card payments
- May be located at Cox retail centers or community businesses
- May offer after-hours payment kiosks

**RELATED INFORMATION**
- View / Pay Bill
- Order services

Cox Customer Support

Page 2 of 2

**Pay automatically with EasyPay**

EasyPay is an automatic and recurring payment program that allows customers to pay their Cox bill each month automatically from a bank account or credit card. Learn more about EasyPay or sign up now.

**Pay online with View / Pay Bill**

With Cox.com View / Pay bill you can:

- Check your current balance
- View your last three bill statements
- Make one-time payments from your checking account or by credit card at no fee.
- Sign up for EasyPay automatic recurring payments.
- Stop your paper bill
- Set up email bill reminders

See our View / Pay Bill page for more information or you can click here to use View / Pay Bill.

| Cox.net | Careers | Diversity | Newsroom | Search Cox.com | Contact us

© 1998-2006 Cox Communications, Inc.    Policies
Visitor Agreement | Privacy Policy | Parental Control

11/22/2006

For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

**Support Home**

Contact us

Phone numbers

Locations

Mailing addresses

Business, media & other

Check out our
**Special Offers**
on Cox Services

*EasyPay*

Sign up here for an
easier way to pay

## Contact Us

Login to view/pay your bill     [LOGIN ►]

Need password?    Forgot password?

Find service in your area ▼    [Zipcode]

Just like a true friend,
Cox is here for you 24/7

## 🏠 Locations: Retail & Payment Centers

### Northeast Texas

Athens | Gainesville | Gladewater | Henderson | Jacksonville | Livingston | Lufkin | Mineola | Mineral Wells | Mt. Pleasant |
Nacogdoches | New Boston | Paris | Sulphur Springs | Tyler | Winnsboro

### Southeast Texas

Byran/College Station | Conroe | Gatesville | Georgetown/Leander/Pflugerville | Huntsville | Victoria

**NORTHEAST TEXAS**

| | | |
|---|---|---|
| **Athens** | 518 East Corsicana<br>Athens, TX 75751 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 675-5917 |
| **Gainesville** | 104 North Morris<br>Gainesville, TX 76240 | Mon-Fri 8:00 am – 5:00 pm<br><br>(940) 665-3241 |
| **Gladewater** | 507 Northeast Loop 485<br>Gladewater, TX 75647 | Mon-Fri 8:00 am – 6:00 pm<br><br>(903) 845-4036 |
| **Henderson** | 109 North High Street<br>Henderson, TX 75652 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 657-3333 |
| **Jacksonville** | 1009 S. Jackson<br>Suite 365<br>Jacksonville, TX 75766 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 586-8122 |
| **Livingston** | 101 South Washington<br>Livingston, TX 77351 | Mon-Fri 8:30 am – 5:30 pm<br><br>(936) 327-4512 |

Cox Customer Support | Contact Cox Communications, Inc.

| | | |
|---|---|---|
| **Lufkin** | 1415 South First<br>Lufkin, TX 75901 | Mon-Fri 8:00 am – 5:00 pm<br><br>(936) 639-1116 |
| **Mineola** | 403 West Broad Street<br>Mineola, TX 75773 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 569-2651 |
| **Mineral Wells** | 6501 Hwy 180 East<br>Mineral Wells, TX 76067 | Mon-Fri 8:30 am – 5:30 pm<br><br>(940) 325-9586 or<br>(940) 325-9587 |
| **Mt. Pleasant** | 1506 Shadywood Lane<br>Mt. Pleasant, TX 75455 | Mon-Fri 8:30 am – 5:30 pm<br><br>(903) 572-6107 |
| **Nacogdoches** | 409 North Fredonia<br>Nacogdoches, TX 75961 | Mon-Fri 8:00 am – 5:00 pm<br><br>(936) 564-6353 |
| **New Boston** | 118 North West Street<br>New Boston, TX 75570 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 628-5569 |
| **Paris** | 25 Southeast 19th Street<br>Paris, TX 75460 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 785-0086 |
| **Sulphur Springs** | 220 Linda Drive<br>Sulphur Springs, TX 75482 | Mon-Fri 8:00 am – 5:00 pm<br><br>(903) 885-3757 |
| **Tyler** | 322 N. Glenwood<br>Tyler, TX 75701 | Mon-Fri 8:00 am – 6:00 pm<br>Saturday 8am – Noon<br><br>(903) 561-2323 |
| **Winnsboro** | 816 West Coke Road<br>Winnsboro, TX 75494 | Mon-Fri 8:00 am – noon<br>& 1:00 pm – 4:30 pm<br><br>(903) 342-6080 |
| **Bryan/College Station** | 4114 East 29th Street<br>Bryan, TX 77802 | Mon-Fri 8:00 am – 5:30 pm<br>Saturday 9:00 am – 12:30 pm<br><br>(979) 846-2229 |

Cox Customer Support | Contact Cox Communications, Inc.

| | | |
|---|---|---|
| **Conroe** | 903 N. Loop 336 W, Suite K Conroe, TX 77301 | Mon-Fri 8:00 am – 5:30 pm |
| | | (936) 756-6604 |
| **Gatesville** | 2536 East Main Street Gatesville, TX 76528 | Mon-Fri 8:00 am – 5:00 pm |
| | | (254) 865-5315 |
| **Georgetown** | 111 North College Drive Georgetown, TX 78626 | Mon-Fri 8:00am – 6:00pm |
| • **Leander** | 409 Crystal Falls Parkway | Tues and Thurs; 10:00am-1:00pm, 2:30pm-6:00pm |
| • **Pflugerville** | 201 East Walter Ave. | Mon-Fri; 10:00am-1:00pm, 2:30pm-6:00pm |
| | | (512) 930-3085 |
| **Huntsville** | 1620 Normal Park Huntsville, TX 77340 | Mon-Fri 8:00 am – 5:00 pm |
| | | (936) 295-5733 |
| **Victoria** | 105 Industrial Drive Victoria, TX 77901 | Mon-Fri 8:00 am – 5:30 pm |
| | | (361) 573-6301 |

| Cox.net | Careers | Diversity | Newsroom | Search Cox.com | Contact us |

© 1998-2006 Cox Communications, Inc.   Policies
Visitor Agreement | Privacy Policy | Parental Control

11/22/2006



**COX** COMMUNICATIONS

Your Friend in the Digital Age

| For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

Login to view/pay your bill [LOGIN ▶]

Need password? Forgot password?

Find service in your area ▾ | Zipcode

TEXAS

## Contact Us

Just like a true friend,
Cox is here for you 24/7

**Support Home**

Contact us

Phone numbers

Locations

Mailing addresses

Business, media & other

### Mailing Addresses

**ADDRESSES**

**Mail Cox services payments to:**

**Cable payments:**
PO Box 139004
Tyler, TX 75713-9004

**High Speed Internet payments:**
PO Box 131447
Tyler, TX 75713

**General mailing address & business offices:**

**Cox Communications**
322 N. Glenwood Blvd.
Tyler, TX 75702
(903) 595-4321

Check out our
**Special Offers**
on Cox Services

**EasyPay**
Sign up here for an easier way to pay

© 1998-2006 Cox Communications, Inc.
Visitor Agreement | Privacy Policy | Parental Control

Policies

| Cox.net | Careers | Diversity | Newsroom | Search Cox.com | Contact us |

**COX**
COMMUNICATIONS

*Your Friend in the Digital Age.*

Login to view/pay your bill   **LOGIN ▸**
Need password?   Forgot password?

| For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

## Contact Us

Find service in your area ▾   Zipcode

*Just like a true friend,*
**Cox is here for you 24/7**

**Support Home**
Contact us
Phone numbers
Locations
Mailing addresses
Business, media & other

*Check out our*
**Special Offers**
on Cox Services

**EasyPay**
Sign up here for an
easier way to pay

### 📞 Phone Numbers

**CUSTOMER SUPPORT**

**Customer support, ordering
& billing:**

**888 822-5151**

24 hours / 7 days a week

**24/7 automated phone:**      **888 822-5151**      24 hours / 7 days a week

Check your balance | Make a payment | Establish/change your PIN | Confirm/Establish/Change an appointment

CUSTOMER SUPPORT, ORDERING & BILLING BY LOCATION

**Northeast Texas**

Athens | Gainesville | Gladewater | Henderson | Jacksonville | Livingston | Lufkin | Mineola | Mineral Wells | Mt. Pleasant |
Nacogdoches | New Boston | Paris | Sulphur Springs | Tyler | Winnsboro

**Southeast Texas**

Byran/College Station | Conroe | Gatesville | Georgetown/Leander/Pflugerville | Huntsville | Longview | Victoria

NORTHEAST TEXAS

| | | |
|---|---|---|
| **Athens** | **903-675-5917** | Mon-Fri 8:00 am – 5:00 pm |
| **Gainesville** | **940-665-3241** | Mon-Fri 8:00 am – 5:00 pm |
| **Gladewater** | **903-845-4036** | Mon-Fri 8:00 am – 5:00 pm |
| **Henderson** | **903-657-5769 or**<br>**888-822-5151** | Mon-Fri 8:00 am – 5:00 pm |
| **Jacksonville** | **903-586-8122** | Mon-Fri 8:00 am – 5:00 pm |
| **Livingston** | **936-327-4512** | Mon-Fri 8:00 am – 5:00 pm |
| **Lufkin** | **936-639-1116** | Mon-Fri 8:00 am – 5:00 pm |
| **Mineola** | **903-569-2651** | Mon-Fri 8:00 am – 5:00 pm |

| Mineral Wells | 940-328-1281 | Mon-Fri 8:30 am – 5:30 pm |
| Mt. Pleasant | 903-572-6107 | Mon-Fri 8:00 am – 5:00 pm |
| Nacogdoches | 936-564-6353 | Mon-Fri 8:00 am – 5:00 pm |
| New Boston | 903-628-5569 | Mon-Fri 8:00 am – 5:00 pm |
| Paris | 903-785-0086 | Mon-Fri 8:00 am – 5:00 pm |
| Sulphur Springs | 903-885-3757 | Mon-Fri 8:00 am – 5:00 pm |
| **Tyler** | | |
| Customer support: | 903-561-2323 | Mon-Fri 8:00 am – 7:00 pm |
| Technical support: | 888-822-5151 | Mon-Fri 8:00 am – 7:00 pm |
| Winnsboro | 903-342-6080 | Mon-Fri 8:00 am – noon and 1:00 pm – 4:30 pm |

### SOUTHEAST TEXAS

| Bryan/College Station | 979-846-2229 | Mon-Fri 8:00 am – 6:00 pm Saturday 9:00 am – 12:30 pm |
| Conroe | 936-756-6604 | Mon-Fri 8:00 am – 5:00 pm |
| Gatesville | 254-865-5315 | Mon-Fri 8:00 am – 5:00 pm |
| Georgetown | 512-930-3085 | Mon-Fri 8am – 5:30pm |
| Leander Office | 512-930-3085 | Tues & Thurs 10am - 1pm, also 2:30pm - 6pm |
| Pflugerville Office | 512-930-3085 | Mon-Fri 10am - 1pm, also 2:30pm - 6pm |
| Huntsville | 936-295-5733 | Mon-Fri 8:00 am – 5:00 pm |
| Longview | 903-234-9494 or 88-822-5151 | |
| Victoria | 361-573-6301 | Mon-Fri 8:00 am – 5:00 pm |

Cox Customer Support | Contact Cox Communications, Inc.

Your Friend in the Digital Age

# COX
**COMMUNICATIONS**

For Home | For Business | Order Services | View / Pay Bill | Customer Support | About Cox |

## Contact Us

Just like a true friend,
Cox is here for you 24/7

**Support Home**

Contact us

Phone numbers

Locations

Mailing addresses

Business, media & other

Check out our
**Special Offers**
on Cox Services

**EasyPay**
Sign up here for an
easier way to pay

## Locations: Retail & Payment Centers

### WEST TEXAS / NEW MEXICO

| Location name & address | Hours / phone number | Services |
|---|---|---|
| **Abilene**<br>902 S. Clack Street,<br>Abilene, TX 79605 | Monday - Friday 9:00-6:00<br><br>(325) 698-3585 | • Order Cox services<br>• Payment center<br>• Schedule service calls |
| **Amarillo**<br>5800 W. 45th Street,<br>Amarillo, TX 79109 | Monday - Friday 8:00-6:00<br><br>(806) 358-4801 | • Order Cox services<br>• Payment center<br>• Schedule service calls |
| **Andrews**<br>412 Broadway,<br>Andrews TX 79714 | Monday - Friday 8:30-5:30<br><br>(432) 523-3081 | • Order Cox services<br>• Payment center<br>• Schedule service calls |
| **Big Spring**<br>2006 Birdwell Lane,<br>Big Spring, TX 79702 | Monday - Friday 9:00-5:00<br><br>(432) 267-3821 | • Order Cox services<br>• Payment center<br>• Schedule service calls |
| **Canyon**<br>2201 8th Avenue<br>Canyon, TX 79015 | Monday - Friday 8:30-5:00<br>Closed from 1:00-2:00<br><br>(806) 358-4801 | • Order Cox services<br>• Payment center<br>• Schedule service calls |
| **Clovis**<br>1106 Main Street,<br>Clovis, NM 88101 | Monday - Friday 8:00-5:00<br><br>(505) 763-4411 | • Order Cox services<br>• Payment center<br>• Schedule service calls |
| **Floydada**<br>119 E. Kentucky,<br>Floydada, TX | Monday - Friday 8:00-5:00<br><br>(806) 983-2911 | • Order Cox services<br>• Payment center<br>• Schedule service calls |

Cox Customer Support | Contact Cox Communications, Inc.

**Lubbock**
6710 Hartford Avenue
Lubbock, TX 79413

Monday - Friday 8:00-6:00

(806) 793-2222

- Order Cox services
- Payment center
- Schedule service calls
- Main Office

**Midland**
2530 South Midkiff Road
Midland, TX 79701

Monday - Friday 8:00-6:00

(432) 694-7721

- Order Cox services
- Payment center
- Schedule service calls

**Plainview**
2301 W. 5TH Street
Plainview, TX 79072

Monday - Friday 8:00-5:00

(806) 293-2551

- Order Cox services
- Payment center
- Schedule service calls

**San Angelo**
4272 West Houston Harte
Express Way
San Angelo, TX 76903

Monday - Friday 8:00-6:00

(325) 655-8911

- Order Cox services
- Payment center
- Schedule service calls

**Snyder**
2211 Avenue R.
Snyder, TX 79549

Monday - Friday 8:00-6:00

(325) 573-3536

- Order Cox services
- Payment center
- Schedule service calls

**Sweetwater**
1118 E Broadway
Sweetwater, TX 79556

Monday - Friday 9:00-6:00

(325) 236-6375

- Order Cox services
- Payment center
- Schedule service calls

© 1998-2006 Cox Communications, Inc.    Policies
Visitor Agreement | Privacy Policy | Parental Control

Cox.net | Careers | Diversity | Newsroom | Search Cox.com | Contact us

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) | Case No. 2:06-CV-239-(RC) |
| Defendant(s). | ) ) | |

COX COMMUNICATIONS, INC.'S CONSOLIDATED
(1) REPLY IN SUPPORT OF ITS MOTION TO DISMISS
AND (2) OPPOSITION TO PLAINTIFF'S MOTION TO AMEND

Mitchell G. Stockwell
Leroy M. Toliver
Candice C. Decaire
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E.
Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
(404) 815-6555 (Facsimile)

Michael E. Jones
Allen F. Gardner
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500 (75702)
P.O. Box 359
Tyler, Texas 75710
(903) 597-8311
(903) 593-0846 (Facsimile)

## I.     Introduction

Plaintiff ("U.S. Video") mischaracterizes the arguments advanced in Cox

Communications, Inc.'s ("Cox") motion to dismiss for lack of personal jurisdiction. In addition,

Plaintiff improperly seeks to file an untimely, and ultimately futile, amended complaint adding

Coxcom, Inc. ("Coxcom") as a party. Cox should be dismissed from this action and Plaintiff's

motion to amend should be denied because neither Cox nor Coxcom are properly subject to this

Court's jurisdiction.

First, U.S. Video endeavors to conflate Cox and its affiliates, and never adequately

responds to Cox's showing of an absence of minimum contacts. U.S. Video does not even

address the controlling case law Cox cited that holds that contacts of Cox's affiliates may not be

used to show personal jurisdiction over Cox absent evidence sufficient to pierce the corporate

veil. Despite this failure, U.S. Video proceeds to cite registrations with the Texas secretary of

state of Cox affiliates or "doing business as" registrations by entities that are not even related to

Cox. Such evidence has no bearing on Cox's contacts with Texas and cannot suffice to

demonstrate jurisdiction.

Second, U.S. Video's belated effort to replead its allegations and add Coxcom should be

rejected as futile and untimely. U.S. Video's effort to amend has no bearing on whether this

Court has jurisdiction over Coxcom's parent, Cox. In addition, U.S. Video's motion to amend to

add Coxcom as a party should be rejected because Coxcom itself does not have sufficient

minimum contacts with Texas to confer personal jurisdiction. Coxcom has never offered video-

on-demand services in Texas. Coxcom sold and transferred its Texas assets to another entity,

Cox Southwest Holdings, L.P., which itself has since sold those assets. Thus, not only are there

1

no Coxcom connections or assets in Texas that suffice for general personal jurisdiction, there also are presently no Cox affiliates with material assets in Texas.

Cox's motion to dismiss or transfer should be granted and Plaintiff's untimely motion to amend to add Coxcom should be denied so that the issue of whether Coxcom's video-on-demand services infringe Plaintiff's '792 patent can be decided in the Delaware suit. [1] Only in Delaware are jurisdiction and venue proper and the Delaware action, filed two months before U.S. Video's untimely attempt to amend, is the vehicle by which the substance of U.S. Video's complaint should be addressed.

## II.   Argument

### A.   U.S. Video Has Neither Demonstrated that Cox Has "Minimum Contacts" With Texas Sufficient to Show General Jurisdiction Nor Otherwise Justified Pursuing its Claims Against Cox in Texas.

1. U.S. Video has not pointed to any legally relevant contacts to sustain personal jurisdiction.

Cox's opening motion explained why Cox is not subject to specific personal jurisdiction.

U.S. Video's response does not challenge that point, but rather argues that there are sufficient contacts between Cox and Texas to establish the minimum contacts required for general jurisdiction. U.S. Video's response, however, entirely ignores the controlling law Cox cited concerning the nature of the contacts required to sustain general jurisdiction. The Supreme Court has emphasized that the question is not whether "any" contacts exist, but whether the contacts are of a kind necessary to sustain general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1983) (the inquiry is whether the contacts "constitute the **kind** of **continuous and systematic general business contacts** the Court found to exist in" an earlier case) (emphasis added; citation omitted).

---

[1] *Coxcom, Inc. v. USA Video Technology Corp.*, C.A. No. 1:06-cv-00394 –KAJ (D. Del).

2

US2000 9482841.1

Contrary to U.S. Video's claims, exhibits A through C of its Response neither satisfy the governing standard for minimum contacts nor "detail . . . Cox's business dealings with Texas."

First, U.S. Video asserts that because Cox still owns a franchise in Henderson, Texas, it has sufficient contacts for personal jurisdiction. Aside from the fact that property ownership alone does not justify exercising personal jurisdiction (*Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977)), Cox is the entity U.S. Video sued in this case and Cox does not and has not owned the Henderson franchise. *See* Ex. D, Supplemental Declaration of John Spalding ("Spalding Supp. Dec."), at ¶¶4-5. As Mr. Spalding explains, the Henderson, Texas cable franchise is operated by a third party under a Management Agreement, but is held in the name of Cox Southwest Holdings, L.P., solely because Henderson city would not consent to an outright transfer. *Id.* Such a fact is not the kind of contact to justify haling Cox into a Texas court. *Compare Helicoperos*, 466 U.S. at 417 (holding that the "unilateral activity of another party or third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction").

Second, U.S. Video attempts to make much of the fact that the Henderson franchise operates under a "Cox Communications" name and cites to its exhibit A, a March 10, 2005 press release concerning SORPESA! television programming soon to be available in many states, including Texas, that mentions "Cox Communications." All of these are simply examples of Cox's affiliates using a "Cox Communications" "doing business as" name. Ex. D, ¶7. As explained in Cox's opening brief, courts have uniformly held that an affiliate's use of a parent's name does not subject that parent entity to personal jurisdiction. U.S. Video has not challenged that caselaw because it has no basis for so doing.

3

US2000 9482841.1

Likewise, U.S. Video's Response Exhibit B -- concerning various "Texas Fictitious Business Names" records – has nothing whatsoever to do with Cox or Coxcom. The printouts relating to Cablevision of Pflugerville, Cablevision of Leander, Cebridge Telecom TX, and Cable Midland, Inc. clearly show, under "Other Name Information," that "Cox Communications" (or, in the case of Cable Midland, Inc., "Cox Communications West Texas") was an assumed name of these other entities and do not demonstrate any legally relevant connection to Cox or Coxcom. *See* pages 2-12 of Response Exhibit B. The printout at pages 12-13 of Response Exhibit B concerns "Carol Cox Communications," owned by Carol Cox of Houston, Texas, and is not even remotely probative of Texas jurisdictional contacts by Cox or Coxcom. Pages 13 – 15 of Response Exhibit B list various "fictitious" or "doing business as" "Cox Communications" assumed business names, but add nothing to the jurisdictional inquiry (nor does the Nevada UCC record included on page 15). The property record printouts at pages 16-20 of U.S. Video's Response Exhibit B are similarly irrelevant, because they do not show ownership of Texas property by Cox or Coxcom, but rather show that various property owners purported to be divisions of some entity doing business as "Cox Communications."

Mr. Spalding has reviewed the above information and confirms that the listings submitted by U.S. Video are simply "doing business as" entries. Ex. D, ¶¶2-3, 7. As he confirms, Cox has not done business in Texas in the last ten years and the assets that were used in Texas by its affiliates were sold off. *Id.*, ¶5. Cox has no property and no business in Texas.

Finally, the record printouts attached as U.S. Video's Response Exhibit C do not help U.S. Video's cause; to the contrary, they demonstrate that Coxcom does **not** have a Texas presence. Each of the printouts in Exhibit C clearly show under "Other Name Information" that to the extent "Coxcom, Inc." was an "Other Name," it became **inactive** on December 31, 2003,

4

long before this action was filed. The printout at pages 14-15 of Exhibit C, showing data from the Arkansas Secretary of State, is totally irrelevant to the question of Texas jurisdiction.

Even if the actions of Cox's affiliates were relevant to jurisdiction over Cox (they are not, *see infra*), the **only** Cox affiliate that has operated or owned any property in Texas in recent years is Cox Southwest Holdings, L.P. – and Cox Southwest Holdings, L.P. sold its Texas assets pursuant to an Asset Transfer Agreement dated October 31, 2005. Ex. D, ¶5.

2.    Cox's status as a defendant in other lawsuits is irrelevant, but in any event U.S. Video fails to present the full picture of those cases.

U.S. Video makes a strange assertion that "Cox has not argued jurisdiction in other Texas lawsuits." Nowhere does U.S. Video explain why this point is relevant to assessing jurisdiction over Cox, despite the controlling law Cox cited that requires courts to assess the alleged contacts to determine whether they are of the type necessary to sustain general jurisdiction. Legally, U.S. Video's argument is wholly irrelevant because each of the lawsuits U.S. Video cites involve situations where Cox was a defendant – in other words, every suit involved "unilateral activity of another party" – the plaintiff -- rather than a choice by Cox to avail itself of this State's laws and protections. *Helicoperos*, 466 U.S. at 417. Such choices by other parties cannot sustain jurisdiction over Cox.

Even setting aside that issue, U.S. Video's further attempts to fog the relevant issues by citing to other lawsuits filed in Texas against Cox or its affiliate Coxcom fail to present the whole story. Plaintiff in the *Rembrandt Technologies* matter has agreed voluntarily to dismiss Cox -- because it recognizes that Cox is not a proper defendant -- and Coxcom has not yet been required to answer or respond to that complaint. *See* Ex. E. Similarly, Plaintiffs in the *Forgent Networks* matters voluntarily dismissed Cox, because Cox has no Texas presence. *See* Ex. F (attaching Notices of Voluntary Dismissal). As to the presence of Coxcom in the *Forgent*

5

*Networks* suit, that matter is being defended by Coxcom's suppliers (Motorola and Scientific Atlanta), who are defending and indemnifying Coxcom. They control the defense of the suit and chose to litigate the *Forgent Networks* matter in Texas because that is where their other customers were sued. Ex. G, at 2-4. Under the circumstances, these other lawsuits do not show that Cox or Coxcom have sought to avail themselves of Texas's laws and courts and thus do not help U.S. Video meet its burden of showing jurisdiction over either Cox or Coxcom.

> 3. Overall, U.S. Video has not shown the assertion of jurisdiction over Cox, as opposed to dismissal or transfer to Delaware, would comport with "fair play" or achieve "substantial justice."

Cox does not believe that U.S. Video has come close to showing the type and amount of minimum contacts sufficient to justify exercising jurisdiction over Cox. Even more, U.S. Video has not justified that litigation in this forum against Cox would "comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (even where "it has been established that a defendant purposefully established minimum contacts within the forum State," the court must consider the contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"). Other factors to consider in evaluating whether "fair play and substantial justice" are served by exercising jurisdiction include "the burden on the defendant"; "the forum State's interest in adjudicating the dispute"; "the plaintiff's interest in obtaining convenient and effective relief"; and "the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *Id.* at 477 (citations omitted).

Because any contacts between Cox and Texas shade toward the "none" side of a "slim to none" equation, *Burger King's* emphasis on examining "fair play and substantial justice"

6

strongly favors dismissal of this case or, at minimum, transfer to Delaware. Moreover, the relevant "other factors" also favor dismissal or at least transfer.

Transfer may be appropriate because venue in Texas cannot be sustained where Cox has insufficient contacts with Texas. *See* 28 U.S.C. §§ 1391, 1400 (venue is proper where defendant is subject to personal jurisdiction, or where defendant has infringed and has a regular, established place of business). The burden to Cox of litigating a case where it has no contacts or ties is self-evident. Likewise, it is evident that Texas has no stake in the outcome of this dispute. Of more import, however, is the fact that Delaware is a jurisdiction that can efficiently resolve U.S. Video's claims with minimal burden to both parties. As noted in Cox's draft scheduling report for the Delaware court (attached as exhibit H, at ¶19), Cox believes an early summary judgment motion premised on Judge Jordan's claim construction is appropriate. U.S. Video's speculation that Judge Jordan may not preside over all proceedings in the District of Delaware because he may be appointed to the Third Circuit Court of Appeals does not obviate the fact that his expertise in dealing with the patent in suit may be sought early in the case so as to avoid burdening the parties with a potentially unnecessary and unwarranted lawsuit. Further, note that Cox proposes trial in the Delaware case for March, 2008, close to the February, 2008 trial date set by this Court's initial schedule. Ex. H, at ¶18. Thus, U.S. Video will achieve the same efficient and timely resolution of its claims in Delaware as before this Court.

Finally, given that U.S. Video has identified only tenuous and legally irrelevant contacts, this Court should simply transfer the matter to Delaware for consolidation with the action filed there by Coxcom, rather than granting U.S. Video's unsupported and unjustified request for

7

jurisdictional discovery.[2] As explained below, the Delaware action remains the appropriate vehicle for resolving the parties' disputes – including U.S. Video's core averment that Cox too should be liable for allegedly trespassing on U.S. Video's patent rights.

## B.    U.S. Video's Effort to Amend the Complaint to Include Coxcom should be Rejected as Untimely and Futile.

U.S. Video attempts to prop up its opposition by mischaracterizing Cox's motion to dismiss – stating that Cox argues that its affiliate Coxcom provides the allegedly infringing video-on-demand services and is the proper party to be sued. That incorrect assertion is the genesis of U.S. Video's motion to amend.

Cox has previously noted that any motion to amend should not relate back and thus cannot be used to favor this venue over Coxcom's appropriate and earlier declaratory judgment action. Cox's Brief, at 10-11. In addition, however, U.S. Video's motion to amend should be denied as futile because this Court lacks jurisdiction over Coxcom. *See, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962); *Overseas Inns S.A.P.A. v. United States*, 911 F.2d 1146, 1150-51 (5th Cir. 1990). In the context of a motion for leave to amend, the Fifth Circuit has defined "futility" to mean that an amended complaint would fail to state a claim for which relief may be granted. *See Stripling v. Jordan Production Company, LLC*, 234 F.3d 863, 873 (5th Cir. 2000). Absent personal jurisdiction over Coxcom, this Court cannot grant relief.

As confirmed in Mr. Spalding's supplemental declaration, Coxcom has insufficient contacts with Texas to support either general or specific jurisdiction over Coxcom.[3] As

---

[2] To the extent relevant to U.S Video's action against Cox, contentions concerning the timing of Coxcom's filing of a declaratory judgment action in Delaware further support transfer. Coxcom filed its Declaratory Judgment in Delaware, where jurisdiction and venue are proper as to all parties, on June 19, 2006. U.S. Video didn't move to add Coxcom to this action until August 29, 2006. Coxcom's action is thus the "first filed" action and the appropriate forum in which to evaluate whether Coxcom's video-on-demand services infringe the '792 patent.

8

explained further below, Coxcom provides neither cable television nor video-on-demand services in Texas (ex. D, ¶3), and the operating company that previously owned Texas cable assets was a different entity that sold those assets in 2005. *Id.*, ¶5. Because U.S. Video cannot show that the Court has personal jurisdiction over Coxcom, it would be futile to allow U.S. Video to amend its complaint.

1.   U.S. Video has effectively conceded that there is no basis to exercise specific personal jurisdiction over Coxcom.

Despite Cox's opening brief explaining that no Cox entity has ever offered video-on-demand services in Texas, U.S. Video has submitted nothing to rebut that point.[4] Thus, for the reasons explained in Cox's opening brief at 8-9, there is no basis for finding contacts sufficient to establish specific personal jurisdiction over Coxcom.

2.   U.S. Video has not shown facts sufficient to establish general personal jurisdiction over Coxcom.

As explained in Cox's opening brief at 6-8, finding general jurisdiction requires proof of a heightened level and different type of forum contacts than those needed for specific jurisdiction. U.S. Video's presentation of "facts" sufficient to show jurisdiction over Coxcom is woefully flawed and insufficient to establish jurisdiction. *See* Section A, *supra.* For the reasons noted above, U.S. Video cannot rely on those "facts" to assert a sufficient basis for general jurisdiction over Coxcom.

---

[3] Independently, as explained in Cox's Brief, U.S. Video cannot justify Long Arm service of process on Coxcom. That issue is not entirely ripe since no service has been made, but the same analysis applies and would suggest futility of any amendment.

[4] Contrary to U.S. Video's assertion as to what Cox argued, Cox's opening brief noted only that Coxcom was the entity that operated video-on-demand services – although it does so in other regions of the country. Cox explicitly stated that **neither Cox nor its affiliates provide, nor have provided, video-on-demand services in Texas.** Cox also explained that it had no Texas presence and, even if affiliate contacts were relevant, Cox's affiliates sold their Texas assets. *See* Docket Entry No. 30 ("Cox's opening Brief"), at 2-3, 8; *see also* Spalding Declaration, submitted therewith).

9

Independently, Coxcom shows through Mr. Spalding's supplemental declaration that it has insufficient contacts with Texas to support general jurisdiction. First, Cox Southwest Holdings, L.P. is the only Cox affiliate that has owned any property in Texas since January 1, 2004. Second, Cox Southwest Holdings, L.P. sold that property pursuant to the October, 2005 agreement. Ex. D. There are thus insufficient substantial and continuous jurisdictional contacts to confer general jurisdiction over Coxcom.

        3.      U.S. Video's generalized averments about actions of Cox affiliates and other lawsuits do not suffice to show jurisdiction as a matter of law.

As explained in Cox's opening brief, even if the actions of Cox's affiliates were relevant, they would not confer personal jurisdiction over Cox for purposes of this suit. U.S. Video never challenged or addressed caselaw Cox cited showing **its affiliates' actions do not suffice to establish jurisdiction over Cox**. And, none of those actions related to the infringement alleged by U.S. Video because neither Cox nor its affiliates, including Coxcom, have provided video-on-demand services in Texas. Thus, overall, U.S. Video cannot meet its burden of showing facts sufficient for jurisdiction.

## III.   Conclusion

Cox's motion to dismiss for lack of personal jurisdiction should be granted. Plaintiff's belated and futile effort to add Coxcom should be denied. In the alternative, Plaintiff's claim against Cox should be severed for transfer to the District of Delaware for consolidation with Coxcom's pending action there.

Respectfully submitted, this 6th day of September 2006.

                /s/ Mitchell G. Stockwell
                Mitchell G. Stockwell

US2000 9482841.1

Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846

**Attorneys for Cox Communications, Inc.**

11

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **USA VIDEO TECHNOLOGY CORPORATION,** | ) ) ) |
| **Plaintiff(s),** | ) ) ) |
| **v.** | ) ) ) |
| **TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP,** | ) ) Case No. 2:06-CV-239-(RC) ) ) ) ) ) |
| **Defendant(s).** | ) ) ) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a correct copy of the foregoing was served on all

counsel of record who are deemed to have consented to electronic service via the Court's

CM/ECF system per Local Rule CV-5(a)(3) on September 6, 2006. Any other counsel of record

will be served by first class U.S. Mail.

/s/ Mitchell G. Stockwell

Case 2:07-cv-00249-TGMSE Document 15824 Filed 06/28/2007 Page 1 of 99



**CHAMBER MEMBER DIRECTORY**

HOME
ABOUT THE CHAMBER
CHAMBER EVENTS
RELOCATION TO THE AREA
AREA HISTORY
INDUSTRY
COMMUNITY PARTNERS
RECREATION AND TOURISM
ECONOMIC DEVELOPMENT

Home - What's New - What's Cool - Search

Top : Computers and Internet

[ ] Search ☐ Search this Category

## Categories:

Computer Stores (0)
Internet Services (1)
Organizations (0)
Search Engines (0)

Service and Repair (0)
Web Design and Development (0)
Wireless Devices (0)

## Chamber Members:

- **Cox Communications - Henderson**
  website: http://www.cox.com
  Since 1962, Cox has built high quality communications networks and delivered quality cable television programs. Cox offers an array of services, including Cox Cable; advanced digital video programming services under the Cox Digital Cable brand; local and long distance telephone services under the Cox Digital Telephone brand; high-speed Internet access under the brand Cox High Speed Internet, and commercial voice and data services via Cox Business Services.
  109 N High St, Henderson, TX
  903-657-3333

Home - What's New - What's Cool - Search

Contact the Chamber

Henderson Area Chamber of Commerce Member Directory : Computers and Internet

All Rights Reserved 2003-2006

Case 2:07-cv-00249-CE   Document 56-24   Filed 06/28/2007   Page 3 of 9

The Henderson Texas Area Chamber of Commerce - Henderson Texas, the county seat for Rusk county, is more than just a sm...   Page 1 of 7



HOME
ABOUT THE CHAMBER
CHAMBER EVENTS
RELOCATION TO THE AREA
AREA HISTORY
INDUSTRY
COMMUNITY PARTNERS
RECREATION AND TOURISM
ECONOMIC DEVELOPMENT

Click here for the Chamber Calendar

Search the Chamber Member Directory

## INDUSTRIES & MAJOR EMPLOYERS
## HENDERSON, RUSK COUNTY, TEXAS 75652

**ADVANCED AIR TECHNOLOGIES,** - 907 Millard St., Henderson, TX  75652 Ph. (903) 657-1951, Terry Barton, Owner, No.of employees - 10

**AZALEA HOUSE** - 1905 Old Nacogdoches Rd. Henderson, TX 75654, Ph. (903) 657-1563, No. of employees - 12

**BALLQUBE, INC.** - Rt. 2, Box 190, Cushing, TX 75760, Ph. (903) 863-5600, Kenneth Rogers, Owner,
No of employees - 20

**BANK OF AMERICA** - 605 South Main St., Henderson, TX 75654,  Ph. (903) 657-9581, Wilma Young, Branch Manager, No of employees - 9

**BOATCYCLE MFG. & CHEMICAL CO., INC.** - 219 N. Van Buren, Henderson, TX 75652, P. O. Box 494, Ph. (903) 657-3791, Ken Hale, Owner, No. of employees - 5-10

**BORAL BRICKS, INC.** (Henderson Plant) - 1309 Kilgore Dr., P. O. Box 2110, Henderson, TX 75653-2110, Ph. (903) 655-5900, Chad Runzi, Plant Mgr., No. of employees - 118

**BRADSHAW STATE JAIL** - 3900 W. Loop 571 N., P. O. Box 9000, Henderson, TX

Case 2:07-cv-00249-TJW-CE Document 16-24 Filed 06/28/2007 Page 4 of 99

The Henderson Texas Area Chamber of Commerce - Henderson Texas, the county seat for Rusk county, is more than just a sm... Page 2 of 7

75653-9000, Ph. (903) 655-0880, Robert Shaw, Warden, No. of employees - 285

**BRYAN & BRYAN ASPHALT** - Highway 2276, P. O. Box 625, Henderson, TX 75653-0625, Ph. (903) 657-2391, Billy Todd Bryan, Owner, No. of employees 36

**CAIN'S MEAT MARKET** - 419 Hwy 79 North, Henderson, TX 75652, Ph. (903) 655-6448, Richard Cain, Owner, No, of employees - 6

**CAPCO FABRICATORS, INC., CAPCO SUPPLY and CAPCO CONTRACTORS** - 3323 Hwy 259 N, Henderson, TX 75652, Ph. (903) 657-2699, Bryan Bateman, President, No. of employees - 165

**CENTRAL PLAINS CONTRACTING** - 1333 N. Frisco Ave., Henderson, TX 75652, Ph. (903) 657-7947, Richard Redmon, Owner, No. of Employees - 5-20

**CITIZENS NATONAL BANK** - 201 West Main St., P. O. Box 1009, Henderson, TX 75653-1009, Ph. (903) 657-8521, Milton McGee, President, No. of employees - 160

**CITY OF HENDERSON** - 400 West main St., Henderson, TX 75652, Ph. (903) 657-6551, Greg Smith, City Manager, Buzz Fullen, Mayor, No of employees - 110

**COLD VAULT** - 100 Millard Rd., Henderson, TX 75652 Ph. (903) 657-2377, Ryan Kuehne, No. of employees - 50

**COMBS INTERPRISES** - 1503 Millard Drive, Henderson, TX 75652 Ph. (903) 657-0716, No. of employees - 14

**COMPETITION TRAILERS, INC.** - 2000 FM 3135, Henderson, TX 75654, Ph. (903) 657-1096, Sam Harris, Owner, No. of employees - 25

**COX COMMUNICATONS** - 109 North High St., Henderson, TX 75652, Ph. (903) 657-3333, Ronnie Powell, Manager, No. of employees - 10

**EASTEX TELEPHONE CO-OP** - 3675 US Hwy .79 South, Henderson, TX 75654, Ph. (903)854-1000, Allan Dorman, Manager, No.of employees - 73

**FIBERGLASS CREATIONS** - 2390 Creations Dr., P. O. Box 2042, Henderson, TX

The Henderson Texas Area Chamber of Commerce - Henderson Texas, the county seat for Rusk county, is more than just a sm...   Page 3 of 7

75653, Ph. (903) 657-6616, Kelly Hall, Owner, No. of employees - 3

**FIBERGLASS SPECIALTIES, INC.** - 500 Austin Ave., P. O. Box 1340, Henderson, TX 75653, Ph. (903) 657-6522, Rocky Hall, President, No. of employees - 100

**GALYEAN EQUIPMENT CO.** - 1225 Industrial Dr., P. O. Box 1686, Henderson, TX 75653, Ph. (903) 657-7561, Larry Galyean, Owner, No. of employees - 28

**HACKER MACHINE SHOP** - 919 Hwy. 64, P. O. Box 1208, Henderson, TX 75653, Ph. (903) 657-1505, John P. Hacker, President, No. of employees - 12

**HALCO SPRING & STAMPING CO.** - 12190 CR 4182 W., Henderson, TX 75681, Ph. (903) 854-2777, Joseph Haley, Owner, No. of employees - 8

**HALL MANUFACTURING** - 1321 Industrial Dr., P. O. Box 157, Henderson, TX 75653, Ph. (903) 657-4501, Odis Chapman, Manager, No. of employees - 25

**HENDERSON FEDERAL SAVINGS ASSOCIATION**, 130 N. Marshall, Henderson, TX 75652, Ph. (903) 657-2577, Johnny Foster, President, No. of employees - 20

**HENDERSON HEALTH AND REHAB** - 1010 West main St., Henderson, TX 75652, Ph. (903) 657-6513, Marilyn Johnson, Administrator, No. of employees - 126

**HENDERSON ISD** - 200 N. High St., P. O. Box 728, Henderson, TX 75653, Ph. (903) 657-8511, Tommy Alexander, Superintendent, No. of employees 569

**HENDERSON MEMORIAL HOSPITAL** - 300 Wilson St., Henderson, TX 75652, Ph. (903) 657-7541, No. of employees - 400

**IESI TX CORP.** - Hwy. 135 North, P. O. Box 3125, Kilgore, TX 75663, Ph. (903) 956-1959, Larry Goswick, District Manager, No. of employees 41

**INTERNATIONAL PAPER CO.** - (Southern Woodcraft Div.) 609 Industrial Dr., P. O. Box 460, Henderson, TX 75652, Ph. (903)657-4575, Raymond Mitchell, Plant Manager, No. of employees - 155

**JACSON, INC.** - 902 Hwy 64 West, Henderson, TX 75652,  Ph. (903) 657-6059,

1/2/2007

Andrew Threadgill, CEO, Chris Threadgill, Plant Manager, No. of employees - 7

**KINGSLEY PLACE OF HENDERSON** - 1000 Richardson Dr., Henderson, TX 75654, Ph. (903) 655-1198, Christy Brown, Administrator, No. of employees - 43

**LAMBERT SOUTHWEST, INC.** - 1110 N. Frisco, P. O. Box 1111, Henderson, TX 75653, Ph. (903) 657-4680, Glenn Holladay, President - No. of employees - 7

**LONGVIEW ASPHALT, INC.**, (Formerly M. Hanna Cons.) FM 2276, P. O. Box 3661, Longview, TX 75606, Ph. (903) 758-0065 Rodney Price, No. of employees at Rusk Co. Plant - 4

**McNEW'S PRODUCE** - 400 Hwy 79 S., P. O. Box 2124, Henderson, TX 75653, Ph. (903) 657-4832, Buck and Frances McNew, Owners, No. of employees - 30

**B.M. MOORE CORRECTIONAL FACILITY** - 8500 N FM 3053, Overton, TX 75684, Ph. (903) 834-6186, Neva Yarbrough, Warden, No. of employees - 125

**MUSTANG DRILLING** - 101 W. Fordall, Henderson, TX 75652 Ph. (903) 657-0566, Mike Wilhite, Owner, No. of employees - 7

**OPTI-CASE/OPTI-SOUND** - 1175 CR 481 West, Henderson, TX 75654 - Ph. (903) 657-5666, David Phipps. Owner, No. of employees - 11

**PANEL TRUSS TEXAS, INC.** - 700 Kilgore Drive, P. O. Box 817, Henderson, TX 75653, Ph. (903) 657-7000, Donnie Powers, Owner, No. of employees - 118

**PIONEER DRILLING COMPANY** - 1409 Kilgore Drive, Henderson, TX 75652, Ph. (903) 655-6374, No. of employees - 240

**PRECISION HARDWOODS INC.** - Hwy 259 S., P. O. Box 355, Mt. Enterprise, TX 75681, Ph. (903) 822-3275, David Maher, Manager, No. of employees - 7

**REAL BARK** - 500 Austin Ave., P. O. Box 1340, Henderson, TX 75653, Ph. (903) 657-6522, Rocky Hall, President, No. of employees - 10

**R. T. SMITH WELDING & PRESS CO**. - 808 Hwy 64 West, Henderson, TX 75652,

The Henderson Texas Area Chamber of Commerce - Henderson Texas, the county seat for Rusk county, is more than just a sm... Page 5 of 7

Case 2:07-cv-00049-TGW-SCE Document 105-24 Filed 06/28/2007 Page 7 of 99

Ph. (903)657-3000, Richard Smith, President, No. of employees - 7

**RUSK COUNTY** - 115 N. Main St., Henderson, TX 75652, Sandra Hodges, County Judge, No. of employees - 250

**RUSK COUNTY ELECTRIC COOPERATIVE, INC. (RCEC)** - 3162 Hwy. 43 East, P. O. Box 1169, Henderson, TX 75653-1169, Phone (903) 657-4571, Buddy Bankhead, General Manager, No. of Employees - 68

**SADLER'S BAR-B-QUE SALES, INC.** - 1206 N, Frisco, P. O. Box 1088, Henderson, TX 75653, Ph. (903) 657-5581, Harold Sadler, President, No. of employees - 304

**SANDY BROOK RESIDENTIAL TREATMENT CENTER** - 14546 CR 3163 S., Laneville, TX, P. O. Box 2077, Henderson, TX 75653, Ph. (903) 863-5394, Mike Jackson, Owner, No. of employees - 30

**KIM R. SMITH LOGGING** - Rt. 2, Box 457, Tatum, TX 75691, Ph. (903) 947-2295, Kim Smith, Owner, No. of employees - 40

**SOUTHWEST TANK & TREATER MANUFACTURING CO.** - 2325 Hwy. 64 West, P. O. Box 340, Henderson, TX, 75653-0340, Ph. (903)657-3556, Sammy Rogers, Owner, No. of employees - 48

**SPIVEY STAKE & SUPPLY CO.** - Hwy 259 North, P. O. Drawer 349, Mt. Enterprise, TX 75681, Ph. (903) 822-3267, Fred Spivey, Owner, No. of employees - 30

**SWIRL-WAY PLUMBING GROUP** (Division of Mansfield Plumbing Products, Inc.) - 1505 Industrial Drive, Henderson, TX 75652, Ph. (903) 657-1436, Ray Hall, Administrative Manager, No. of employees - 81

**TENASKA, INC.** - P. O. Box 697, Mt. Enterprise, TX 75681, Ph. (903) 898-2044, Russell Anderson, Plant Manager, No. of employees - 28

**TEXAS BANK** - 1120 Hwy 79 North, Henderson, TX 75652, Ph. (903) 657-1466, Bobby Davis, President/CEO, No. of employees - 50

**TEXAS FOREST SERVICE** - Lake Forest, Henderson, TX 75652, Ph. (903) 657-0511,

Jason Guinn, Forester, No. of employees - 10

**TEXAS UTILITIES** - FM 2658 off Hwy 43, P. O. Box 651, Tatum, TX 75691, Ph. (903) 836-2711, Brian Ballard, Plant Manager; Ph. (903) 836-6510, William Cooper, Mine Manager. No. of employees - 930

**W. D. TOWNLEY & SON LUMBER CO.** - 13668 Hwy. 79 South, P. O. Box 726, Henderson, TX 75653-0726, Ph. (903) 854-4499, Robert T. Wilson, President, Joey Townley, Vice President, No. of employees - 140

**TRANSIT MIX** - 105 Industrial Dr., P. O. Box 1052, Henderson, TX 75653, Ph. (903) 657-3649, Ricky Norman, Manager, No. of employees - 3

**TRINITY ASPHALT, INC.** - FM 2276, P. O. Box 636, Henderson, TX 75653-0636, Ph. (903) 657-5112, Billy Todd Bryan, Owner, No. of employees - 5

**TRUELOCK WELDING AND FABRICATION, INC.** - 923 Hwy. 64 West, Henderson, TX 75652, Ph. (903) 657-4478, Henry Truelock, Owner, No. of employees - 15

**VELVIN OIL COMPANY** - 403 Webster Drive, Henderson, TX 75652, Ph. (903) 657-2108, David Velvin, Owner, No of employees - 11

**VTEC VESSEL TECHNOLOGY** - (A Division of Sure Alloy Steel) - FM 2011 S., P. O. Box 6570, Longview, TX 75608, Ph. (903) 643-9111, Tony Leslie, Manager, No. of employees - 20

**WALMART SUPER CENTER** - 2121 Highway 259 South, Henderson, TX 75654, Ph. (903) 657-5707, Debbie Whorton, Manager, No. of employees - 320

The Henderson Texas Area Chamber of Commerce - Henderson Texas, the county seat for Rusk county, is more than just a sm...   Page 7 of 7

Contact the Chamber

All Rights Reserved 2003-2006

1/2/2007



COMMUNICATIONS

**WHITEPAPER: Voice over Internet Protocol:
Ready for Prime Time**

Cox Communications' Successful Deployment of VoIP

# FOREWORD

**DEFINING VoIP**

VoIP is a technology — not a service. VoIP technology converts analog voice signals to packets, which are routed as data over an Internet Protocol (IP) network without ever having to rely on traditional circuit-switching. By doing so, the voice conversation does not tie up a dedicated path or channel. With traditional circuit-switching, a dedicated circuit is required. In fact, circuit-switching requires the circuit to remain open until the phone call is terminated.

Packets consisting of voice conversations can be sent over the same path as other data or voice packets. Due to the efficiencies of multiplexing inherent in an IP network, a common infrastructure can carry multiple services, including VoIP-based telephone, along with data and video.

*In February 2003, Cox Communications published* "Preparing for the Promise of Voice over Internet Protocol (VoIP)," *its first whitepaper on the subject. At that time, VoIP technology was still in its infancy and the need still existed to educate industry analysts and media, as well as our peers, on several fronts, including: the state of VoIP technology and its applications; Cox's VoIP strategy in relation to the circuit-switched technology Cox has deployed since 1997; the anticipated economics associated with VoIP; and the company's time-to-market plan.*

*In Cox's widely published whitepaper, it clearly stated that VoIP held great promise as an upcoming technology, yet it was not quite ready for prime time deployment. Yet, the paper stated, when VoIP is ready for deployment, it would be well-positioned to launch VoIP based on its significant circuit-switched telephone experience. This experience would allow Cox to leverage its telephone back-office operations, network platform and knowledge — without stranding any deployed circuit-switched capital.*

*Since publication of the first whitepaper, Cox continued its thorough approach to developing VoIP technology. During that time, Cox worked very closely with its vendors in the lab and in field trials to drive the technology toward a quality level that Cox deemed suitable for customers. This effort also involved discussions on the regulatory front with the Federal Communications Commission (FCC), the National Cable & Telecommunications Association (NCTA) and various state regulatory agencies to ensure that the regulatory landscape would meet the needs of Cox customers and the business needs of Cox.*

*Cox believes that VoIP is now ready for prime time as a complement to its circuit-switched deployments. This whitepaper will provide an update on Cox's successful deployment of VoIP technology and the company's telephone strategy.*



# EXECUTIVE SUMMARY

**COX'S MANAGED VoIP VS. INTERNET TELEPHONY**

Cox's commitment to customers has driven the development of the VoIP technology that it deploys today and clearly differentiates Cox's VoIP architecture from numerous VoIP technology offerings currently available in the marketplace. There are several compelling advantages to Cox's deployment of VoIP over a private, managed data network rather than the public Internet, including:

**Call Management Control.** Signaling for call set-up and call management is transported as packets on our own backbone data network, never traversing the public Internet.
In contrast, signaling for call set-up and call management for Internet Telephone calls travels through the Internet, a 'best-effort' data network that is not engineered to handle voice's stringent requirements. Hence, these 'best effort' calls are much more likely to fail during the initial call set-up or inadvertently dropped sometime during the conversation.

**End-to-End Quality of Service (QoS).** On Cox's managed VoIP network, voice packets are labeled and tagged to receive priority treatment and avoid bottlenecks that can cause delays, echoes, drop-outs or other negative impacts on voice quality. By contrast, Internet Telephone calls are transmitted via the public web of networks that comprise the Internet. With Internet Telephony, there is no way to distinguish a voice packet from a data packet. This makes voice packets susceptible to all of the potential problems described above.
In short, Cox's managed VoIP technology delivers the same high-quality phone calls as traditional phone technology, while Internet Telephony call quality may vary based on the amount of data traffic being carried at the time.

**Emergency Services.** Cox's managed VoIP technology enables Enhanced 911 (E-911) service, while some Internet Telephony providers do not. Some Internet Telephony companies provide 911 access – but it is not E-911, where the police or fire department receive the actual phone number and address/location of the calling party and the line stays open even if the calling party hangs up. Cox can accomplish this in Roanoke and in future VoIP deployments because it maintains complete control of its end-to-end managed network infrastructure and back-office functions.

**Open Standards.** Cox's VoIP architecture is compliant with PacketCable™ 1.0 and DOCSIS®, 1.1 standards to ensure quality-of-service levels, while Internet Telephony does not provide quality-of-service guarantees.

Cox, the 12th largest telephone company in the United States, has developed significant telephony infrastructure, operations, expertise and experience during its seven successful years of providing Cox Digital Telephone service, which is now available in 13 markets. Cox's success with circuit-switched technology is evident with more than 1 million satisfied residential customers and more than 100,000 Cox Business Services customer locations. Cox continues to demonstrate strong telephony growth; the company grew its residential telephone customer base by 38 percent in 2003. The fact that Cox is already a major telephone provider clearly distinguishes the company from many of its peers and competitors.

For more than two years, Cox tested and trialed VoIP technology in its laboratories and in field trials. Recently, Cox successfully launched the technology to residential customers in Roanoke, Va., and the company is preparing to launch additional VoIP telephone markets in 2004. Cox's commitment to customers has driven the development of a more robust VoIP technology that clearly differentiates Cox's VoIP architecture from many other VoIP offerings currently available in the marketplace. Regardless of the technology Cox provides — circuit-switched or VoIP — the company is committed to providing high-quality, full-featured telephone service to its customers. Indeed, as the competitive, regulatory and technological environment continues to evolve, Cox will leverage the flexibility it has built into its network to remain a customer-driven, efficient and successful provider in the telephone marketplace.

Based on extensive experience with both circuit-switched and VoIP technology, Cox expects the following distinct advantages as the company expands its telephone footprint with VoIP:

- As a successful telecom provider with solid customer growth in 12 circuit-switched markets and our first VoIP market, Cox will continue to extensively leverage its back-office systems, experienced people and processes for further VoIP market launches.



**LESSON LEARNED**

Cox's decision to use a number of different vendors for its VoIP architecture provided a significant integration challenge. For example, consider the number of equipment types (i.e. softswitch, gateways, CMTSs and MTAs) multiplied by numerous configuration variations multiplied by constantly shifting software versions.

One key to Cox's successful integration testing was the strong stance it took on software version control. By greatly reducing the number of "moving parts" and only allowing new software versions when it was deemed absolutely critical, Cox was able to make continuous progress towards a deployable solution.

- The Cox advantage, in terms of architecture, rests in the fact that it owns and operates its own end-to-end network infrastructure, including a nationwide OC-48 IP backbone network — a key differentiator from Cox's peers and competitors. This allows us to own and manage the complete end-to-end customer experience including sales, provisioning, transport, billing and quality-of-service (see "Architecture Variations" diagram, page 10).

- The regionally distributed architecture provides for an efficient deployment of the technology and its associated back-office operations. It also allows Cox to introduce phone services to customers in markets where the economics do not support the cost of a circuit-switched architecture (see "VoIP vs. Circuit-Switched Cost Comparison," page 11).

- The inherent flexibility already built into Cox's infrastructure will enable the company to remain a successful provider in the highly competitive, ever-changing regulatory world of telecommunications.

- Cox will not abandon its circuit-switched business. Rather, it will leverage the circuit-switched experience to launch new VoIP telephone markets — without stranding the capital it has invested in its circuit-switched operations. Moreover, Cox will have the capability to add capacity in circuit-switched markets via IP transport technology in relation to subscriber growth, when the existing circuit-switch capacity is exhausted.

- Cox will expand its phone service footprint via VoIP to commercial customers, thereby furthering its leadership position in voice among its peers in the commercial telecom marketplace.

- VoIP will help enable the company to reach its goal of providing a three-product bundle of services in all of its markets. Cox also looks forward to the future integration of video, voice and data into a series of unified communications products and services.



# INTRODUCTION

Voice over IP technology has arrived. Cox Communications first launched and marketed it as Cox Digital Telephone in Roanoke, Va. in December 2003 — bringing the same high-quality, full-featured telephone service to residents in Roanoke that it delivers to 12 other Cox telephone markets via circuit-switched technology.

Both the technical and operational foundations that Cox has deployed today have been for the sole purpose of providing high-quality, full-featured telephone service — a strategy that differentiates Cox from other competitive VoIP telephone providers. More so, as described within this whitepaper, Cox had the foresight to build flexibility into its architecture. As a result, Cox will have the capability to adapt its telephone product, if deemed necessary by competitive, regulatory and/or technological advancements.

With VoIP, voice calls are digitized into Internet Protocol (IP) data packets and transported in that form over Cox's managed IP network. Cox's VoIP solution is based on the technical and operational requirements of an end-to-end, private, managed IP network transport system with full Quality of Service (QoS) that provides telephone service

**COX TELEPHONY MARKETS**



Cox Digital Telephone service is available to more than 5 million homes in Orange County and San Diego, Calif.; Phoenix and Tucson, Ariz.; Omaha, Neb.; Meriden, Conn.; Rhode Island statewide; New Orleans, La.; Oklahoma City, Okla.; Wichita, Kansas; and Hampton Roads, Roanoke and Northern Virginia. Cox will launch the service in additional markets in 2004.

## VoIP Comparison

| | End-to-End Quality of Service | Full Regulatory Compliance (Company) | Interconnect Agreement | PacketCable Compliant | CPE Powering | Automated Provisioning |
|---|---|---|---|---|---|---|
| Cox | Yes | Yes | Yes | Yes | Yes | In-house |
| Other MSOs | Not yet | No | No | Some | Not yet | Outsource |
| Internet Telephony Providers | No | Some Providers | Some | Not Applicable | No | Some Providers |

| | End-to-End Customer Service | Available to Customers Without Broadband | E-911 | 7 Digit Local Dialing (Where Applicable) | Local Number Portability | |
|---|---|---|---|---|---|---|
| Cox | Yes | Yes | Yes | Yes | Yes | |
| Other MSOs | Yes | Some | Yes | Yes | Some MSOs | |
| Internet Telephony Providers | No | No | No | No | Some | |



with enhanced 911 services, directory assistance, operator services, local phone number portability, equal access long distance and compliance with CALEA (Communications Assistance for Law Enforcement Act). This product direction is based on significant market research and Cox's proven success in providing a quality telephone solution.

# COX'S EARLY ENTRY INTO TELEPHONE

No discussion of Cox's success with VoIP can start without first exploring the company's success as a circuit-switched telecom provider. Cox has grown from a single-service cable television company into a multi-service broadband communications provider. Via its flexible and powerful broadband delivery network, Cox now offers a number of communications and entertainment services, including analog and digital cable television, high-speed Internet, telephone and high-definition television in most of its residential and commercial markets. Cox has not only leveraged the power of its broadband platform to create multiple revenue streams, but has also created more profitable, longer-term customer relationships by offering bundled services to customers. Cox customers continually validate the company's strategies, as evidenced by the impressive growth of these new services.

Cox's telephone business, in particular, has distinguished the company from its peers. In the mid 1990s, Cox began installing switches and other telecom equipment in select markets, preparing to capitalize on the Telecommunications Act of 1996 which officially opened the telecom market to competition. Cox first launched local phone service in 1997 in Orange County, Calif. Today, Cox Digital Telephone has more than 1 million residential customers and more than 100,000 Cox Business Services customer locations across 13 telephone markets. In 2003, Cox received the highest honor in J.D. Power and Associates' 2003 Residential Local Telephone Customer Satisfaction Study in the Western Region.

"Cox pioneered cable telephone via circuit-switched technology," notes Chris Bowick, Cox's Chief Technical Officer. "In doing so, we amassed more than seven years of in-the-trenches experience as a telecom provider.

## BUILDING AN IP BACKBONE

Cox Communications decided to internally build and run most of its Internet services, thus eliminating most external dependencies for the delivery of its services. This included the construction of a nationwide IP backbone network.

One of the primary advantages of building a backbone is the ability to reduce data delivery costs via peering. While originally networks must pay to get data to and from the Internet, peering can help reduce or eliminate such costs.

Peering is defined as the exchange of data with other IP networks or ISPs on a settlement-free basis. Cox has been able to ramp up peering to more than 50 percent of its total Internet traffic in just over a year, saving more than half the cost of its transit bill. Peering has the added bonus of reducing latency and, hence, improving network performance for customers.

There are eight main locations for peering in North America: New York, Northern Virginia, Atlanta, Dallas, Chicago, Seattle, the San Francisco Bay Area and Los Angeles. In Cox's case, the backbone extends to most of these cities even though several are not Cox cable franchise areas. It can sometimes feel like a leap of faith adding such locations to your network topology, but it's necessary. Only in that way can you engage in peering relationships that will ultimately save on expenses.

In terms of security requirements, a best-of-breed service provider network requires at least four components: access control, configuration management, attack protection and security policies.

Access control is best defined as "Triple A," or Authentication (verify user), Authorization (determine privileges) and Accounting (track all activities). After reviewing the available tools and feature sets with existing AAA products, Cox's security team decided to build a more comprehensive solution using a combination of open-source and productized tools.

Attack protection was accomplished via a variety of methods, including firewalls, Intrusion Detection Systems (IDS), Access Control Lists (ACLs) and anti-Denial-of-Service (DoS) tools. Firewall and IDS boxes were installed at each regional data center location to protect distributed telemetry and provisioning servers, while every router interface is configured with ACLs to protect critical networks. Cox deployed a DoS protection system, which collects data (i.e., traffic samples from all routers) in order to detect attacks and provide trend analysis.

*Continued on page 6*



We navigated the complexities of the business, built a tremendous technological and operational base on which to distribute phone service and have already delivered significant financial results. Above all, we proved to both residential and commercial customers that they can depend on Cox for their phone services — for multiple services, in fact."

Cox attributes much of its success with launching VoIP technology to its pragmatic approach. "We reached the point where VoIP technology made good business sense from a technical, financial and operational perspective," said Bowick. "Today, the technology is robust and reliable and it integrates seamlessly with our circuit-switched operations. Importantly, we were not forced to abandon our circuit-switched technology in favor of VoIP because the two technologies are complementary. Cox's telephony strategy is a win-win scenario, one in which we control our destiny and our customers experience, thanks to our end-to-end managed network infrastructure and back-office functions, as well as our tremendous base of telephone expertise."

## MAXIMIZING ALL OF THE PIECES

Key elements of Cox Digital Telephone with a VoIP architecture include:

- Network — Cox attributes much of its success to its powerful network. Over the past decade, the company has extensively upgraded the HFC network in its local markets to deliver a very high capacity, reliable and extremely flexible platform on which to layer advanced services. Presently, more than 92 percent of the company's homes-passed are at least 750Mhz and two-way activated. With fiber optic nodes serving an average of less than 700 homes passed, Cox continues to effectively manage spectrum for ample capacity for all of the services it delivers now and for future growth.

- Back-office — Just as important as the power of the network is the complex system of back-office functions and processes that must be perfected in order to effectively deliver telephone services. These

---

*"Building an IP Backbone," continued*

**Services**
Cox's backbone has, to date, far exceeded expectations. Performance has been excellent and peering (as well as competitively bidding transport and transit services) has helped us to reduce backbone costs.

On top of that, the backbone is beginning to be used as a strategic asset that can be applied toward other parts of the business. One of the first applications to take advantage of the backbone was Cox's own internal network, used for Cox's business needs (e-mail, billing, customer care, etc.). Most of this network has migrated over to our IP backbone from a leased frame relay network, saving millions of dollars in recurring expenses.

Cox is also beginning to use its own network to transport its long-distance telephone traffic. As the nation's 12th-largest telephone company and with 75 percent of the residential phone customers taking Cox's long distance offering, Cox purchases significant amounts of wholesale long distance minutes from third parties.

The company realized that a significant portion of these calls terminate in other markets where Cox either offers phone service or where the backbone terminates. By converting calls to VoIP and then transmitting these calls over Cox's IP backbone, the company is realizing cost savings totaling millions of dollars in expenses.

Lastly, as Cox launches VoIP services over the coming years, the IP backbone is perfectly suited to act as the transport mechanism for both telephone calls and call-control protocols. One of the keys to VoIP's success will be the ability to geographically distribute and share the assets necessary for running the service. The backbone is ideally suited to act as the glue that connects those assets together. Eventually, Cox will be able to interoperate between this "Class 5" infrastructure and the "Class 4" long-distance infrastructure mentioned above.

Continued on page 7

---

Finally, security policies were written to provide a baseline for continued network security. Operational guidelines, such as password management and DoS attack response procedures are covered, as well as restrictions on what sorts of protocols may be used for any given type of service or access. One valuable lesson learned was that a single comprehensive policy facilitates more widespread adherence than several topic-specific policy documents.



*"Building an IP Backbone," continued*

Enabling an IP backbone to accommodate the delivery of multiple services does not come without considerable preparation and testing, as well as the work involved with activation of advanced protocols. In Cox's case, quality of service (QoS) is implemented in core routers via DiffServ and TOS (type of service) bits, as well as by marking and remarking as appropriate all data that enters the backbone. Cox has created levels of priority-setting properties, such as packet-drop, packet delay and delay jitter. Cox has also activated the MPLS protocol for traffic engineering purposes.

Just as Cox has for years referred to hybrid fiber/coax (HFC) as the "winning network," the company has gained an appreciation for the importance and value of its IP backbone as another powerful tool for delivering services to customers. By keeping this asset under Cox's own control, the company has been able to easily evolve the network to meet current and future needs without dependencies on outside partners. And due to the efficiencies of multiplexing inherent in an IP network, Cox is able to achieve significant cost savings by sharing a common infrastructure for multiple services.

*For further information on building Cox's IP backbone, visit http://www.cedmagazine.com/ced/2004/0204/02c.htm*

functions include call processing, enhanced 911 services, billing, phone number administration, local number portability, operator services, directory assistance, directory listings, interexchange agreements with other phone companies, calling cards and numerous other requirements. For many years, Cox has dedicated teams exclusively to perfecting support and delivery processes for telephone service. These teams develop methods, procedures, audit processes and measurements that impose discipline and efficiency on the delivery and support of all of video, voice and data services.

Indeed, Cox's back-office systems and processes are leveraged extensively for VoIP roll-outs. Thereby, Cox did not have an extensive learning curve for its first VoIP launch. Cox already had the processes and experienced people in place to provision services, manage data and integrate information about multiple services into one central location. This provides extraordinary value that Cox continues to reap every day.

A key asset is Cox's ability to manage the back-office functions of delivering phone service with its integrated customer management system. Cox is the only major broadband company that operates 100 percent of its field locations and all of its video, voice and data services on a single back-office platform. The vast capabilities of this system help provide a smooth experience for Cox customers at all stages of the relationship. Cox's system ensures seamless flow of functions, including order entry, scheduling, installation, billing and service provisioning. The value of this integration is extraordinary, allowing Cox customer care representatives to sell efficiently and activate all services utilizing a single platform at one time with one phone call and one view of all relevant customer data. Cox is also able to offer customers the flexibility of receiving one billing statement for multiple services, choosing a single bill for each or selecting a combination of those options. Lastly, the back-office integration supports a high degree of flexibility and automation, eliminating paper and manual processes that erode margins, cause errors and lead to customer dissatisfaction. Moreover, it eliminates the need to coordinate with third party companies, which can lead to delays in activating and servicing customers.



- Backbone — Cox's nationwide OC-48 IP backbone network was created in 2001. Today it transports Cox High Speed Internet, Cox Business Internet services, VoIP and more than 25 percent of Cox's long distance traffic.

  The backbone interconnects all Cox markets and connects other major metropolitan hubs including Chicago, Dallas, Los Angeles, San Francisco and New York. This extremely flexible and powerful network includes 14 regional data centers (RDCs) and three services data centers (SDCs). The SDCs serve as hosting locations for VoIP soft-switch technology for nationwide telephony coverage in addition to hosting and sharing mail, news, web space and other components of Cox High Speed Internet. These centers provide Cox with a national presence well beyond the local-only networks typical in the cable business and an attractive economic foundation for significant geographic efficiencies enabled by the network. Instead of replicating



**Cox High Speed Internet Backbone**



equipment in every data or VoIP market, Cox regionalizes some
components of service delivery into these centers. This architecture
enables Cox to further leverage its backbone to integrate data and
telephony services.

## COX'S VoIP ARCHITECTURE

Cox's architecture is PacketCable™ compliant and purpose-built to provide
nothing less than high-quality, full-featured telephone service. The network's
primary components include DOCSIS 1.1 cable modem termination
systems (CMTSs), media terminal adapters (MTAs), media gateways
and a soft switch.

The highly distributed nature of Cox's VoIP architecture creates
numerous leverage points throughout the network. The ability to leverage
local, regional and national infrastructure, as well as processes and
procedures, enables the operation to efficiently scale in size and scope.

**Local.** The media gateway and CMTS reside at the local (metro) network
level. The existing CMTS equipment provides a key infrastructure leverage



**Cox VoIP Architecture**



point since it is already deployed to support Cox High Speed Internet services. In addition, many of the back-office functions typically performed locally in decentralized circuit-switched markets are consolidated at the regional level, thereby eliminating the need to replicate operations groups for newly launched markets.

**Regional.** The Dynamic Host Configuration Protocol (DHCP), Domain Name Server (DNS) and provisioning functions are located at the regional level. In the traditional circuit-switched model, Cox's local markets maintain responsibility for many of the back-office functions. However, Cox's regional design enables the consolidation of many back-office functions, including directory assistance, E-911 and local number portability. "The regional back-office support structure can support multiple markets," said Bowick. "As a result, Cox has realized true efficiency gains by eliminating the need to train and staff employees for local telephone operations. This creates downward pressure on what is typically a steep learning curve, given the complex nature of the telephony business."

### Architecture Variations



**National.** The soft switch resides at the national level of the architecture. The technical expertise required to support the soft switch is also maintained at this level, thereby creating a centralized technical



COMMUNICATIONS

**Per Customer Cost Comparison:**
**VoIP vs. Circuit-Switched[1]**

| | VoIP | Circuit-Switched |
|---|---|---|
| **Telephone Cost** | | |
| MTA/NIU | $130[2] | $215 |
| Switch | $86 | $83 |
| HIT | – | $53 |
| **Subtotal** | **$216** | **$351** |
| | | |
| **Network Readiness Cost[3]** | | |
| Drop/Connect | $30 | $85 |
| Powering/Status Monitoring[4] | $21 | $91 |
| **Total** | **$267** | **$527** |

1 Figures reflect current values at the time of publication. Given the dynamic nature of the marketplace, further maturation of VoIP technology will likely contribute to rapid decreases in VoIP costs. Price decreases will likely be seen in mature circuit-switched costs as well, albeit not as rapid as VoIP.

2 Includes the cost of an embedded cable modem.

3 Some published cost analyses may not include these factors as allocated costs for VoIP.

4 Based on 20% penetration.

support structure. With this configuration, Cox's local markets do not have to develop the technical expertise necessary to support the soft switch. More so, the ability to have a single view of the whole network to facilitate efficient troubleshooting techniques and problem resolution is the true benefit of centralizing knowledge of the entire system architecture and diagnostics. Moreover, a single group within the Cox organization maintains secure, controlled access to the soft switch to produce inherent quality control.

## THE ECONOMICS OF VoIP

Cox anticipates the cost of VoIP technology will continue to improve over time, much more rapidly than circuit-switched costs. Any comparison of the cost of VoIP versus circuit-switched should be done by evaluating similar telephone service components, including:

**CPE, Switching and other Peripheral Headend/MTC Equipment.** In these telephone-specific costs alone, VoIP potentially offers a capex advantage of almost 40 percent per customer when compared to an equivalent circuit-switched primary line replacement service. This significant cost advantage can largely be attributed to the lower cost of the MTA versus the NIU. Also, VoIP does not require the equivalent of a dedicated Headend Interface Terminal (HIT) for interface between the network and the switch. Instead, Cox's VoIP technology leverages the existing CMTS to support Cox's high-speed Internet platform. Further cost advantages for VoIP could be realized if Cox customers purchased the embedded MTA at retail locations (similar to the DOCSIS model) or if Cox provided a non-embedded MTA (one without a DOCSIS modem) to customers that already own a cable modem.

**Network Readiness.** Additional plant-related capex costs that could be attributed, at least partially, to the deployment of VoIP or circuit-switched telephone service include activities such as minor drop replacement and capitalized connect costs (to connect the NIU or MTA to the inside whole-house telephone wiring) and improved plant status monitoring and standby power. Regardless of VoIP, most of these activities would still be accomplished over time. In addition, these activities improve service quality and reliability for all of Cox's products – not just



telephone service. In these cost models, Cox assumes at least four hours of standby power in the HFC plant for both technologies, with in-home battery back-up for the VoIP MTA and network-supplied power for the circuit-switched NIU. Inclusion of these costs in the analysis will increase VoIP's per customer cost advantage to approximately 50 percent when compared to circuit-switched technology.

Cox has regionalized many of the functions and much of the equipment associated with delivering Cox High Speed Internet and VoIP, spreading the costs across multiple markets for savings and efficiencies. The following factors also contribute to the efficiency of its VoIP architecture:

- Regional and National Scalability — Cox's distributed VoIP architecture will drive savings in both operational and capital expense when compared to circuit-switched telephone. For instance, circuit switches are usually geographically restricted based on serving distance; therefore installed and maintained within each local circuit-switched market. With VoIP technology, Cox installs and maintains soft switches at the national level, serving multiple markets with only limited equipment and operations required locally. Current long-term plans are to deploy soft switches in three locations to serve all Cox markets. For Cox, this is particularly beneficial in smaller markets, where the potential customer base doesn't justify the cost of a circuit switch and associated infrastructure. This regional approach to scalability will also help the company defray the significant up-front investment in personnel and recoup its capital investment faster.

- Quality of Service (QoS) — Cox is complete in its upgrade to DOCSIS 1.1 software on its cable modem termination systems, a prerequisite for QoS. Cox believes that QoS is a requirement for providing high-quality, full-featured service and to prevent packets from suffering degradation during peak traffic periods or other periods of network congestion. Overall, Cox believes that end-to-end QoS also reduces operating costs by minimizing the number of customers who otherwise would be unsatisfied with the quality of their service. Cox's end-to-end QoS control is yet another inherent advantage of owning and controlling its network.



- Powering — Cox's research has found that consumers are more likely to choose a telephone service with power back-up than one without, thereby contributing to higher penetration rates. In Roanoke, Cox currently provides back-up powering of the in-home multimedia terminal adapter (MTA) using an internal battery that supplies several hours of back-up service. In the future, should market conditions and research indicate the need, Cox has the flexibility to provide customers with the option of taking telephone service without battery back-up for the MTA.

## MARKETING VoIP

Cox has long enjoyed excellent relationships with its customers, which the company accurately predicted would translate into customer loyalty. According to Cox research, customer churn in two-product households is 18 percent lower than one-product, while three-product customer churn is 48 percent lower.

Cox's belief is simple: Prove to customers that you're capable of delivering traditional cable service and high-speed Internet efficiently and with high value. Without this, they'll never trust you to deliver high-quality, full-featured phone service. Many companies seem to underestimate the critical importance of this fact. It's one thing to have a network and technology in place, but entirely different and more difficult to also possess the know-how and track record of actually serving customers' many needs effectively. Indeed, Cox received the highest honor in J.D. Power and Associates' 2003 Residential Local Telephone Customer Satisfaction Study in the Western Region.

In marketing VoIP, it's important to remember that VoIP is an architecture — not a product. Company research shows that most customers are not interested in the technology behind their telephone service, so Cox prefers to focus on the benefits and features that customers truly care about, such as value, bundled savings, convenience, rich features and attractive packages.



In Roanoke, the company positions, packages and prices its VoIP technology as high-quality, full-featured residential telephone service, branded as Cox Digital Telephone and sold in an identical fashion as in Cox's switched telephony markets. Cox's marketing strategy and tactics used in Roanoke are similar to the successful approach used in markets where a circuit-switched telephone architecture was implemented. In contrast to Internet Telephony, a subscription to Cox's high-speed Internet service is not necessary to receive telephone service served by Cox's VoIP architecture. This enables Cox to serve voice customers who do not wish to subscribe to Internet service.

## CONCLUSION

The inherent flexibility of Cox's end-to-end network infrastructure, from the CPE to transport and back-office functions, as described in this whitepaper, will enable Cox to remain a successful provider in the highly-competitive and uncertain regulatory world of telecommunications and to readily adapt and expand its telephone operations into new markets and to more customers.

In summary, Cox foresees the following:

- VoIP technology permits efficient geographic expansion of Cox's phone services, allowing the company to launch telephony in markets where the economics didn't justify the cost of a circuit-switched architecture. The company will launch several new Cox Digital Telephone markets utilizing VoIP in 2004.

- Cox will expand its phone service footprint via VoIP to commercial customers, thereby furthering its leadership position in voice among its peers in the commercial telecom marketplace.

- Cox's VoIP architecture provides the flexibility to expand service in existing circuit-switched phone markets with either a circuit-switched-only approach, or with a complementary VoIP overlay (once existing circuit-switch capacity is fully exhausted).



- VoIP technology enables Cox to introduce phone services to customers the company isn't currently reaching, without stranding the capital it has invested in its circuit-switched operations. The company will not abandon its circuit-switched business. Cox will completely utilize the capacity of existing switches.

- VoIP technology enables Cox to deliver long distance (LD) traffic over its own IP backbone network. Currently, more than 25 percent of Cox's long distance customer calls are transported via the company's national backbone, reducing its reliance on third-party wholesale LD providers.

- VoIP provides an economically efficient method to provide high-quality telephone service in Cox markets, enabling the company to reach its goal of providing a three-product bundle of services in all of its markets.

- Regulatory agencies are only now beginning to examine appropriate treatment of VoIP technology. To date, it is not yet known how the technology will ultimately be classified. New and varied approaches to VoIP by traditional telephony providers and new market entrants further complicate the regulatory environment. Notwithstanding, Cox's flexible VoIP architecture and back-office infrastructure will continue to position the company well and enable Cox to adapt quickly and as necessary to this dynamic environment.

"As the leading provider of cable telephony services, we take great pleasure in the growth of our telephone customer base," said Bowick. "We've proven that cable providers can be successful as telephone providers and we look forward to continuing our leadership position by offering the service to a broader segment of our customer base in 2004."



Your Friend in the Digital Age.





 

Copyright 1998-2004 Cox Communications, Inc.
Visitor agreement | Policies | EEO public file reports

| Cox.net | Careers | Diversity | Search cox.com | Contact us |

Back

**ADVISORY/Cox Communications Issues a White Paper: Voice over Internet Protocol: Ready for Prime Time**

--(BUSINESS WIRE)--

**ISSUE:** With multiple trials and one commercial VoIP technology launch complete, Cox believes that VoIP is ready for prime time. How will this impact its telephone strategy for 2004 and beyond?

**NEWS:** Today, Wednesday, May 12, Atlanta-based Cox Communications, Inc. announced it has published to its web site (www.cox.com/pressroom) a white paper outlining its telephony strategy and deployment of VoIP technology.

**PERSPECTIVE:** VoIP technology has arrived. Driven in large part by Cox's commitment to customers and quality of service, Cox's VoIP architecture clearly differentiates the company from many other VoIP technology offerings that are currently available in the marketplace.

- With more than 1 million residential telephone customers and 100,000 commercial customer locations, Cox will continue to extensively leverage its back-office systems, experienced people and processes for further VoIP market launches - without stranding the capital it has invested in its circuit-switched operations.
- Cox will expand its phone service footprint via VoIP to commercial customers, thereby furthering its leadership position in voice amongst its peers in the commercial telecom marketplace.
- The regionally distributed architecture allows Cox to introduce phone services to customers in markets where the economics do not support the cost of a circuit-switched architecture.
- In the white paper, Cox outlines its strategy for deploying VoIP; highlights its VoIP architecture; examines cost comparisons of VoIP vs. circuit-switched technology; and highlights its success as a telecom provider.

**WHO:** David Pugliese, vice president of product marketing and management will be available for interviews about VoIP, and Cox Communications' overall telephone strategy.

**WHERE:** The white paper is available online at www.cox.com/pressroom.

**CONTACT:** Cox Communications, Atlanta Bobby Amirshahi, 404/843-7872 bobby.amirshahi@cox.com or Laura Oberhelman, 404/269-7562 laura.oberhelman@cox.com SOURCE: Cox Communications, Inc.

COX
ENTERPRISES, INC.

6205 Peachtree Dunwoody Road
Atlanta, GA 30328
678-645-0000
www.coxenterprises.com

The **RIGHT** Stuff

COX ENTERPRISES, INC.
2005 ANNUAL REPORT



## A Message From Jim Kennedy and Jimmy Hayes

At the dawn of the space age, America's quest to explore new worlds relied upon the efforts of a group of daring risk-takers. After years of sacrifice and setbacks, they achieved success – and wrote the first chapters in our nation's amazing story of space exploration.

These pioneering astronauts were said to possess "the right stuff," a unique combination of skills that set them apart. Those special qualities were not easy to define, but when you saw "the right stuff" in action, you recognized it at once.

As we reflect on 2005, a year of transition and challenge for our company, it's clear that same special spirit to excel and overcome adversity burns bright within Cox Enterprises. Yes, having "the right stuff" means being bold, enduring risk and embracing technology to achieve success. Just as important, it also demands two qualities deeply ingrained in the Cox tradition – integrity and trust. For more than a century, these have been hallmarks of how we conduct our business and how we treat our customers and one another.

These are much more than management slogans. In fact, they are deeply held values brought to life every day by thousands of Cox employees on the front lines of our 300 businesses across America. Sometimes these contributions earn recognition. Countless others, equally valuable, are never touched by the spotlight.

### THE RIGHT STUFF IS RIGHT HERE

Two valuable components of our culture are experience and continuity. That is why, across all Cox subsidiaries, we encourage promoting from within, offering maximum opportunity for employees to progress in their careers.

So it's no surprise that in a year of transition, we saw two accomplished company leaders – Dennis Berry and Jim Robbins – succeed in their operational roles by company veterans. As members of our Board, Dennis and Jim will continue to contribute their expertise and insight to help chart our future course. We are excited about the new leadership that has stepped up and pleased that we can maintain the company's unique and consistent approach to serving our customers and growing our businesses.



Jimmy Hayes
President and Chief Operating Officer

Jim Kennedy
Chairman and Chief Executive Officer

CM-1009-E-0406

## Cox Enterprises At-A-Glance

**COX ENTERPRISES**

is one of the nation's leading media companies and providers of automotive services. We are a Top 10 national player, based on revenues, in every major business category where we compete.

**2005 REVENUES: $12.0 BILLION**

**10-YEAR COMPOUND ANNUAL GROWTH RATE: 13%**

**EMPLOYEES: 77,000**

---

### Cox Communications

Cox Communications is one of the largest broadband communications companies in the U.S., delivering cable TV, high-speed Internet and telecommunications services, as well as new advanced services including high-definition TV, entertainment on demand and digital video recorders. Cox has a minority ownership stake in Discovery Communications.

BY THE NUMBERS

Revenues: $6.7 billion*
Employees: 23,300

Cox Communications serves 6.7 million** total customers in 22 states. Through Cox Business Services, it serves more than 150,000 business locations.

RELATED OPERATIONS

Cox Media
— Advertising sales

HIGHLIGHTS OF THE YEAR

• Mobilized resources companywide to aid employees, customers and communities following Hurricanes Katrina and Rita, and worked tirelessly to restore services in affected areas. Continuing to play a key role in the overall effort to "Rebuild a Greater New Orleans."

• Announced plans to form a joint venture with Sprint Nextel and other major cable companies to accelerate convergence of wired and wireless communications and add wireless phone service to Cox offerings.

• Increased the number of customers subscribing to two or more major services to 3.3 million and passed the one-million-subscriber milestone for the full suite of cable, Internet and telephone services.

• Received the highest ranking among all high-speed Internet service providers in the nation in J.D. Power and Associates' 2005 Internet Service Provider Residential Customer Satisfaction Study, as well as the highest ranking in the All-Distance Telephone Customer Satisfaction Study in the West.

---

### Manheim

Manheim is the world's leading provider of used vehicle services and a marketplace for the millions of cars that change hands every year. Manheim supports sellers in achieving the maximum value and provides buyers a reliable and safe market to purchase a wide array of vehicles.

BY THE NUMBERS

Revenues: $2.5 billion
Employees: 32,000

Manheim registers 10 million vehicles for sales events at its 135 locations worldwide and online annually.

RELATED OPERATIONS

Manheim Automotive Financial Services
— Financing, insurance and related services

Vehicle Management Services
— Titles, Transport, Recovery, Remarketing

Fixed Operations Businesses
— Dent Wizard
— Manheim Auto Body Repair
— Mark III Customs
— Total Resource Auctions

HIGHLIGHTS OF THE YEAR

• Improved the rate of dealer cars sold to record levels for the fifth consecutive year.

• Established Online Vehicle Exchange as a separate operating unit, targeting online wholesale transactions from dealer to dealer.

• Launched POINT, a new dealer inventory optimization product.

• Hosted over 10,000 visitors in the first year of operation for the Manheim DRIVE Center, benefiting customers, industry associations, and employee teams.

• Announced the opening of offices in China, expected to lead to a launch of business initiatives there in 2006.

---

### Cox Newspapers

Cox Newspapers is one of the nation's 10 largest newspaper publishing enterprises, with 17 daily papers and 25 non-dailies. Cox Newspapers operates direct mail businesses, distributes classified advertising publications, creates customized newsletters and owns one-third of a newsprint manufacturing business.

BY THE NUMBERS

Revenues: $1.4 billion
Employees: 15,000

Cox Newspapers publishes 17 daily newspapers with a Sunday circulation of 1.46 million.

RELATED OPERATIONS

Valpak
— National direct mail advertising

Cox Custom Media
— Commercial newsletter publishing

Trader Publishing
— (50 percent owned) 750 publications
— Vehicle, employment and real estate guides

SP Newsprint
— (33 percent owned)
— Recycled newsprint producer

PAGAS Mailing Services
— Direct mail advertising

HIGHLIGHTS OF THE YEAR

• Posted third straight year of record revenues and profits for Valpak.

• Grew online revenue 37 percent and generated a strong operating profit margin from Internet operations for the first time.

• Generated record revenues and operating cash flow at 50-percent-owned Trader Publishing Company.

• Produced new revenue and readers for three Spanish language newspapers.

---

### Cox Television

Cox Television operates both network-affiliated and independent television stations across the country as well as local cable TV channels. In addition to its broadcasting entities, Cox Television owns three television advertising sales rep firms, which together are number one in this industry segment.

BY THE NUMBERS

Revenues: $640 million
Employees: 2,700

Cox Television operates 15 stations, two local cable channels and three multi-cast weather channels in 11 markets — reaching 30 million viewers — as well as three national advertising representation companies and a Washington, DC bureau.

RELATED OPERATIONS

TeleRep
Harrington, Righter & Parson
MMT Sales
— National ad sales representation

HIGHLIGHTS OF THE YEAR

• Generated strong local news ratings, with news leaders delivering 50 percent or more of local news viewing.

• Continued dedication to community service as a business culture and path to long-term local brand identity in the expanding media world.

• Demonstrated competitive spirit through a sense of urgency and focus on viewer preferences with research and product delivery enhancing our audience strength and environment for advertisers.

• Provided new content and advertising options on television market-leading Web sites and state-of-the-art multi-stream digital channels, including three 24-hour "Weather PLUS" channels.

• Displayed broad representation of stations across the country by national sales rep firms, selling half of the national ad time sold nationwide to non-network-owned stations.

---

### Cox Radio

Cox Radio is one of the largest radio broadcasting companies in the U.S., based on revenues. With a focus on operational excellence and the customer, Cox Radio's high-performing radio clusters fit well with current media-buying approaches. A majority-owned subsidiary of Cox Enterprises, the company stock is traded on the New York Stock Exchange under the symbol "CXR."

BY THE NUMBERS

Revenues: $438 million
Employees: 2,136

Cox Radio operates 79 stations, including 66 FM and 13 AM stations, in 18 markets, reaching over 13 million listeners each week.

RELATED OPERATIONS

CXRi
— Internet Web sites

HIGHLIGHTS OF THE YEAR

• Increased revenues by 3 percent (excluding the impact of the discontinuation of the Atlanta Braves broadcasting agreement in 2004) — a rate that outpaced both the industry and our markets.

• Improved station operating income margin to 42 percent.

• Grew Internet revenues by 24 percent.

• Maintained consistent ratings leadership in the important 25–54 demographic.

• Launched a totally re-engineered Customer Service Initiative, including a robust online advertiser service portal.

• Repurchased $40 million of common stock and strengthened balance sheet by paying down debt.

• Completed the upgrade to HD Radio™ on almost half of our stations.

---

### AutoTrader.com

AutoTrader.com is the world's largest online auto classifieds marketplace and consumer information Web site. Through easy-to-use search tools and innovative merchandising products, AutoTrader.com unites buyer and seller online — dramatically improving the way people research, locate and advertise vehicles. Cox Enterprises is the majority owner of AutoTrader.com.

BY THE NUMBERS

Revenues: $274 million
Employees: 1,320

AutoTrader.com aggregates in a single location an average of 2.8 million vehicle listings from approximately 37,000 dealers and 200,000 private owners. This provides the largest selection of vehicles, attracting an average of 10 million shoppers every month.

HIGHLIGHTS OF THE YEAR

• Increased revenue 44 percent and profits 150 percent over 2004.

• Grew total customer base year-over-year by 30 percent to approximately 18,000 paying dealers.

• Expanded total audience from 8.1 million shoppers to an average of over 10 million shoppers monthly.

• Launched a new marketing partnership with Yahoo! Autos that enables AutoTrader.com to power Yahoo's automotive classifieds.

• Launched a new regional office in Seattle, WA.

• Introduced Power Search functionality to the Web site to enable easy comparison of vehicles.

• Upgraded customer service through Team Based Account Management.

• Staged targeted marketing campaign that resulted in a 25 percent increase in For Sale By Owner revenues.

---



**Patrick J. Esser**
President



**Dean H. Eisner**
President and
Chief Executive Officer

**Jay R. Smith**
President



**Andrew S. Fisher**
President



**Robert F. Neil**
President and
Chief Executive Officer

**Chip Perry**
President and
Chief Executive Officer

*\* Revenues from continuing operations*
*\*\* Numbers are an approximation as the company continues to assess the effect of population loss in New Orleans in the wake of Hurricane Katrina.*

---

The **RIGHT** Stuff

The **COX** Way

## The Right Response
## Right Away

**ustomers**

**Partners**

**ities**

Cox Enterprises is one of the nation's largest media companies and a leader in automotive services because of one simple tenet – we always try to do what is right. Though our operations are diverse and have their own distinct traditions, Cox people are united by a common set of values. From making every effort to hire from within to upholding the highest standards of journalistic ethics, from setting an industry standard for customer service to fostering an environment that encourages new ideas, our collective success is grounded in an understanding that when we do the right things as individuals, we do what is best for our company.

The catastrophic hurricanes of 2005 created unprecedented challenges for us all. When Hurricane Katrina roared ashore on the morning of August 29th, no one could imagine the devastation that would follow and the human suffering it would leave behind. It would prove to be one of the most difficult tests we've ever faced.

The response by employees in every Cox company was nothing short of remarkable…and provided a vivid example of "the right stuff" in action. Cox people pulled together to help rebuild communities, restore service, report extensively on the storm's impact and, most importantly, extend a helping hand to their co-workers, many of whom had lost their homes and everything they owned.

How thankful we are that none of our colleagues lost their lives or were seriously injured. A crisis such as this is a supreme test, and the choices we made – to retain all employees at full pay, to immediately begin to rebuild our network to an even higher level of quality, and to make a $10 million corporate gift for hurricane relief – are powerful expressions of who we are and what we believe in.

### By the Numbers:

More than 1,200 employees were impacted by the 2005 hurricanes:

- 905 employees from Cox Communications (25 percent lost everything)
- 7 employees from AutoTrader.com
- 294 employees from Manheim
- 9 employees from Valpak

$10 million in cash and in-kind support was given by Cox businesses to assist in the relief, recovery and rebuilding of the affected communities.

### Cox Employee Disaster Relief Fund

More than $3.1 million was raised by the not-for-profit Cox Employee Disaster Relief Fund, including employee and vendor donations and the company match.

5,200 employees contributed to the relief fund.

$1 million of employee contributions was matched dollar for dollar by Cox.

768 employees received emergency assistance from the Fund.

157 employees had received rebuilding assistance from the Fund by March 15, 2006, with new requests continuing.



*Photo by Brant Sanderlin, Atlanta Journal-Constitution*

# THE VERY BEST OF
# The Right Stuff

T he images on this page are just three examples of Cox photojournalists' coverage of the 2005 hurricanes. We wish space allowed us to tell all of the inspiring stories that we have heard in the days, weeks and months after the storms. We have chosen some (at right) that exemplify just what can happen when Cox employees donate their money, their time and their spirit to others.

Photo by Matt Rourke, Austin American-Statesman.

Photo by Barbara Hannan-Henry, Atlanta Journal-Constitution.

Photo by Matt Rourke, Austin American-Statesman. This photo earned Rourke the cover of National Geographic magazine.



*Harvey and Walda Sbisa*

## A Helping Hand for a New Start

Harvey and Walda Sbisa, both part-time drivers for Manheim, knew that their home in Lacombe, Louisiana, just six miles off the north shore of Lake Ponchartrain, might be in jeopardy as Katrina approached. At their son's insistence, the couple evacuated to their daughter's home in Texas before the storm. The Sbisas lost almost 60 trees to Katrina's high winds, and one tree completely crushed the roof of their home.

"It was just a godsend that we left," Harvey says. "I don't know what would have happened if we had been in the house when the tree came through."

Upon their return to Lacombe, the Sbisas called their Manheim supervisor and spoke of the destruction to their home. Word of their plight was passed along and submitted to the Cox Employee Disaster Relief Fund. Within days, the Sbisas received their first assistance – household items to equip a rented trailer to live in and financial assistance to begin the long rebuilding process. "I've never worked with a finer group of people, and we so appreciate the help that Cox and its employees have given us," Harvey says.



*B. Brian, 95.7 JAMZ afternoon drive jock, loads bottled water into a Cox Radio Birmingham truck for hurricane victims.*

## Bringing a Miracle to Miracle Place

As Brian Lejeune, a customer satisfaction analyst, made his way to work at Cox Communications in Baton Rouge the Tuesday after Hurricane Katrina came ashore, he was amazed at the destruction. "I got to thinking," Brian says, "that I have to do something."

Having a Cajun background, Brian began to formulate a plan to cook jambalaya – lots of it – to feed evacuees. He arranged donations of 50 pounds of pork, 50 pounds of sausage, onions, garlic and other needed ingredients. "The night before we cooked, we had a big chopping party, and when people drove by and saw what we were doing, they were stopping and donating meat and other things we needed," Brian says. By Friday, Brian and friends gathered to cook at a small church in Baker, Louisiana, aptly named Miracle Place, where 100 evacuees were housed. When cooking began on Saturday morning, more than 600 evacuees had arrived. While Brian and a few buddies got to work on the jambalaya, several other friends built showers so that the little church could house the evacuees, while still others sorted through donations of clothing and other items to disburse. Brian and his friends cooked until 4 p.m., making enough jambalaya to feed 600 people. "I did this with no expectation, other than helping people, and it really just snowballed from there," Brian says. "I don't feel like I did anything special; I just did what anyone else would have done."



*Brian Lejeune*

**COX ENTERPRISES CONSOLIDATED REVENUES*** (in millions of dollars)



| | |
|---|---|
| 1995 | 3,635 |
| 1996 | 4,358 |
| 1997 | 4,863 |
| 1998 | 5,304 |
| 1999 | 6,191 |
| 2000 | 7,973 |
| 2001 | 8,623 |
| 2002 | 9,611 |
| 2003 | 10,450 |
| 2004 | 11,233 |
| 2005 | 12,034 |

*All revenues are from continuing operations. 2001–2004 amounts have been restated to exclude the Cox Communications cable television systems that qualify for discontinued operations presentation.

## THE RIGHT STUFF IN THE FUTURE

Continued growth and profitability for our company requires the right combination of businesses, each configured to adapt to rapidly changing market conditions. Another feature of our success has been a sound, strategic mix of cash-generating enterprises that provide the fuel to build and acquire new ventures with high growth potential.

That time-tested model benefits every Cox employee – ensuring that we have the resources we need to remain fiscally sound and that we can offer new, more challenging opportunities to talented people. It also provides the flexibility to make major strategic adjustments when necessary – such as returning Cox Communications to private ownership.

## THE RIGHT STUFF IN ACTION

A commitment to community, customers and employees has been integral to our company's approach to its businesses for more than a century. The catastrophic hurricanes of 2005 created unprecedented challenges for us all. As you will read in the following pages, the response by Cox employees – who worked to overcome disruptions to our business and reached out to thousands of those in need – exemplified the very best qualities of commitment and service.

As we celebrate in this report the challenges met and overcome in 2005, even more important is the knowledge that, all around us, there are talented and trusted colleagues, unafraid to tackle tough problems, bold enough to innovate and meet our customers' needs in exciting new ways, and committed to the high standards of integrity and service that have been our touchstone for more than 100 years. Thanks for another great year.

*Jim Kennedy*
Jim Kennedy
*Chairman and Chief Executive Officer*

*Jimmy Hayes*
Jimmy Hayes
*President and Chief Operating Officer*

## A Tribute To Dennis Berry and Jim Robbins



DENNIS BERRY

Throughout a nearly four-decade career that began as an *Atlanta Journal-Constitution* classified sales representative and concluded as president and chief operating officer of Cox Enterprises, Dennis Berry proved uniquely capable at building strong teams and focusing on the countless small details that add up to exceptional performance. After rising to publisher, Dennis deftly switched gears to lead Manheim to some of its strongest periods of growth. Throughout his long career, Dennis' openness and intense commitment to the frontline people who make Cox successful serve as a powerful model of management excellence.



JIM ROBBINS

Jim Robbins is known as a cable pioneer and a true giant of the industry. On his watch, Cox Communications quadrupled in size while leading the way in technological innovation and operational excellence. From his earliest days in cable more than three decades ago, Jim understood that superb customer care comes first. His focus on great service never wavered. Jim saw early that building a robust network could lead to profitable new businesses such as telephony and high-speed Internet. Under his leadership, the bundling of voice, video and data into a single service package became a marketing mandate for Cox and the entire industry. Jim Robbins' visionary, committed leadership helped Cox earn four J.D. Power awards for customer satisfaction and numerous industry accolades for operational excellence.

Employees

C

Retirees

Suppliers

Commun

# The **RIGHT** Stuff



## COX COMMUNICATIONS

Leroy Thomas III is one of the many Cox Communications employees who demonstrated two cornerstone values – teamwork and service – following the devastation of Hurricane Katrina. After the safe evacuation of his family from New Orleans, Leroy stayed behind. For hours, he documented his experience on video as Katrina came and went and flood waters began rising. Ultimately, Leroy was forced to his roof and then to a neighbor's house, where a boat transported him to safety. Over the next several days, Leroy worked nearly non-stop to rescue others. Similar demonstrations of heroism and selflessness were common practice among Cox employees in the hours, days and months following the storm. They illustrate why Cox is a leader in its field and is recognized as a dedicated supporter of its communities and customers.

*Pictured:*
*Leroy Thomas III*
*Field Service Representative,*
*Cox Communications – New Orleans*

## COX COMMUNICATIONS

Cox Communications is an industry leader in advanced broadband communications. It has pioneered the bundling of multiple services that deliver convenience and value to customers. Its reputation for superior customer service continues to be reinforced by an ever-growing number of awards. And it is also a supportive corporate partner, donating more than $100 million annually in cash and in-kind support to important community causes. At Cox Communications, the right stuff is always done the right way.







**Your Friend In The**

# DIGITAL AGE

## COX COMMUNICATIONS

**BUNDLES OF SUCCESS**   Today, multiple service providers are focused on grabbing a share of the vast communications marketplace. Many of them are trying to perfect the "bundling" and seamless delivery of multiple services into homes and businesses. Cox Communications has nearly a decade lead in this effort and an advantage that is evident in the company's subscriber counts and customer loyalty. Among the company's 6.6 million residential customers, almost half subscribe to at least two of Cox's three major services: Cox Cable, Cox High Speed Internet and Cox Digital Telephone. In 2005, Cox Communications reached an industry first: one million "triple-play" customers who chose all three services. The company realizes that keeping customers happy is largely dependent on how much convenience Cox can bring to their lives, so the company offers numerous features and services – including multiple billing options – that help customers enjoy their Cox services even more.

**VERY SATISFIED CUSTOMERS**   Already a recognized leader in customer satisfaction, Cox received



the highest rankings for overall customer satisfaction from J.D. Power and Associates in two 2005 studies: The Internet Service Provider Residential Customer Satisfaction Study, marking the first time that Cox High Speed Internet ranked first in overall customer satisfaction nationally; and in the residential telephone study in the West region, the third consecutive year Cox's phone service has been cited by this study. Finally, Cox's Internet service received its third PC Magazine Readers' Choice Award, a survey based on responses by more than 9,000 broadband users, including DSL and satellite customers.

**FAMILY TIME**   *Take Charge! Smart Choices for Your Cox Digital Home* is an educational campaign empowering parents to manage children's access to mass media content. The initiative strives to increase customer awareness and use of parental controls and filtering tools already available on their cable and Internet services. Customer research indicates parents overwhelmingly feel it is their responsibility to manage what their children see, and don't see, on TV and the Internet. But they admit they sometimes don't do a great job and are looking for help. With *Take Charge!* (www.cox.com/TakeCharge), Cox provides that help. The company partners with well-known children's advocate and TV host John Walsh to deliver dozens of resources, materials and events that educate parents on how to talk to their kids about appropriate viewing habits and to set guidelines and parameters that are right for their families.





**TO THE MAX**   A digitally animated, three-dimensional character named Digital Max was born as Cox Communications' brand icon in 2005. The witty character resides in the real world and lives to educate and interact with Cox customers. The well-coiffed, blue-sweater-attired Digital Max stars in the company's advertising, hosts his own site on cox.com, and generally delights in reinforcing Cox Communications' brand promise, *Your Friend in the Digital Age.*

Featured in this section: Pages 8-9:  Allison Briley *– Producer/Director, Cox Communications-Roanoke;* Dave Delisle *– Plant Maintenance, Cox Communications-Central Florida;* Beth Denning *– Executive Director, Marketing Operations, Cox Communications Corporate;* Sherriah Johnson *– Secretary, Cox Communications Corporate;* Kevin Sabins *– Logistics Coordinator, Cox Communications-New England;* Leroy Thomas III *– Field Service Representative, Cox Communications-New Orleans;* John West *– Marketing Manager, Cox Communications-Arizona*

# The RIGHT BID

## On Every Front



### MANHEIM

Whether it's global expansion, increasing dealer revenue, setting the standard for operational excellence or working together to recover from a natural disaster, Manheim continues to make the right moves to come up the winner. Over the past ten years, the company's compound annual growth rate is 14 percent. This growth is attributable not only to Manheim's leadership in auto remarketing, but also the increasing range of services it provides to support both sellers and buyers.

Pictured:
*Charles Williams*
*Vice President and General Manager,*
*POINT*

## MANHEIM



The world's leading provider of used vehicle services and marketplaces is now in more places around the world than ever before, helping sellers get top value for their vehicles and providing buyers a reliable and safe market in which to purchase the right vehicles for their needs.

Success Goes

# GLOBAL



## MANHEIM

**GLOBAL GROWTH ACCELERATES**  Manheim's strong industry role in the U.S. and Canada is expanding around the world with a presence in England, Scotland, Belgium, Spain, Australia, New Zealand and Thailand. In early 2005, the company opened its first offices in China, located in Shanghai and Beijing, positioning Manheim to capitalize on the country's emerging automotive industry. In recognition of the importance of global markets to its future, the company has appointed Manheim veterans Mike Langhorne as Senior Vice President of International Operations and Greg Gehman as Vice President of Export Services, both newly created positions. They will continue the company's goal of seeking strategic partners throughout the world, as well as other entry points into new markets.

**DEALER SALES ARE BIG BUSINESS**  Manheim's initiatives to increase dealer sales are a clear success, with dealer revenues increasing 55 percent since 2001 and comprising 48 percent of total revenues in 2005. This growth is attributable to increasing the percentage of registered dealer vehicles that are sold, as well as new business initiatives outside the auction lanes and value-added services to help customers grow their own businesses. Online Vehicle Exchange, for example, has been established as a separate  unit that targets online wholesale transactions between dealers. Clearly designed with the busy dealer in mind, Online Vehicle Exchange handled more than 50,000 transactions in 2005. POINT was another important innovation in 2005. Developed to help improve dealer profitability, POINT simplifies the complex task of inventory management, giving dealers transaction-based market data that allows more informed buying and selling decisions while controlling, optimizing and streamlining inventories on a daily basis. Additionally, the utilization of Simulcast continued to increase, allowing dealers from around the globe to purchase vehicles from Manheim locations across the United States.

**OPERATIONAL EXCELLENCE PRODUCES RESULTS**  The Manheim team's commitment to excellence in every facet of operations is evident in operating results for 2005. U.S. auctions turned in a strong performance, offsetting a decrease in available commercial vehicles (due to cyclical lease origination patterns) with aggressive actions to increase dealer volume, manage costs and embrace best practice processes. Dent Wizard and Manheim Automotive Financial Services also turned in strong results, while all international operations improved their year-over-year performance.

**EXCELLENCE WHEN IT COUNTS**  Look no further than Manheim's efforts in the aftermath of Hurricane Katrina to see excellence at work. Manheim auctions in New Orleans and Lafayette, Louisiana,  and Hattiesburg, Mississippi, sustained damage from Hurricane Katrina, disrupting business and destroying Manheim property, as well as that of many Manheim employees. Once all affected employees were accounted for and their immediate needs addressed, an incredibly collaborative effort allowed the Lafayette auction to hold its first sale just 72 hours after the storm passed. Within two weeks, Hattiesburg Auto Auction in Mississippi had its first sale, and within just one month of the storm's passing, the once-flooded Greater New Orleans Auto Auction hosted its first sale.

Featured in this section: Pages 12-13: Cliff Anderson — *Vice President Operations, China;* Luis Antolin — *Operations Manager, California Auto Dealers Exchange;* Gary Brewer — *General Manager, Lafayette Auto Auction;* Mark Davidson — *Vice President, Commercial Accounts;* Patricia Duensing — *Head Teller, Skyline Auto Exchange;* Rena Maas — *Office Manager, Dallas-Fort Worth Auto Auction;* Barbara Osborne — *Director, Employment Practices*

# The RIGHT STUFF

## For More Than A Century

## COX NEWSPAPERS

Beginning with the very first Cox paper in 1898, Cox Newspapers was founded on the values of integrity and trust. Today, the 49 publications and businesses that comprise Cox Newspapers continue to bring the highest standards of ethics and journalistic excellence to their readers and customers.

*Pictured:*
*Andy Alexander*
*Bureau Chief,*
*Washington, DC News Bureau*

## COX NEWSPAPERS

Whether it's in print or online, Cox Newspapers brings the world to readers through compelling coverage from our respective local vantage points. In doing so, Cox Newspapers also provides advertisers with media solutions that contain a high level of credibility and equity. The overall result is an organization that is committed to chronicling the people and events that define our lives and our communities.











The Business Of Publishing

# PAGE-TURNERS

COX NEWSPAPERS



**WINNING ON THE WEB**   The numbers tell a story of success for Cox Newspapers' Internet presence. In 2005, the overall online audience increased by 10 percent and the registered user base by approximately 75 percent. Collectively, the 29 sites for Cox's metro papers, community papers, Spanish language papers, and others generate nearly 8 million unique visitors and over 110 million page views monthly. These statistics demonstrate why digital media revenues have grown 37 percent over the past year. Newspaper sites also bring strategic value. Sites increase overall newspaper Net audience by about 10 percent, attract young adult readers and enable print newsrooms to compete more effectively in the breaking news business.

**SUPPORTING DIVERSITY**   When the National Association of Black Journalists held its 30th annual convention in Atlanta in 2005, Cox showed its commitment to supporting future journalists. The company was the exclusive sponsor for the convention's professional development program, which provided real-world experience for aspiring journalists. Cox journalists provided opportunities for students to assist in the production of a daily newspaper, radio and television broadcasts, as well as Internet products. All told, Cox provided more than $250,000 in monetary and in-kind donations and demonstrated its leadership in the education, recruitment and retention of diverse newsroom talent.

**A DIRECT HIT ON HUNGER**   Valpak, a Cox Newspapers company, has long been known as an effective direct mail tool for advertisers, mailing 19.4 billion coupons in 528 million envelopes to 45 million homes in 2005. It is also an effective partner in the fight against hunger through its partnership with the National Association of Letter Carriers' (NALC) annual "Stamp Out Hunger" campaign, the largest one-day food drive in the nation. With support from Valpak clients, the NALC and Valpak collected a record 71.3 million pounds of food in 2005. Valpak's commitment to this cause has been honored as the Best Corporate Social Responsibility Program by the Stevie Awards, which recognize great performances in the workplace. Look for Valpak to team with the NALC again in 2006 for another successful food drive.

**TIME TO OPEN UP**   In an era when official secrecy is a growing public policy issue, Sunshine Week could not be a more timely endeavor. The week-long effort in March 2005, spearheaded by the American Society of Newspaper Editors, turned the spotlight on the need for open government through thousands of stories, editorials, columns and cartoons about excessive government secrecy. Cox Newspapers presented hard-hitting coverage in creative ways, including a two-page spread in the *Atlanta Journal-Constitution* that demonstrated stories it had been able to report using state open records laws. Cox Newspapers' Washington Bureau Chief Andy Alexander, chairman of the American Society of Newspaper Editors' Freedom of Information Committee, is helping lead the company's continued commitment in 2006, when Sunshine Week highlights the industry's push to revamp the federal Freedom of Information Act, among other issues.



Featured in this section: Pages 16-17: Andy Alexander – *Bureau Chief, Washington, DC News Bureau*; Debbie Campbell – *Online Advertising Director, Atlanta Journal-Constitution*; Brenda Lara – *Web Designer, COXnet*; Leon Levitt – *Vice President, Digital Media*; Deji Omisore – *Senior Software Engineer-Enterprise Projects, COXnet*; Rajiv Pant – *Chief Technology Officer, COXnet*; Chris Perry – *Software Engineer-Special Projects, COXnet*; Donnie Wu – *Product Development Manager-Jobs, COXnet*

The **RIGHT** Commitment

## COX TELEVISION

Cox Television stations believe that one way to define great local TV is by how well the stations reflect the communities they serve. This is why every Cox station is dedicated to understanding and serving their local community, and their success in doing so is evident by the strong local news ratings enjoyed across the entire station group.

*Pictured:*
*Rosy Chu*
*Director of Community Affairs,*
*KTVU Oakland*

## COX TELEVISION

When Cox Television serves its viewers well, it also serves its advertising clients well. This starts with a competitive spirit and a willingness to utilize sophisticated research to gauge viewer interests. Cox stations also help clients gain maximum exposure through a combination of on-air and online advertising. Cox's expertise in broadcast advertising is also demonstrated by its national sales firms, which represent a broad group of stations. In fact, half of all national advertising sold on non-network-owned stations is sold by the three Cox sales representative firms – TeleRep, HRP and MMT.





ADVERT



## Results-Oriented
## ISING

COX TELEVISION



**A DECEMBER MIRACLE**   With 38,475 children eagerly awaiting Christmas toys, WFTV in Orlando pulled out all the stops to help the U.S. Marine Corps Reserves with their annual Toys For Tots collection. The goal was to match the number collected in 2004 – 103,000 toys by December 16. The campaign kicked off November 7 with PSAs and two subsequent live remote events. Yet, by December 12, the warehouse had only 11,000 toys – not nearly enough to meet the needs of even a third of the children. Realizing they needed a miracle, WFTV aired additional PSAs to update the totals daily. On December 16, the station asked the community one last time to drop off toys at the station or a local automotive showroom. By 9:00 that night, Orlando had responded with a total of 129,617 toy donations and $78,644 in cash donations.

**EXTRAORDINARY EFFORTS, EXTRAORDINARY RESULTS**
In the aftermath of Hurricane Katrina, WSB-TV and Cox Radio stations in Atlanta joined with the American Red Cross and The Salvation Army to raise funds for victims. For three days, volunteers staffed a phone bank from 4 p.m. to midnight to take individual donations. In addition, WSB's community partner, Wachovia Bank, opened a relief collection account, and local Kroger stores offered customers the opportunity to "round up" their total purchase amount in order to donate. The result: Over $3.3 million was raised in 72 hours, thanks to the efforts of WSB and the generosity of Atlantans.



**GEORGIA'S CHILDREN FORGOTTEN NO MORE**   Georgia has 15,000 foster children – often seemingly forgotten by the community and the foster care system. With an idea conceived in its news-room, WSB-TV in Atlanta decided to embark on a yearlong campaign to highlight the state's foster care system. Formalizing the effort through a mission statement and internal board of directors, the station set a goal to increase the number of qualified foster parents and to connect children living within the system on multiple levels. WSB has used its leadership position, contacts, news and community programming to support the effort. On-air projects have included a prime-time special, a town hall meeting and a volunteer phone bank that logged over 2,000 calls of interest in seven hours. Through the campaign, WSB staffers hope that they can make the cause of each and every foster child a better understood one.

**SHINING LIGHT ON A HIDDEN CRISIS**   More than 30,000 children in the Charlotte area suffer from some type of mental illness. Many go undiagnosed or untreated due to a lack of awareness. WSOC-TV sought to enlighten the area about "Charlotte's Hidden Crisis" through two half-hours of local programming, a phone bank and a special link on its Web site. Combined, these initiatives provided an in-depth look at how local children and families live with mental health issues, as well as resources for parents to learn more. The "Hidden Crisis" programming is part of "24 Hours for Children," a WSOC-TV multimedia initiative to provide information and resources about community issues that impact children.

Featured in this section: Pages 20-21: Roy Avila – *Public Affairs, KICU San Jose*; Toni Baker – *Supervisor of Broadcast Operations, WSOC Charlotte*; Jim Burton – *Chief Meteorologist, WJAC Johnstown*; Rosy Chu – *Director of Community Affairs, KTVU Oakland*; Elizabeth O'Hara – *News Anchor, KFOX El Paso*; Genetha Short – *Account Executive, WPXI Pittsburgh*; Barbara West – *News Anchor, WFTV Orlando*; Eleanor Williams – *Office Manager-Sales, WSOC Charlotte*

# The **RIGHT** Strategy

## COX RADIO

It's all about the right stations in the right markets. Clustering stations with diverse listening formats in expanding markets produces efficient operations and a station portfolio that allows advertisers to target broad geographic coverage or pin-point a specific demographic. 2005 results demonstrate the effectiveness of this strategy. Cox stations maintained consistent ratings leadership in the important 25–54 age group and outpaced both the industry and Cox markets in revenue growth.

*Pictured:*
*Karen Klimowicz*
*Controller,*
*Cox Radio – Dayton*

COX RADIO

Local news. Local weather. Local traffic. Local personalities. It's what makes Cox Radio a competitive player in an increasingly competitive radio market where loyalty among listeners is imperative. It's these local ties that contribute to continuing growth at Cox Radio.

## Local Equals
# LOYAL











## COX RADIO

**TOP RANKINGS AMONG TOP LISTENERS**  79 percent of Cox Radio stations are ranked in the top ten within their target demographic, and Cox stations were ranked among the top three stations in the 25–54 demographic in almost all of its markets during 2005. In Florida, where growth has been exceptionally strong, Cox stations in Tampa captured two of the top five spots in 2005.

**TURN UP THE TECHNOLOGY**  Cox Radio continues to go digital, delivering higher sound quality to listeners than ever before. By mid-2006, more than 50 percent of Cox stations will be broadcasting in high-definition (HD) radio, and by 2008, 80 percent of Cox stations should be upgraded.

HD also delivers new opportunities for expanded programming offerings, such as the use of supplemental audio channels with more diverse programming, as well as the ability to provide visual information on enhanced data displays. Technology is also changing the device through which Cox Radio reaches listeners. More personal devices, such as cell phones and iPods, feature FM receivers, which means that Cox Radio stations have more opportunities to spend time with their listeners.

**A STATION PRESENCE ON-SITE AND ONLINE**  Local advertisers appreciate the grassroots presence Cox has in its communities. Cox sales associates capitalize on this presence by creating customer-tailored programs, such as sponsorship of local events or live broadcasts from retail sites. Cox advertisers can also reach their target audiences through advertising opportunities on stations' Web sites that listeners visit frequently. The popularity of our stations' Web sites resulted in a 24 percent jump in Internet revenues in 2005.



**OUT-SERVICING THE COMPETITION**  Customer service took a major leap in 2005 through a totally re-engineered Customer Service Initiative that includes an online Advertiser Resource Center. This portal enables Cox advertisers to monitor when a spot will run, when it actually ran, how the copy sounds, billing data, and much more. As part of this industry pioneering effort, Cox now has a service hotline and a central customer service representative in each market, providing a leg up on the competition when it comes to service.

Featured in this section: Pages 24-25: Michelle Catolico – *General Sales Manager, WPLR FM-New Haven;* Roz Clark – *Director of Technical Operations, Cox Radio-Tampa;* Rick Couri – *Sports Director & Morning Show Co-Host, KRMG AM-Tulsa;* Randy Heller – *Director of Client Services, Cox Radio-Tulsa;* Karen Klimowicz – *Controller, Cox Radio-Dayton;* Mumball – *General Sales Manager, WHQT FM-Miami;* Paul Pate – *General Sales Manager, WYBC FM-New Haven*

# The **RIGHT** Vehicle, Seller, Buyer

## AUTOTRADER.COM

It's all right here at AutoTrader.com. A combination of innovative services, aggressive marketing and customer value commitment has made AutoTrader.com a phenomenal growth story. This business combines an historical expertise in classified advertising with today's leading Internet technology to bring more than 10 million qualified shoppers and close to 200,000 sellers together each month through more than 2.8 million listings. It's a success story that's built on innovation and a drive to meet customer needs not currently met by traditional media.

*Pictured:*
*Jason Shapiro*
*AutoTrader.com Advertising*
*Consultant of the Year, 2005*

## AUTOTRADER.COM

With a 44 percent increase in total revenue, a 30 percent increase in dealer count and a 25 percent increase in total audience during 2005, AutoTrader.com continues to show it has all the right stuff to be the clear leader in the online auto classifieds industry.







Log On To
LEADERSHIP

## AUTOTRADER.COM

**NEW FUNCTIONALITY THROUGH POWER SEARCH**    More than two years in development, Power Search is based on the philosophy that what's good for the shopper is also good for the seller. Visitors to AutoTrader.com can now use the Power Search function to compare new, used and certified pre-owned vehicles. In addition, new car buyers can see inventories from more dealerships than ever before.

**A SUCCESSFUL COLLABORATION**    Realizing the potential of the For Sale By Owner (FSBO) market, AutoTrader.com and Trader Publishing, Inc. double-teamed in 2005 to develop innovative ways to reach these sellers. An aggressive advertising campaign promoted the value and effectiveness of combining online ads with print ads when individuals sell by owner. The result has been a 35 percent increase in AutoTrader.com's FSBO revenue.

**BRING ON THE BLITZ**    One of AutoTrader.com's most successful sales initiatives is its regional Sales Blitzes. In four key markets each year, a team of top salespeople descends on a city after the market has been blanketed by non-stop AutoTrader.com brand advertising. In 2005, this blitz strategy drove in an additional $10 million in annualized revenue by creating heightened market awareness and increased energy and sense of urgency throughout the company.

**ONE CALL DOES IT ALL**    Building long-term relationships between the customer, the salesperson and the service person has always been a cornerstone of the AutoTrader.com strategy. In 2005, the company upgraded its customer service process to a "one call does it all" model by implementing Team-Based Account Management (TBAM). With the goal to make it even easier for customers to do business with AutoTrader.com, the company has added new personnel and provided coaching and training for existing staff. Now, one call is truly doing it all and doing it better for customers.

**TRAINING GETS THE JOB DONE**    In 2005, AutoTrader.com responded to what its employees said they wanted most: more training and development tools. The company's new Performance Management Process more clearly identifies and communicates success factors for each employee in a specific job, as well as explains how the individual employee contributes to the success of the entire company. Through the development of AutoTrader.com University (ATCU), the company has met requests for more training by providing a strong corporate curriculum that offers high-quality, innovative learning experiences to individuals, teams and managers.



**REVENUE GROWTH**
(In millions of dollars)

| Year | Value |
|------|-------|
| 98 | 1 |
| 99 | 5 |
| 00 | 27 |
| 01 | 57 |
| 02 | 106 |
| 03 | 134 |
| 04 | 190 |
| 05 | 274 |



Featured in this section: Pages 28-29: Kevin Gallagher — *Creative Director;* Robert Gunton — *Inside Advertising Consultant;* Bruce Jackson — *District Sales Manager;* Lynn Kirkendoll — *Dealer Concierge;* John Kovac — *Director, Advertising;* Mary Laverty — *Advertising Consultant;* Rick MacConnell — *Director, Enterprise Architecture;* Jason Shapiro — *Advertising Consultant*

## Cox Enterprises Board of Directors



**SEATED LEFT TO RIGHT**
James C. Kennedy, Anne Cox Chambers, Barbara Cox Anthony, Paul J. Rizzo, Thomas O. Cordy

**BACK LEFT TO RIGHT**
Dennis Berry, Robert C. O'Leary, Richard L. Braunstein, David E. Easterly, Arthur M. Blank, Carl R. Gross

**Barbara Cox Anthony**
Chairman,
Dayton Newspapers

**Anne Cox Chambers**
Chairman,
Atlanta Newspapers

**Dennis Berry**
Vice Chairman,
Cox Enterprises, Inc.

**Arthur M. Blank**
Co-Founder,
The Home Depot, Inc.
Owner and Chief Executive Officer,
Atlanta Falcons and Georgia Force

**Richard L. Braunstein**
Member,
Dow, Lohnes & Albertson, PLLC

**Thomas O. Cordy**
Retired President and
Chief Executive Officer,
The Maxxis Group, Inc.

**David E. Easterly**
Retired Vice Chairman,
Cox Enterprises, Inc.

**Carl R. Gross**
Retired Senior Vice President
and Chief Administrative Officer,
Cox Enterprises, Inc.
Retired President,
Cox Newsprint Supply

**James C. Kennedy**
Chairman and
Chief Executive Officer,
Cox Enterprises, Inc.

**Robert C. O'Leary**
Executive Vice President and
Chief Financial Officer,
Cox Enterprises, Inc.

**Paul J. Rizzo**
Retired Vice Chairman,
IBM

# Cox Communications



## CORPORATE OFFICERS

Patrick J. Esser
*President*

Christopher J. Bowick
*Senior Vice President, Engineering, Chief Technical Officer*

Jill Campbell
*Senior Vice President, Operations*

Dallas S. Clement
*Senior Vice President, Strategy and Development*

Mae A. Douglas
*Senior Vice President and Chief People Officer*

John M. Dyer
*Senior Vice President and Chief Financial Officer*

F. William Farina
*Senior Vice President, Advertising Sales*

James A. Hatcher, Esq.
*Senior Vice President, Legal and Regulatory Affairs*

Scott A. Hatfield
*Senior Vice President and Chief Information Officer*

Claus F. Kroeger
*Senior Vice President, Operations*

Joseph J. Rooney
*Senior Vice President, Marketing*

Robert C. Wilson
*Senior Vice President, Programming*

Andrew I. Albert
*Vice President, Programming*

Susan W. Coker
*Vice President and Treasurer*

Ellen M. East
*Vice President, Communications and Public Affairs*

William J. Fitzsimmons
*Vice President, Accounting and Financial Planning, Chief Accounting Officer*

Steve M. Gorman
*Vice President, High-Speed Internet Marketing and Product Management*

Thomas G. Guthrie
*Vice President, Information Technology Operations*

Erin B. Hand
*Vice President, Talent and Development*

Scott Hightower
*Vice President, Data/Voice Product Development*

John G. Hildebrand
*Vice President, Multimedia Engineering*

Mark A. Kaish
*Vice President, Voice Development and Support*

Veenod Kurup
*Vice President, Data Product Services*

Sherryl D. Love
*Vice President, Supply Chain Management*

Anthony J. Maldonado
*Vice President, Acquisition and Marketing Sciences*

Richard A. Mueller
*Vice President, Network Planning, Engineering and Operations*

Stephen K. Necessary
*Vice President, Video Product Development*

Belinda Turner Patterson
*Vice President, People Services*

Katherine S. Payne
*Vice President, Programming*

Carrington F. Phillip, Esq.
*Vice President, Regulatory Affairs*

David Pugliese
*Vice President, Product Management and Marketing*

Jay A. Rolls
*Vice President, Telephone and Data Engineering*

Robin H. Sangston, Esq.
*Vice President and Assistant General Counsel*

Debbie S. Siek
*Vice President, Customer Care*

John P. Spalding, Esq.
*Vice President and Assistant General Counsel*

William R. Stemper
*Vice President, Cox Business Services*

Mary E. Thigpen
*Vice President, Strategy*

Mark S. Williams
*Vice President, Engineering Field Operations*

## LOCATIONS

Following is a list of Cox Communications' largest operations.

**Arizona**
Arizona operation includes Phoenix, Tucson,
Sierra Vista and nearby areas

**Arkansas**
Bentonville, Fayetteville/Springdale, Fort Smith,
Jonesboro, Russellville and nearby areas*

**California**
Humboldt
Orange County/Palos Verdes
San Diego
Santa Barbara/Bakersfield

**Florida**
Central Florida (Gainesville, Ocala and nearby areas)
Gulf Coast (Pensacola, Ft. Walton Beach and nearby areas)

**Georgia**
Middle Georgia (Macon, Warner Robins and nearby areas)

**Idaho**
Sun Valley

**Kansas**
Kansas operation includes Dodge City/Garden City,
Manhattan/Junction City, Salina, Southeast Kansas,
Topeka, Wichita and nearby areas

**Louisiana**
Alexandria, Bossier City, Lafayette, Lake Charles,
New Iberia and nearby areas*
Baton Rouge
New Orleans

**Nebraska**
Omaha (including Council Bluffs, Iowa)

**Nevada**
Las Vegas

**New England**
New England operation encompasses Rhode Island
and portions of Connecticut and Massachusetts

**North Carolina**
North Carolina operation includes Greenville,
New Bern, Rocky Mount and nearby areas

**Ohio**
Cleveland area

**Oklahoma**
Oklahoma operation includes Oklahoma City, Tulsa,
Enid, Muskogee, Stillwater, McAlester and nearby areas

**Texas**
Bryan, Georgetown, Tyler, Victoria and nearby areas*
West Texas (Lubbock, Midland, Amarillo, San Angelo,
Abilene and nearby areas. Also includes Clovis,
New Mexico.)

**Virginia**
Hampton Roads
Northern Virginia (Fairfax County and Fredericksburg)
Roanoke

*These locations are part of the Middle America Cox operation, encompassing portions of Arkansas, Louisiana, Missouri, Oklahoma and Texas.*

## OPERATIONS MANAGEMENT

Janet H. Barnard
*Vice President and Region
Manager, Middle America*

David A. Bialis
*Vice President and Region
Manager, Oklahoma*

Greg Bicket
*Vice President and Region
Manager, New Orleans, LA*

Franklin R. Bowers
*Vice President and Region
Manager, Hampton Roads, VA*

Leo W. Brennan
*Vice President and Region
Manager, Las Vegas, NV*

Paul J. Cronin
*Vice President and Region
Manager, New England*

Kimberly C. Edmunds
*Vice President and Region
Manager, Kansas*

William K. Geppert
*Vice President and Region
Manager, San Diego, CA*

Percy J. Kirk
*Vice President and Region
Manager, Omaha, NE*

Thomas H. "Duffy" Leone
*Vice President and Region
Manager, Orange County, CA*

Gary T. McCollum
*Vice President and Region
Manager, Northern Virginia*

J. Stephen Rizley
*Vice President and Region
Manager, Arizona*

Jacqui D. Vines
*Vice President and Region
Manager, Greater Louisiana*

Philip C. Ahlschlager
*Vice President and General
Manager, North Carolina*

Keith N. Crossley
*Vice President and General
Manager, Humboldt, CA*

J. Michael Dyer
*Vice President and General
Manager, Middle Georgia*

Mike J. Giampietro
*Vice President and General
Manager, Central Florida*

L. Keith Gregory
*Vice President and General
Manager, Gulf Coast, FL*

Kevin H. Haynes
*Vice President and General
Manager, Cleveland, OH*

Marilyn S. Burrows
*Vice President and General
Manager, Roanoke, VA*

Julie O. McGovern
*Vice President and General
Manager, Central Coast, CA*

Connie S. Wharton
*Vice President and General
Manager, West Texas*

# Manheim



43 locations in the United Kingdom, Spain, Belgium, Australia, New Zealand, Thailand and China.

## MANAGEMENT:

### EXECUTIVE

Dean H. Eisner
*President and
Chief Executive Officer*

Jamie D. Porter
*Executive Vice President,
Operations*

Michael W. Broe
*Senior Vice President,
Chief Financial Officer*

Michael J. Langhorne
*Senior Vice President,
International Operations*

Ralph M. Liniado
*Senior Vice President,
Business Development*

Harold J. Logan
*Senior Vice President, Strategic
Planning and Industry Relations*

Nick H. Peluso
*Senior Vice President, Customer
Relations and Strategies*

Lilicia P. Bailey
*Vice President, People Strategies*

Michael S. Lang
*Vice President, Marketing*

Joseph Luppino
*Vice President and
Chief Information Officer*

### CORPORATE

Andrew M. Drake
*Vice President,
Product Management*

William A. Fielding
*Vice President, Product Services
and Customer Support*

Jeffrey J. Lenar
*Vice President, Real Estate*

Michael L. McKinney
*Vice President, Dealer Sales*

David R. Nutter
*Vice President, Consistency*

Berta M. Phelps
*Vice President, Best Practices*

### OPERATIONS

David M. Berkstresser
*Vice President, Operations, Southwest*

Joseph J. Cadigan, Jr.
*Vice President, Operations, Florida*

Anthony J. Giurato, Jr.
*Vice President, Operations, Midwest*

Timothy A. Janego
*Vice President, Operations, Southeast*

Kyle E. Ohman
*Vice President, Operations, Northeast*

Daniel E. Thomas
*Vice President, Operations, West*

---

Mark J. Brunn
*Vice President and
General Manager,
Vehicle Management Services*

J. David Young
*Vice President, Fixed Operations
Businesses*

### SALES

Diane F. Barton
*Vice President, Operations*

Mark A. Davidson
*Vice President, Commercial Accounts*

Michael P. Lasini
*Vice President, Total Resource
Auctions*

Michael F. Moumousis
*Vice President, National Accounts*

Charles E. Novince
*Vice President, National Accounts*

Michael L. Russo
*Vice President, National Accounts*

Peter M. Trench
*Vice President, National Accounts*

**WORLDWIDE LOCATIONS**

**Arizona**
Arizona Auto Auction
Greater Auto
    Auction of Phoenix
Tucson Auto Auction

**California**
Bay City Auto Auction
California Auto Dealers
    Exchange
Fresno Auto Dealers Auction
Los Angeles Dealers Auto
    Auction
Riverside Auto Auction
San Diego Auto Auction
Southern California Auto
    Auction

**Colorado**
Colorado Auto Auction
Denver Auto Auction

**Florida**
Central Florida Auto Auction
Daytona Auto Auction
Florida Auto Auction of Orlando
Greater Tampa Bay Auto
    Auction
Imperial Auto Auction
Lakeland Auto Auction
Lauderdale-Miami Auto Auction
Orlando Orange County Auto
    Auction
Pensacola Auto Auction
St. Pete Auto Auction
West Palm Beach Auto
    Auction

**Georgia**
Atlanta Auto Auction
Bishop Brothers Auto Auction
Georgia Dealers Auto Auction
Manheim DRIVE Center

**Hawaii**
Aloha Auto Auction

**Illinois**
Arena Auto Auction
Auction Way Sales
Gateway Auto Auction
Greater Chicago Auto Auction

**Indiana**
Fort Wayne Vehicle Auction
Louisville Auto Auction

**Kentucky**
Mid-America Auto Auction

**Louisiana**
Greater New Orleans Auto
    Auction
Lafayette Auto Auction

**Maryland**
Baltimore-Washington
    Auto Exchange

**Massachusetts**
American Auto Auction

**Michigan**
Detroit Auto Auction
Metro Detroit Auto Auction
Michigan Auto Auction

**Minnesota**
Minneapolis Auto Auction
Northstar Auto Auction

**Mississippi**
Mississippi Auto Auction

**Missouri**
166 Auto Auction
Kansas City Auto Auction
St. Louis Auto Auction

**Nebraska**
Omaha Auto Auction

**Nevada**
Greater Las Vegas Auto Auction
Greater Nevada Auto Auction

**New Jersey**
National Auto Dealers Exchange
Skyline Auto Exchange
Skyline Port Newark Facility

**New Mexico**
Albuquerque Auto Auction

**New York**
Newburgh Auto Auction
Northway Exchange Auto
    Auction

**North Carolina**
Aycock Auto Auction
Statesville Auto Auction

**Ohio**
Cincinnati Auto Auction
Ohio Auto Auction

**Oregon**
Portland Auto Auction

**Pennsylvania**
Butler Auto Auction
Hatfield Auto Auction
Keystone Auto Auction
Manheim's Auto Auction

**South Carolina**
Clanton's Auto Auction

**Tennessee**
Nashville Auto Auction
Tennessee Auto Auction

**Texas**
Big H Auto Auction
Dallas Auto Auction
Dallas-Fort Worth Auto Auction
Dealers Auto Auction of Dallas
El Paso Auto Auction
Fort Worth Vehicle Auction
San Antonio Auto Auction
Texas Hobby Auto Auction

**Utah**
Utah Auto Auction

**Virginia**
Fredericksburg Auto Auction
Harrisonburg Auto Auction
Virginia Vehicle Exchange

**Washington**
South Seattle Auto Auction

**Wisconsin**
Metro Milwaukee Auto Auction

**Puerto Rico**
Caribbean Auto Dealers
    Exchange

**Canada**
Oshawa Dealers Exchange
Toronto Auto Auction

**Europe**

**Belgium**
Portfolio Europe – Antwerp

**England (Manheim Auctions)**
Birmingham
Bristol
Colchester
Coventry
Gloucester
Haydock
Knottingley
Leeds
Leeds – Commercials
Leicester
Manchester
Mansfield
Middlesbrough
Northampton
Rotherham
Washington
Wimbledon
Dent Wizard – Tamworth
E-Good Manners – Leeds
Portfolio – Macclesfield
Portfolio Europe –
    Manchester
Vehicle Remarketing
    Solutions – Coventry
KAH Systems –
    Newcastle upon Tyne

**Scotland**
Manheim Scottish
    Auctions – Glasgow

**Spain**
Manheim Directo – Madrid

**Asia**

**China**
Beijing
Shanghai

**Thailand**
Manheim Asia Pacific –
    Bangkok

**Australia (Manheim Fowles)**
Adelaide
Brisbane
Canberra
Hobart
Launceston
Melbourne
Newcastle
Perth
Sydney
Townsville
Portfolio Australia –
    Melbourne

**New Zealand (Manheim Fowles)**
Auckland
Christchurch
Wellington

## OTHER BUSINESSES

John E. Bailey
*Chief Executive Officer,
Manheim Europe*

Kevin F. Beattie
*President, Manheim Auto Body Repair*

Pam Mabry–Cadigan
*Vice President, Inspection Operations*

Kelly G. Conger
*President, Dent Wizard*

Katherine K. Decker
*Vice President and
General Manager, MAFS*

M. Gregory Gehman
*Vice President, Export Services*

Scott Levy
*Chief Executive Officer,
Manheim Fowles*

James T. McKnight
*President, Online Vehicle Exchange*

Lynn M. Morgan
*Vice President, Information and
Consulting Services*

David Munnikhuysen
*Vice President, Recon Operations*

Thomas J. Nohstadt
*Vice President, Mark III Customs*

William A. Tiedemann
*Vice President, Total Resource Auctions*

Gordon M. Warren
*Vice President and
General Manager, Tracker*

Charles H. Williams
*Vice President and
General Manager, POINT*

# Cox Newspapers



## MANAGEMENT

Jay R. Smith
*President*

Brian G. Cooper
*Executive Vice President*

Christopher D. Caneles
*Vice President and Chief Information Officer*

Cathy Coffey
*Vice President, Advertising*

Susan S. Davidson
*Vice President, Human Resources*

Karla Garrett Harshaw
*Senior Editor, Community Newspapers*

Caroline C. John
*Group Vice President, Community Newspapers Vice President, Marketing*

Leon Levitt
*Vice President, Digital Media*

Mark P. Mansfield
*President, Cox Newsprint Supply, Inc.*

Stan Richmond
*Vice President, Operations*

Al Smith
*Vice President, Circulation*

Buddy Solomon
*Vice President and Chief Financial Officer*

## PUBLISHERS

Gary Borders
*The Lufkin Daily News (TX)*

Karla DeLuca
*The Daily Sentinel (Nacogdoches, TX)*

Douglas E. Franklin
*Dayton Daily News (OH)*

Tom Giuffrida
*The Palm Beach Post (FL)*

Tim Hobbs
*The Daily Advance (Elizabeth City, NC)*

Ann M. Hoffman
*JournalNews (Hamilton, OH)*
*The Middletown Journal (OH)*

Michael A. Laosa
*Austin American-Statesman (TX)*

Phil Latham
*The Marshall News Messenger (TX)*

Glenn McCutchen
*Longview News-Journal (TX)*

John C. Mellott
*The Atlanta Journal-Constitution (GA)*

George Orbanek
*The Daily Sentinel (Grand Junction, CO)*

Joyce Reingold
*Palm Beach Daily News (FL)*

Kevin G. Riley
*Springfield News-Sun (OH)*

Michael C. Vivio
*Waco Tribune-Herald (TX)*

D. Jordan Whichard III
*The Daily Reflector (Greenville, NC)*

Raye P. Woodin III
*Rocky Mount Telegram (NC)*

| DAILIES CIRCULATION | DAILY | SUNDAY |
|---|---|---|
| The Atlanta Journal-Constitution (GA) | 369,203 | 577,794 |
| Austin American-Statesman (TX) | 178,522 | 223,033 |
| The Palm Beach Post (FL) | 167,062 | 202,541 |
| Dayton Daily News (OH) | 131,138 | 174,360 |
| Waco Tribune-Herald (TX) | 38,921 | 46,930 |
| The Daily Sentinel (Grand Junction, CO) | 30,324 | 33,729 |
| Longview News-Journal (TX) | 29,343 | 35,420 |
| Springfield News-Sun (OH) | 26,822 | 33,691 |
| The Daily Reflector (Greenville, NC) | 20,898 | 22,854 |
| JournalNews (Hamilton, OH) | 20,880 | 23,513 |
| The Middletown Journal (OH) | 18,420 | 20,577 |
| Rocky Mount Telegram (NC) | 14,343 | 16,722 |
| The Lufkin Daily News (TX) | 12,936 | 14,829 |
| The Daily Advance (Elizabeth City, NC) | 10,744 | 10,319 |
| The Daily Sentinel (Nacogdoches, TX) | 8,097 | 8,907 |
| News Messenger (Marshall, TX) | 7,082 | 7,355 |
| Palm Beach Daily News (FL) | 5,843 | 6,611 |
| Total | 1,090,578 | 1,459,185 |

*Source: Internal Annual Average Circulation as of December 31, 2005*

| NON-DAILIES CIRCULATION | |
|---|---|
| Florida Pennysaver (West Palm Beach, FL) | 437,506 |
| Western Star (Lebanon, OH) | 64,596 |
| Mundo Hispánico (Atlanta, GA, Spanish language) | 53,310 |
| Pulse-Journal (Mason, OH) | 49,744 |
| LaPalma (West Palm Beach, FL, Spanish language) | 26,944 |
| ¡ahora sí! (Austin, TX, Spanish language) | 25,890 |
| The Nickel-Grand Junction (Grand Junction, CO) | 25,304 |
| Fairfield Echo (OH) | 22,821 |
| The Duplin Times (Kenansville, NC) | 13,584 |
| North Lake Travis (Lago Vista, TX) | 5,331 |
| The Chowan Herald (Edenton, NC) | 4,903 |
| The Enterprise (Williamston, NC) | 4,586 |
| Bastrop Advertiser (TX) | 4,577 |
| Beaufort-Hyde News (Belhaven, NC) | 4,025 |
| Oxford Press (OH) | 3,673 |
| Bertie Ledger-Advance (Windsor, NC) | 3,361 |
| Lake Travis View (Austin, TX) | 3,263 |
| Westlake Picayune (Westlake Hills, TX) | 2,659 |
| Standard Laconic (Snow Hill, NC) | 2,650 |
| Smithville Times (TX) | 2,595 |
| Farmville Enterprise (NC) | 1,789 |
| Perquimans Weekly (Elizabeth City, NC) | 1,627 |
| Times-Leader (Ayden-Grifton, NC) | 1,546 |
| Pflugerville Pflag (TX) | 1,539 |
| Weekly Herald (Robersonville, NC) | 885 |
| Total | 768,708 |

*Source: Internal Annual Average Circulation as of December 31, 2005*

| RELATED OPERATIONS | LOCATION | MANAGEMENT |
|---|---|---|
| Valpak | Largo, FL, and Elm City, NC | William B. Disbrow, President & CEO |
| Cox Custom Media | Greenville, SC | Gerry Wiatrowski, President |
| PAGAS Mailing Services | Tarboro and Charlotte, NC | Jeffrey J. Means, CEO |
| SP Newsprint *(33% owned)* | Atlanta, GA | Joseph R. Gorman, President & CEO |
| Trader Publishing Co. *(50% owned)* | Norfolk, VA | Conrad M. Hall, President & CEO |
| Washington, D.C. News Bureau | Washington, D.C. | Andrew N. Alexander, Bureau Chief |
| COXnet | Atlanta, GA | John Reetz, General Manager |

# Cox Television



Seattle, WA
Minneapolis, MN
Troy, MI
Detroit, MI
Boston, MA
Southfield, MI
Reno, NV
San Francisco, CA
Chicago, IL
Steubenville, OH
Johnstown, PA
New York City, NY
Philadelphia, PA
Pittsburgh, PA
Dayton, OH
Washington, D.C.
St. Louis, MO
Los Angeles, CA
Charlotte, NC
Atlanta, GA
El Paso, TX
Dallas, TX
Orlando, FL
Tampa, FL
Miramar, FL

● Television
■ Related Operations

## MANAGEMENT

Andrew S. Fisher
*President*

Bruce R. Baker
*Executive Vice President*

Sterling E. Davis
*Vice President, Engineering*

Amelia L. DiVenere
*Vice President, Finance and Administration*

William M. Spell
*Vice President, Sales and Marketing*

Deborah A. Thomas
*Vice President, Human Resources*

John D. Tramontanis
*Controller*

David F. Grayson
*Director, Business Development/ Interactive Service*

Angie Amon
*Manager, Research Services*

Lorraine Kenny
*Manager, TV Automotive/Marketing*

Heidi Wiedenbauer
*Bureau Chief Washington News Office Washington, D.C.*

## RELATED OPERATIONS

TeleRep
New York
James J. Monahan, *President*

Harrington, Righter & Parsons, Inc.
New York
Murray L. Berkowitz, *President*

MMT Sales
New York
Larry Strumwasser, *President*

| FIRM | LOCATION | FIRM | LOCATION |
|------|----------|------|----------|
| **California** | | **Minnesota** | |
| TeleRep | Los Angeles | TeleRep | Minneapolis |
| TeleRep | San Francisco | HRP | Minneapolis |
| HRP | Los Angeles | MMT | Minneapolis |
| HRP | San Francisco | **Missouri** | |
| MMT | Los Angeles | TeleRep | St. Louis |
| MMT | San Francisco | HRP | St. Louis |
| **Florida** | | **New York** | |
| TeleRep | Miramar | TeleRep | New York |
| HRP | Tampa | HRP | New York |
| MMT | Tampa | MMT | New York |
| **Georgia** | | **North Carolina** | |
| TeleRep | Atlanta | MMT | Charlotte |
| HRP | Atlanta | **Pennsylvania** | |
| MMT | Atlanta | TeleRep | Philadelphia |
| **Illinois** | | MMT | Philadelphia |
| TeleRep | Chicago | **Texas** | |
| HRP | Chicago | TeleRep | Dallas |
| MMT | Chicago | HRP | Dallas |
| **Massachusetts** | | MMT | Dallas |
| TeleRep | Boston | **Washington, DC** | |
| HRP | Boston | TeleRep | Arlington |
| MMT | Boston | HRP | Arlington |
| **Michigan** | | **Washington** | |
| TeleRep | Detroit | TeleRep | Seattle |
| HRP | Southfield | HRP | Seattle |
| MMT | Troy | | |

| BROADCAST STATION | MARKET | MARKET SIZE* | AFFILIATION | MANAGEMENT |
|-------------------|--------|--------------|-------------|------------|
| KTVU-TV | San Francisco/Oakland | 6 | FOX | Tim McVay |
| KICU-TV | San Jose/San Francisco | 6 | IND | Tom Raponi |
| WSB-TV | Atlanta | 9 | ABC | Bill Hoffman |
| KIRO-TV | Seattle | 13 | CBS | John Woodin |
| WFTV-TV | Orlando | 20 | ABC | Shawn Bartelt |
| WRDQ-TV | Orlando | 20 | IND | Shawn Bartelt |
| WPXI-TV | Pittsburgh | 22 | NBC | Ray Carter |
| WSOC-TV | Charlotte | 27 | ABC | Lee Armstrong |
| WAXN-TV | Charlotte | 27 | IND | Lee Armstrong |
| WHIO-TV | Dayton | 59 | CBS | Harry Delaney |
| WJAC-TV | Johnstown | 98 | NBC | Dick Schrott |
| KFOX-TV | El Paso | 99 | FOX | John Witte |
| KRXI-TV | Reno | 112 | FOX | Marty Ozer |
| KAME-TV | Reno | 112 | UPN | Marty Ozer |
| WTOV-TV | Steubenville | 154 | NBC | Tim McCoy |
| **CABLE CHANNEL** | | | | |
| PCNC | Pittsburgh | 22 | IND | Ray Carter |
| UPN 17 | Dayton | 59 | UPN | Harry Delaney |
| **WEATHER PLUS CHANNEL** | | | | |
| WPXI | Pittsburgh | 22 | NBC | Ray Carter |
| WJAC | Johnstown | 98 | NBC | Dick Schrott |
| WTOV | Steubenville | 154 | NBC | Tim McCoy |

*Market size by population according to Nielsen.*

# Cox Radio



Bridgeport, CT
Stamford/Norwalk, CT
New Haven, CT
Long Island, NY
Dayton, OH
Richmond, VA
Louisville, KY
Greenville/Spartanburg, SC
Tulsa, OK
Atlanta, GA
Birmingham, AL
Honolulu, HI
Jacksonville, FL
Houston, TX
Orlando, FL
San Antonio, TX
Tampa, FL
Miami, FL

## MANAGEMENT

Robert F. Neil
*President and
Chief Executive Officer*

Marc W. Morgan
*Executive Vice President and
Chief Operating Officer*

Richard A. Ferguson
*Executive Vice President*

Neil O. Johnston
*Vice President and
Chief Financial Officer*

Richard A. Reis
*Group Vice President*

Caroline J. Devine
*Regional Vice President*

Kimberly A. Guthrie
*Regional Vice President*

Jarrett A. O'Connor
*Regional Vice President*

Robert B. Reed
*Regional Vice President*

Gregg A. Lindahl
*Vice President, CXRi and
New Technologies*

Roxann L. Miller
*Vice President, Research*

| MARKET | STATION | RANK IN TARGET | FORMAT |
|--------|---------|----------------|--------|
| Atlanta | WSB-AM | 1 | News/Talk |
| | WALR-FM | 3 | Urban Adult Contemporary |
| | WSB-FM | 4 | Adult Contemporary |
| | WBTS-FM | 8 | Rhythmic CHR |
| | WFOX-FM | -(2) | Classic Hits |
| Birmingham | WBHJ-FM | 1 | Hip Hop |
| | WBHK-FM | 1 | R&B/Soul |
| | WZZK-FM | 10 | Country |
| | WBPT-FM | 11 | Classic Hits |
| | WAGG-AM | 18 | Gospel |
| | WPSB-AM (formerly WZZK-AM) | -(2) | Urban Talk |
| | WNCB-FM | 14 | New Country |
| Dayton | WHKO-FM | 3 | Country |
| | WHIO-AM | 6 | News/Talk |
| | WZLR-FM | 10 | Classic Rock |
| | WDPT-FM | 15 | 80s |
| Greenville | WJMZ-FM | 1 | Urban |
| | WHZT-FM | 2 | Rhythmic CHR |
| Honolulu | KRTR-FM | 2 | Adult Contemporary |
| | KCCN-FM | 6 | Hawaiian CHR |
| | KPHW-FM | 3 | Rhythmic CHR |
| | KINE-FM | 3 | Hawaiian Adult Contemporary |
| | KRTR-AM | 26 | Soft Adult Contemporary |
| | KKNE-AM | 19 | Traditional Hawaiian |
| Houston | KLDE-FM | 9 | Oldies |
| | KKBQ-FM | 10 | Country |
| | KTHT-FM | 12 | Country Legends |
| | KHPT-FM | 15 | 80s |
| Jacksonville | WFYV-FM | 1 | Classic Rock |
| | WOKV-AM | 2 | News/Talk |
| | WAPE-FM | 2 | CHR |
| | WMXQ-FM | 9 | 80s |
| | WJGL-FM | 2 | Classic Hits |
| Long Island | WBLI-FM | 2 | CHR |
| | WBAB-FM | 3 | Mainstream Rock |
| | WHFM-FM | -(3) | Mainstream Rock |
| Louisville | WVEZ-FM | 2 | Adult Contemporary |
| | WSFR-FM | 4 | Classic Rock |
| | WRKA-FM | 7 | Oldies |
| | WPTI-FM | 14 | New Country |
| Miami | WHQT-FM | 1 | Urban Adult Contemporary |
| | WEDR-FM | 1 | Urban Contemporary |
| | WFLC-FM | 5 | Adult Contemporary |
| | WHDR-FM (formerly WPYM-FM) | -(2) | Active Rock |
| Orlando | WCFB-FM | 1 | Urban Adult Contemporary |
| | WPYO-FM | 3 | CHR Rhythmic |
| | WDBO-AM | 4 | News/Talk |
| | WHTQ-FM | 4 | Classic Rock |
| | WWKA-FM | 7 | Country |
| | WMMO-FM | 2 | Rock Adult Contemporary |
| Richmond | WKLR-FM | 4 | Classic Rock |
| | WKHK-FM | 3 | Country |
| | WMXB-FM | 5 | Adult Contemporary |
| | WDYL-FM | 6 | New Rock |
| San Antonio | KONO-FM | 1 | Oldies |
| | KONO-AM | -(4) | Oldies |
| | KISS-FM | 2 | Active Rock |
| | KSMG-FM | 5 | Hot Adult Contemporary |
| | KCYY-FM | 6 | Country |
| | KELZ-FM | 9 | Mainstream CHR |
| | KKYX-AM | 17 | Classic Country |
| Southern Connecticut Bridgeport/ Fairfield County | WEZN-FM | 2 | Adult Contemporary |
| New Haven | WPLR-FM | 1 | Classic Rock/Mainstream |
| | WYBC-FM (5) | 2 | Urban Adult Contemporary |
| Stamford/Norwalk | WKHL-FM | 8 | Oldies |
| | WEFX-FM | 2 | Classic Rock |
| | WSTC-AM | 15 | News/Talk |
| | WNLK-AM | -(6) | News/Talk |
| Tampa | WWRM-FM | 1 | Adult Contemporary |
| | WDUV-FM | 1 | Soft Adult Contemporary |
| | WXGL-FM | 4 | Classic Hits |
| | WSUN-FM | 5 | Alternative Rock |
| | WPOI-FM | 7 | 80s |
| | WHPT-FM | 10 | Classic Rock |
| Tulsa | KKCM-FM (formerly KRTQ-FM) | -(2) | Christian Contemporary |
| | KWEN-FM | 1 | Country |
| | KJSR-FM | 2 | Classic Rock |
| | KRMG-AM | 7 | News/Talk |
| | KRAV-FM | 3 | Adult Contemporary |

*Source: Arbitron Market Reports four-book average for Winter 2005, Spring 2005, Summer 2005 and Fall 2005.*

(1) Metropolitan market served; city of license may differ.

(2) The station format was recently changed; therefore, the station's audience share and rank information for 2005 are not applicable.

(3) Audience share and audience rank information for WBAB-FM and WHFM-FM are combined because the stations are simulcast.

(4) Audience share and audience rank information for KONO-FM and KONO-AM are combined because the stations are simulcast.

(5) Station operated by Cox Radio under a Joint Sales Agreement.

(6) Audience share and audience rank information for WSTC-AM and WNLK-AM are combined because the stations are simulcast.

# AutoTrader.com



## MANAGEMENT

Chip Perry
*President and
Chief Executive Officer*

Bill Templeton
*Senior Vice President,
Chief Financial Officer*

Hal Greene
*Senior Vice President, Sales*

Joe George
*Senior Vice President,
Strategic Alliances*

Dave Amundsen
*Vice President, Finance*

Dan Crowe
*Vice President,
Chief Information Officer*

Brian Goddard
*Vice President,
Application Development*

Craig Hunt
*Vice President,
West Division, Dealer Sales*

Beth Jordan
*Vice President,
Sales Operations*

John McCormick
*Vice President, East Division,
Dealer Sales*

Matt McKenna
*General Manager,
National Account Sales*

Fred Prybol
*General Manager,
Classified Advertising*

Alan Smith
*Vice President,
Customer Service*

Sylvia Taylor
*Vice President,
Human Resources*

Rebecca Watson
*Vice President,
Organizational Services and
Community Relations*

Clark Wood
*Vice President, Marketing*

## REGIONAL OFFICES

Dallas, TX

Boston, MA

Seattle, WA

Ft. Lauderdale, FL

Norfolk, VA

Los Angeles, CA

Chicago, IL

### HEADQUARTERS

Atlanta, GA

Jim Cox
*Regional Director (Southwest)*

David Crawford
*Regional Director (Northeast)*

Cynthia Ferguson
*Regional Director (Northwest)*

Roger Hilterbrandt
*Regional Director (South)*

Bob Landers
*Regional Director (Mid-Atlantic)*

Ian MacDonald
*Regional Director (West)*

Eric Webb
*Regional Director (Midwest)*

## MARKETS WITH FIELD SALES REPRESENTATIVES

**Alabama**
Birmingham
Mobile

**Arizona**
Phoenix
Sierra Vista
Tucson

**Arkansas**
Little Rock
Pine Bluff

**California**
Fresno
Los Angeles
Modesto
Monterey
Oakland
Sacramento
Salinas
San Diego
San Francisco
San Jose
Stockton
Visalia

**Colorado**
Colorado Springs
Denver
Pueblo

**Connecticut**
Hartford
New Haven

**Delaware**
Wilmington

**Florida**
Daytona Beach
Ft. Lauderdale
Ft. Myers
Jacksonville
Melbourne
Miami
Naples
Orlando
Palm Beach
Pensacola
Sarasota
St. Petersburg
Tallahassee
Tampa

**Georgia**
Atlanta
Brunswick
Savannah
Thomasville

**Hawaii**
Honolulu

**Idaho**
Boise

**Illinois**
Bloomington
Chicago
Harrisburg
Mt. Vernon
Peoria
Rockford

**Indiana**
Indianapolis

**Iowa**
Ames
Cedar Rapids
Des Moines
Dubuque
Waterloo

**Kansas**
Hutchinson
Wichita

**Kentucky**
Louisville
Paducah

**Louisiana**
New Orleans

**Maine**
Auburn
Portland

**Maryland**
Baltimore

**Massachusetts**
Boston
New Bedford

**Michigan**
Battle Creek
Bay City
Detroit
Flint
Grand Rapids
Kalamazoo
Lansing
Saginaw

**Minnesota**
Minneapolis/St. Paul

**Mississippi**
Jackson

**Missouri**
Cape Girardeau
Kansas City
Springfield
St. Louis

**Nebraska**
Hastings
Kearney
Lincoln
Omaha

**Nevada**
Las Vegas

**New Mexico**
Albuquerque
Santa Fe

**New York**
Albany
Buffalo
New York City
Rochester
Schenectady
Syracuse
Troy

**North Carolina**
Asheville
Charlotte
Durham
Greensboro
High Point
Raleigh
Winston-Salem

**Ohio**
Cincinnati
Cleveland
Columbus
Dayton
Toledo

**Oklahoma**
Oklahoma City
Tulsa

**Oregon**
Eugene
Portland

**Pennsylvania**
Harrisburg
Lancaster
Lebanon
Philadelphia
Pittsburgh
Scranton
Wilkes-Barre
York

**Rhode Island**
Providence

**South Carolina**
Charleston
Columbia
Florence
Greenville
Myrtle Beach
Spartanburg

**Tennessee**
Chattanooga
Memphis
Nashville

**Texas**
Austin
Corpus Christi
Dallas/Fort Worth
El Paso
Houston
Lubbock
San Antonio
Tyler

**Utah**
Salt Lake City

**Virginia**
Harrisonburg
Lynchburg
Newport News
Norfolk
Petersburg
Portsmouth
Richmond
Roanoke

**Washington**
Seattle
Spokane
Tacoma

**Washington, D.C.**

**West Virginia**
Charleston
Huntington

**Wisconsin**
Appleton
Eau Claire
Green Bay
La Crosse
Madison
Milwaukee

## Cox Enterprises, Inc.
### OTHER OPERATIONS

| | | |
|---|---|---|
| Clarendon Farms, Inc. | Burton, SC | Ted R. Moring, Farm Manager |
| Hualalai Land Corp. | Kailua-Kona, HI | Franklin T. Boteilho, Ranch Manager |

## Cox Enterprises

## Management

**James C. Kennedy**
Chairman and Chief Executive Officer

**Dennis Berry**
Vice Chairman

**Jimmy W. Hayes**
President and
Chief Operating Officer

**Robert C. O'Leary**
Executive Vice President and
Chief Financial Officer

**Timothy W. Hughes**
Senior Vice President, Administration

**John G. Boyette**
Senior Vice President, Investments
and Administration

**Richard J. Jacobson**
Senior Vice President, Finance

**Alexander V. Netchvolodoff**
Senior Vice President, Public Policy

**Preston B. Barnett**
Vice President and General Tax Counsel

**Susan W. Coker**
Vice President, Treasurer

**Richard D. Huguley**
Vice President, Development

**Roberto I. Jimenez**
Vice President, Corporate Communications
and Public Affairs

**Marybeth H. Leamer**
Vice President, Human Resources

**J. Lacey Lewis**
Vice President, Development

**Michael J. Mannheimer**
Vice President, Supply Chain Services
Chief Procurement Officer

**Andrew A. Merdek**
Vice President, Legal Affairs,
General Counsel and Corporate Secretary

**Gregory B. Morrison**
Vice President and Chief Information Officer

**Robert N. Redella**
Vice President, Development

**Deborah E. Ruth**
Vice President, Marketing

**Sanford H. Schwartz**
Vice President, Business Development

**Alexandra M. Wilson**
Vice President, Public Policy

### Location

Cox Enterprises, Inc.
6205 Peachtree Dunwoody Road
Atlanta, GA 30328
(678) 645-0000
www.coxenterprises.com

### Cox Media Hot Line

1-877-4-COXNEWS
(1-877-426-9639)

**Our thanks to the employees appearing in this report.**
These employees were selected for this publication based on their outstanding achievements. Cox values all of our dedicated employees, as they truly exemplify "The Right Stuff."

**We want to hear from you!**
We hope this year's annual report helped you learn more about Cox and your fellow employees. Let us know what you think. Share your feedback on the 2005 annual report by sending an email to annualreport@coxinc.com.

Cox Enterprises employees featured in color photographs on the front cover (left to right): Inez Campbell — *Executive Secretary;* Don Stryszko — *Senior Manager, Risk Control & Claims;* Jill Cohen — *Conference Center & Heritage Center Supervisor*

Cox Enterprises employees featured in color photographs on the back cover (left to right): Steve Rosenboro — *Assistant General Counsel, Technology & Transactions;* Ki Ho Shin — *Manager, Audit Services;* Peggy Arevalo — *Senior IT Auditor*

This annual report printed on recycled paper

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORP., | ) ) ) | |
| Plaintiff, | ) ) | Case No.  2-06cv-239 |
| v. | ) ) | Honorable Ron Clark |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS INC.) COMCAST CABLE; COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | ) ) ) ) ) ) ) ) | JURY |
| Defendants. | ) ) ) | |
| _____ | ) | |

## COX COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE DISTRICT OF DELAWARE AND BRIEF IN SUPPORT THEREOF

OF COUNSEL:
Matthew B. Lehr
Suong T. Nguyen
Duane Nash
Yiping Liao
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park CA  94025
Telephone:  650-752-2000
Facsimile:  650-752-2111

Mitchell G. Stockwell
Lead Attorney
Georgia Bar No.
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846
**Attorneys for Cox Communications, Inc.**

US2000 9448528.1

# TABLE OF CONTENTS

Page

I.  Undisputed Material Facts ...................................................................................3

II.  Issues Presented ..................................................................................................5

III.  Argument ............................................................................................................5

    A.  U.S. Video Cannot Sustain Its Burden Of Proving Personal
        Jurisdiction Over Cox .............................................................................5

        1.  Cox Has Not Committed a Tortious Act Within Texas and
            Cannot be Subject to Jurisdiction Under Texas' Long Arm
            Statute. ..............................................................................5

        2.  Cox Has Insufficient Contacts With Texas Under
            Constitutional Due Process Requirements To Support
            General Personal Jurisdiction. .....................................................6

        3.  Cox is Not Subject to Specific Jurisdiction Because it has
            No Contacts with Texas Related to U.S. Video's Claim. ...........................8

        4.  Actions of Cox's Affiliates Do Not Matter for Personal
            Jurisdiction Purposes. .................................................................9

    B.  If Plaintiff May Pursue this Action Against Cox, Delaware is the
        Appropriate Forum. ...............................................................................11

        1.  Cox's Lack of Jurisdictional Contacts Renders Texas an
            Improper Forum for this Action. ..................................................11

        2.  Delaware is the Proper, More Convenient Forum for
            Resolving Plaintiff's Claims. ......................................................12

IV.  CONCLUSION..................................................................................................13

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995) ........................ 7

*Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000) ...................... 6

*Cannon Mfg. Co. v. Cudahy Packing Co*., 267 U.S. 333 (1925) ........................ 9

*Carmichael v. United Techs. Corp*., 835 F.2d 109, 111 (5th Cir. 1988) ........................ 5

*Coastal Plains, Inc*., 1779 F.3d 197, 205-06 (5th Cir. 1999) ........................ 12

*Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) ........................ 12

*Dunn v. Svitzer*, 885 F. Supp. 980, 987 (S.D. Tex. 1995) .................... 9

*Entek Corp. v. Southwest Pipe and Supply Co*., 683 F. Supp. 1092, 1104-05 (N.D. Tex. 1988) ........................ 9

*Frito-Lay, Inc. v. Proctor & Gambell Co*., 364 F. Supp. 243, 250 (N.D. Tex. 1973) ........................ 6

Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metro. Bottling Co., 785 F. Supp. 514 (E.D. Pa. 1992) ........................ 10

*Hargrave v. Fibre Board Corp*., 710 F.2d 1154, 1159 (5th Cir. 1983) ........................ 9

*Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984) .................... 7

*Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001) .................... 5

*International Shoe Co. v. Washington*, 326 U.S. 310,. 316 (1945) ........................ 8

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp*., 131 F. Supp. 2d 544, 550 (S.D. N.Y. 2001) ........................ 10

Naxon Telesign Corp. v. GTE Information Sys., Inc., 89 F.R.D. 333 (N.D. Ill. 1980) ........................ 11

*Phonometrics, Inc. v. Northern Telecom Inc*., 133 F.3d 1459, 1468 (Fed. Cir. 1998) ........................ 9

*Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977) ........................ 7

*Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1200 (Fed. Cir. 2003) ........................ 7

Tandy Corp. v. Comus Int'l, Inc., 704 F. Supp. 115 (N.D. Tex. 1987) (Mahon, J.) .................. 5, 7

USA Video Tech. Corp. v. MovieLink LLC, 354 F. Supp. 2d 507, 509-13 (D. Del. 2005) ............................................................................................................... 3, 4

Von Grabe v. Sprint PCS, 312 F. Supp. 2d 1285, 1301 (S.D. N.Y. 2003) ................................... 10


**Rules**

Fed. R. Civ. P. 15 ...................................................................................................... 10

Fed. R. Civ. P. 21 ...................................................................................................... 12

Federal Rule of Civil Procedure 12(b)(2) ................................................................ 1, 13

US2000 9429628.2

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION,<br><br>   Plaintiff(s),<br><br> v.<br><br>TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP,<br><br>   Defendant(s). | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 2-06CV-239 (RC) |

## COX COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE DISTRICT OF DELAWARE AND BRIEF IN SUPPORT THEREOF

Defendant Cox Communications, Inc. ("Cox") moves to dismiss Plaintiff's claims against it under Federal Rule of Civil Procedure 12(b)(2) because this Court lacks personal jurisdiction over Cox. In the alternative, Cox moves to transfer venue to the District of Delaware, pursuant to 28 U.S.C. §1404(a).

First, Plaintiff has sued the wrong company. Cox is a Delaware corporation, headquartered in Atlanta, Georgia. Cox only provides services in Georgia. Cox is not in the business of providing the video-on-demand services the Complaint alleges infringe Plaintiff's patent. Cox does not own or operate and has never owned or operated cable systems in Texas; does not offer or provide and has never offered or provided video-on-demand services in Texas; and does not otherwise reside or operate in Texas. Cox does not have the minimum contacts

with Texas sufficient to support personal jurisdiction and there is thus no basis for this Court to exercise personal jurisdiction over Cox.  Therefore, Plaintiff's Complaint should be dismissed with prejudice.

Second, Plaintiff has sued in the wrong forum.  Venue over U.S. Video's purported claims against Cox is not appropriate in Texas.  Neither Cox nor U.S. Video have ties to Texas that could invoke any local interest.  The District of Delaware is the court that has most recently considered and ruled upon key patent claim construction issues that will be raised in addressing U.S. Video's complaint.  Venue is proper in Delaware, where plaintiff has previously sued on the patent at issue and where Cox is incorporated.  The public interest in judicial economy and avoidance of conflicting decisions thus militates for transfer.  Moreover, U.S. Video previously resisted transfer of venue on the ground that Delaware was the appropriate and more convenient venue for litigating the same patent U.S. Video now asserts.  Having prevailed in that argument, U.S. Video is estopped from arguing that Delaware would be an inconvenient forum in which to litigate.

Finally, one of Cox's affiliates, CoxCom, Inc. does offer cable communications services, albeit not in Texas.  But it is an independent entity and it has long been settled that a subsidiary's contacts with a forum state do not give rise to personal jurisdiction over the parent.  Moreover, because CoxCom has initiated a declaratory judgment suit in Delaware, judicial economy warrants transferring this suit to that District.  Thus, even assuming Plaintiff's claims can go forward against Cox, they should be transferred to Delaware, the most appropriate forum for this matter.

# I.     Undisputed Material Facts

1.      Cox is a diversified broadband telecommunications company, incorporated in Delaware, with a principal place of business in Atlanta, Georgia.  (Declaration of John Spalding, attached as Exhibit A, ¶ 2. "Spalding Dec.")

2.      Cox is not registered to do business in Texas.  (*Id*., ¶5.)  Cox does not provide cable television or video-on-demand services in Texas.  (*Id*., ¶¶ 4-5.)  Cox does not maintain any place of business, does not have offices, and does not keep any corporate books or records in Texas.  (*Id*., ¶3.)

3.      CoxCom, Inc. is an affiliate of Cox that initiated a declaratory judgment action against U.S. Video in the District of Delaware.  (Exhibit B.)

4.      Cox's affiliates are party to an Asset Transfer Agreement by which all Texas assets of Cox's affiliates were sold.  (*Id*., ¶ 4.)  The sole Texas material asset of the affiliates of Cox  that was not transferred was the Henderson, Texas cable television franchise, as to which the city government refused to consent to transfer.  The Henderson, Texas cable television franchise does not offer video-on-demand services and is not managed or operated by any of Cox's affiliates, but rather by a third party, under a Management Agreement.  (*Id*., ¶¶ 4-7.)

5.      Plaintiff U.S. Video is a Connecticut corporation, with a principal place of business in Connecticut.  (Complaint, ¶ 1.)

6.      In April 2003, U.S. Video filed suit in the District of Delaware contending that video-on-demand services infringed claim 1 of United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System."  *See USA Video Tech. Corp. v. MovieLink LLC*, 354 F. Supp. 2d 507, 509-13 (D. Del. 2005) ("Delaware action").

3

7.      Here, U.S. Video likewise contends that Cox provides "video-on-demand" services that infringe claim 1 of the '792 patent.  (Complaint, ¶¶ 11-13, 15.)

8.      The Delaware District Court evaluated the parties' evidence, including expert reports on claim construction and the accused technology, and in January of 2005 construed claim 1 of the '792 patent.  *USA Video Tech. Corp.,* 354 F. Supp. 2d  at 509-11, 514.

9.      The Delaware court grappled with numerous motions, including the following: Motion for Summary Judgment of Non-Infringement Relating to U.S. Video's Infringement Allegations for Which No Support in the Record Exists; Motion for Summary Judgment on Non-Infringement, and Alternative Motion for Summary Judgment of Invalidity; Motion for Summary Judgment of Invalidity under 25 U.S.C. § 112 and to Strike Portions of Expert Report; Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement; and Motion to Exclude or Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan.  *USA Video Tech. Corp.,* 354 F. Supp. 2d at 508-09.

10.      The Delaware court found that the language of Claim 1, which describes a "distribution interface" that "initiates connections over the telephone network," requires that the "distribution interface" <u>begin</u> forming the connection.   In other words, a system that involves starting the claimed "connections over the telephone network" by anything other than the claimed "distribution interface," is outside the scope of the '792 patent.  *Id*. at 514-15.

11.      The Delaware court's construction, which has been upheld by the Federal Circuit, 2006 U.S. App. LEXIS 14699 (Fed. Cir. June 7, 2006), substantially limited the scope of the rights U.S. Video was purporting to assert and resulted in a finding that MovieLink did not infringe claim 1 of the '792 patent.  *Id.* at 515-16.

4

## II.    Issues Presented

1.      Are there sufficient "minimum contacts" between Cox and Texas to confer personal jurisdiction over Cox?

2.      In the alternative, should this case be transferred to the District of Delaware pursuant to 28 U.S.C. § 1404(a)?

## III.    Argument

### A.    U.S. Video Cannot Sustain Its Burden Of Proving Personal Jurisdiction Over Cox

U.S. Video has the burden of establishing that Cox has "minimum contacts" with Texas sufficient to establish personal jurisdiction.  *See Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001) (Federal Circuit law controls personal jurisdiction issues and requires plaintiff to show personal jurisdiction over defendant in patent case).  U.S. Video cannot meet its burden because (i) Cox has not committed any act that would trigger application of the Texas Long Arm Statute to authorize Plaintiff's service of process on Cox, and (ii) Cox lacks constitutional minimum contacts with Texas.[1]

#### 1.    Cox Has Not Committed a Tortious Act Within Texas and Cannot be Subject to Jurisdiction Under Texas' Long Arm Statute.

To establish that the service of process Plaintiff made upon Cox was proper, U.S. Video must show that Cox "engages in business" in Texas and that this proceeding "arises out of the business done in this state and to which [Cox] is a party." Tex. Civ. Prac. & Rem. Code Ann., § 17.044(b) (Vernon 1997).  Acts which constitute engaging in business comprise contracting with Texas residents or "commit[ting] a tort in whole or in part in" Texas.  *Id*. at § 17.042.  *See Carmichael v. United Techs. Corp*., 835 F.2d 109, 111 (5th Cir. 1988) (service of process

---

[1]    The absence of personal jurisdiction over Cox requires dismissal under Rule 12(b)(2) (lack of personal jurisdiction), but Rule 12(b)(5) (insufficiency of process) also would direct dismissal upon the same grounds. That is because Plaintiff served pursuant to the Texas Long Arm Statute, which requires personal jurisdiction to exist for service to be proper. *E.g., Tandy Corp. v. Comus Int'l, Inc.*, 704 F. Supp. 115, 116 (N.D. Tex. 1987).

through secretary of state insufficient where "none of the businesses mentioned has agents or officers in Texas or does business in Texas, nor did the cause of action arise from business dealings in Texas."); *Frito-Lay, Inc. v. Proctor & Gambell Co*., 364 F. Supp. 243, 250 (N.D. Tex. 1973) ("amenability to service turns on whether a defendant has 'done business' or 'committed a tort' in the forum") (citations omitted).

Here, Cox has done neither. U.S. Video alleges that Cox wrongfully made, imported, used or sold allegedly infringing video-on-demand services. (Complaint, at ¶14.) Cox, however, does not engage in these acts within Texas. (Spalding Decl., ¶¶3, 4.) Cox thus has not committed any tortious act or engaged in any business within Texas from which this action could arise, thereby rendering improper Plaintiff's service of process upon Cox via the Texas Secretary of State.

## 2. Cox Has Insufficient Contacts With Texas Under Constitutional Due Process Requirements To Support General Personal Jurisdiction.

This Court's personal jurisdiction over a non-resident corporate defendant such as Cox is appropriate only if authorized by the Texas Long Arm Statute, which has been construed to be coextensive with constitutional due process requirements. *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). This Court thus must determine (1) if Cox has "purposefully availed [it]self of the benefits and protections" of Texas by establishing "minimum contacts" with Texas; and (2) whether exercising jurisdiction over Cox would "offend 'traditional notions of fair play and substantial justice.'" *Alpine View Co.,* 205 F.3d at 215 (citations omitted).

In evaluating "minimum contacts," the Court may look both to evidence of minimum contacts that would support specific personal jurisdiction – that is, contacts that are related to the subject matter of the litigation, and the more extensive contacts that would support general

jurisdiction – contacts that are unrelated to the instant cause of action.  *See Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1200 (Fed. Cir. 2003) (evidence of substantial, systematic, continuous contacts with the forum state may support general jurisdiction ); *Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995) (evidence to support specific jurisdiction includes defendant's activities purposefully directed at the forum, out of which the cause of action arises). Here, U.S. Video has shown no facts sufficient to support either general or specific jurisdiction.

General jurisdiction exists when a court exercises jurisdiction in an action not arising out of Cox's specific contacts with Texas.  *Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984).  The Court explained that for causes of action unrelated to forum activities, jurisdiction may be proper "when there are sufficient contacts between the State and the foreign corporation."  *Id*. at 414.  Only the presence of substantial, regular and systematic contacts that are qualitatively different from contacts sufficing for specific jurisdiction allow a defendant to foresee being haled before a Texas court.  For example, property ownership does not establish general jurisdiction.  *Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977).  Nor does purchasing or selling products within the state alone establish general jurisdiction.  *Helicopteros*, 466 U.S. at 418.

Cox is a Delaware corporation that is not registered or even qualified to do business in Texas because it does none here.  (Spalding Decl., ¶3.)   Cox does not provide services to any customers in Texas.  (*Id*.)  Cox does not operate or maintain offices or even books or records in Texas.  (*Id*.)  This case is like the patent case in *Tandy Corp. v. Comus Int'l, Inc*., 704 F. Supp. at 118-19 (N.D. Tex. 1987, in which the court concluded that it lacked general jurisdiction over a defendant who lacked the kinds of qualitative minimum contacts required by the Supreme Court to satisfy Constitutional due process.  The defendant Comus did not lease or own Texas property,

7

was not licensed to do business in Texas, and maintained no bank accounts, phone listings, or employees here.  *Id.*  Like Comus, Cox has no "continuous and systematic general business contacts" with Texas.

U.S. Video has not alleged any facts relevant to personal jurisdiction, aside from the conclusory (and erroneous) allegation that "Cox is doing business in Texas."[2]  (Complaint, at ¶3.)  In fact, Cox is <u>not</u> doing business in Texas and has neither the "substantial, systematic, and continuous contacts" that would support general jurisdiction nor the specific, litigation-related contacts that would support specific personal jurisdiction.  Cox does not have any property, offices, employees, records, or other assets in Texas.  Cox does not offer, sell, or otherwise provide any telecommunications services in Texas, much less digital cable systems services or "video-on-demand" services.  *See generally*, Spalding Declaration, Exhibit A.  Cox's minimal contacts with Texas are <u>not</u> such that maintenance of U.S. Video's suit would "not offend traditional notions of fair play and substantial justice," because Cox could <u>not</u> reasonably have anticipated being haled into Texas court.  *International Shoe Co. v. Washington*, 326 U.S. 310,. 316 (1945) (internal quotation omitted).  In short, no substantial contacts between Texas and Cox exist to make reasonable the exercise of personal jurisdiction over Cox.

> ### 3.    Cox is Not Subject to Specific Jurisdiction Because it has No Contacts with Texas Related to U.S. Video's Claim.

U.S. Video likewise cannot carry its burden of establishing minimum contacts necessary to show specific personal jurisdiction because it cannot show any contacts between Cox and Texas that are related to its claims.  Only by meeting three requirements can such specific

---

[2]    According to U.S Video, Cox is "organized under the laws of the State of Delaware . . .is doing business in Texas . .  and has a principal place of business in Atlanta, GA,"  Complaint at ¶3, and that Cox "operates digital cable systems in which it provides video-on-demand (VOD) services . . . [and] provides its subscribers with digital set-top boxes to enable access to the VOD services."  *Id.* at ¶15.

jurisdiction be shown.  First, the defendant must have "'purposefully directed' its activities at residents of the forum."  *Inamed*, 249 F.3d at 1356.  Second, the claim must "'arise[] out of or relate[] to' the defendant's activities within the forum."  *Id.*  Third, the exercise of personal jurisdiction must be reasonable and fair.  *Id.*  None of these requirements can be shown here.

Undoubtedly, using the accused video-on-demand services within Texas could show that Cox purposefully directed its actions toward Texas residents.  But Cox does not offer such services in Texas – and neither have any of its affiliates.  (Spalding Decl., ¶¶ 3,6,7.)  U.S. Video thus cannot demonstrate any facts that could meet its burden of showing that its claims to arise out of or relate to Cox's alleged, but unproven, actions in Texas.  As a result, there can be no specific personal jurisdiction.

4.      **Actions of Cox's Affiliates Do Not Matter for Personal Jurisdiction Purposes.**

Cox does not do business in Texas.  (Spalding Decl., ¶3.)  It is settled law that the activities of Cox's affiliated companies, some of which have done business in Texas, are irrelevant to determining whether Cox has sufficient contacts with Texas to support jurisdiction. *See Cannon Mfg. Co. v. Cudahy Packing Co*., 267 U.S. 333 (1925) (subsidiary's acts in North Carolina not imputed to parent for jurisdictional purposes); *Phonometrics, Inc. v. Northern Telecom Inc*., 133 F.3d 1459, 1468 (Fed. Cir. 1998) (Sprint not subject to jurisdiction in Florida despite activities of its United Telephone subsidiary); *Hargrave v. Fibre Board Corp*., 710 F.2d 1154, 1159 (5th Cir. 1983) ("Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there."); *Dunn v. Svitzer*, 885 F. Supp. 980, 987 (S.D. Tex. 1995) ("As long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in the forum may not be attributed to the other.*"); Entek Corp. v. Southwest Pipe and Supply Co*., 683 F. Supp. 1092, 1104-05 (N.D. Tex. 1988) (no jurisdiction over parent corporation for subsidiaries' acts in Texas

in the absence of an allegation of a lack of formal separation between parent and subsidiaries and absence of greater control than "normally associated with common ownership and directorship"). Cox and its affiliates share the same name and webpage, but that is insufficient where the Federal Circuit has cautioned in this context that "the corporate form is not to be lightly cast aside." *3D Sys.*, 160 F.3d at 1380-81 (no jurisdiction over out-of-state parent company of alleged infringer). *See also, e.g., Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1301 (S.D. N.Y. 2003) (subsidiary Sprint Spectrum L.P.'s use "Sprint" trade name "was not a sufficient basis for establishing personal jurisdiction" over its parent); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D. N.Y. 2001) (parent's failure to distinguish between itself and subsidiary on webpage and in annual report did not support exercise of personal jurisdiction).

Here, as noted, Plaintiff has simply sued the wrong party. Cox is not responsible for its affiliates' actions and Plaintiff cannot point to the affiliates' contacts to justify this action. U.S. Video has not even alleged, and cannot show, that there is anything other than a normal parent-subsidiary relationship between Cox and its affiliates. It thus cannot ignore the corporate forms.

Moreover, Plaintiff cannot now amend its complaint to add such affiliates – especially where one of Cox's affiliates has already initiated a declaratory judgment action in Delaware, the most appropriate forum for resolving this dispute. *See* Exhibit B. Even if an amendment were sought or allowed, however, such an amendment would not relate back to the filing of plaintiff's original Complaint under Fed. R. Civ. P. 15 because plaintiff could (and should) have known for some time about these others yet purposefully chose not to name them. *See, e.g., Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metro. Bottling Co.*, 785 F. Supp. 514, 516 (E.D. Pa. 1992) (no relation back under Rule 15(c) because "an amendment should relate back only where there has been an error made concerning the identity of the proper party" and

the proposed defendant may have believed plaintiff made a deliberate choice rather than a mistake); *Naxon Telesign Corp. v. GTE Information Sys., Inc.*, 89 F.R.D. 333, 337-38 (N.D. Ill. 1980) (filing of patent infringement action against corporate parent did not relate back to original complaint against the parent's subsidiary).

## B. If Plaintiff May Pursue this Action Against Cox, Delaware is the Appropriate Forum.

Cox joins and incorporates by reference herein the motion for transfer filed by Defendant Comcast on August 10, 2006. (Docket Entry No. 18) Cox's case for transfer is, however, even stronger, given that Cox does nothing in Texas, much less anything relevant to the subject-matter of this case. There are thus no local interests to counter the clear public interest in efficient and consistent resolution of claims. The convenience of the parties, neither of which resides or does business in Texas, clearly favors transfer. Moreover, U.S. Video is estopped by its own sworn assertions in the MovieLink matter from contesting that Delaware is an appropriate and convenient forum.

### 1. Cox's Lack of Jurisdictional Contacts Renders Texas an Improper Forum for this Action.

Venue in patent suits is proper a) where the defendant resides, which for corporate defendants includes any forum in which they are amenable to personal jurisdiction, or b) where the defendant has infringed and has a regular and established place of business. 28 U.S.C. §§ 1391, 1400. Cox is not subject to personal jurisdiction in Texas and has no place of business there. *Supra*. Cox is, however, subject to personal jurisdiction in Delaware because it is incorporated there. (Complaint at ¶6.) Delaware, therefore, is the proper forum for Plaintiff's suit.

11

## 2. Delaware is the Proper, More Convenient Forum for Resolving Plaintiff's Claims.

As stated, Cox has done nothing that would support Plaintiff's claims for infringement. Even if Plaintiff were able to pursue this action against Cox, and even if jurisdiction and venue were proper, this Court may, "[f]or the convenience of parties and witnesses [and] in the interest of justice," transfer this action "to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). This provision and the Federal Rules allow for severing and transferring a cause of action against one defendant to a different forum while maintaining plaintiff's action against other defendants in the original forum. *See* Fed. R. Civ. P. 21 ("Any claim against a party may be severed and proceeded with separately."). At minimum, given the absence of contacts with Texas and in light of the "public and private interest factors" discussed in Comcast's motion, the Court should transfer Plaintiff's claim against Cox to the District of Delaware.

Comcast's motion demonstrated numerous grounds for transfer. In addition, the propriety of transfer is further buttressed by U.S. Video's previous insistence in the *MovieLink* litigation that the District of Delaware was the appropriate venue in which to bring its infringement claims based on the '792 patent, because the District of Delaware was its "home district." When a party has succeeded in obtaining a ruling on the basis of its factual and legal arguments, that party may not turn to a different court and seek an inconsistent advantage by pursuing an incompatible argument. *See Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed"), *In re Coastal Plains, Inc*., 1779 F.3d 197, 205-06 (5th Cir. 1999) (equitable doctrine of judicial estoppel precludes a litigant from

taking inconsistent positions in successive litigations); *see also* Wright & Miller, 18B Fed. Prac. & Proc. Juris.2d § 4477 (discussing judicial estoppel or "preclusion of inconsistent positions").[3] Indeed, U.S. Video should be judicially estopped from taking any inconsistent position concerning venue in Delaware.  Because the Delaware court ruled in favor of U.S. Video and denied MovieLink's motion to transfer, see Order of January 9, 2004, attached as Exhibit C, U.S. Video may not now turn to this Court and assert inconsistent venue arguments.

## IV.     CONCLUSION

For the reasons stated above, the Court should grant Cox Communications, Inc.'s Motion to Dismiss For Lack of Personal Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Alternatively, the Court should transfer this matter to the District of Delaware, pursuant to 28 U.S.C. § 1404(a).

Respectfully submitted, this 14th  day of August, 2006.


OF COUNSEL:

| | |
|---|---|
| Matthew B. Lehr | /s/ |
| Suong T. Nguyen | Mitchell G. Stockwell |
| Duane Nash | Lead Attorney |
| Yiping Liao | Georgia Bar No. 682912 |
| DAVIS POLK & WARDWELL | KILPATRICK STOCKTON LLP |
| 1600 El Camino Real | 1100 Peachtree St NE |
| Menlo Park CA  94025 | Suite 2800 |
| Telephone:  650-752-2000 | Atlanta GA  30309-4530 |
| Facsimile:  650-752-2111 | Telephone:  404-815-6214 |
| | Facsimile:   404-815-6555 |

---

[3]     Judicial estoppel protects the finality of decisions and promotes consistency of disposition by preventing a party from "playing fast and loose" with the judicial system and taking contradictory positions to serve its self interests. *See Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).

13

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846

**Attorneys for Cox Communications, Inc.**

# CERTIFICATE OF CONFERENCE

This is to certify that Candice C. Decaire, counsel for Defendants Cox Communications, Inc., has conferred with Edward Goldstein, counsel for Plaintiff, regarding the matters included in this motion. Counsel for Plaintiff states that this motion is OPPOSED.

_____/s/_____
Candice C. Decaire

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

|  |  |  |
|---|---|---|
| USA VIDEO TECHNOLOGY CORP., | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 2-06cv-239** |
| | ) | |
| v. | ) | **Honorable Ron Clark** |
| | ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS INC.) COMCAST CABLE; COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | ) ) ) ) ) ) ) ) | **JURY** |
| | ) | |
| Defendants. | ) | |
| _____ ) | | |

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 14th day of August, 2006. Any other counsel of record will be served by first class mail.

_____
/s/
Mitchell G. Stockwell

16

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **CASE NO. 2:06-CV-223 [TJW]** |
| | § | **JURY TRIAL REQUESTED** |
| CHARTER COMMUNICATIONS, INC., | § | |
| CHARTER COMMUNICATIONS | § | |
| OPERATING, LLC, COX | § | |
| COMMUNICATIONS, INC., COXCOM, | § | |
| INC., COX ENTERPRISES, INC., CSC | § | |
| HOLDINGS, INC. AND CABLEVISION | § | |
| SYSTEMS CORPORATION, | § | |
| | § | |
| **Defendants.** | § | |

## AFFIDAVIT OF ANTHONY JOSEPH MAGEE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, personally appeared Anthony Joseph Magee, being by me duly sworn, deposed as follows:

1.      My name is Anthony Joseph Magee.  I am over the age of twenty-one (21) years, have never been convicted of a felony, and am fully competent to make this affidavit.  I have personal knowledge of matters set forth herein and know them to be true and correct.  I am Senior Counsel at the law firm of McKool Smith, P.C., attorneys representing Plaintiff Rembrandt Technologies, LP, ("Rembrandt") and have gained knowledge of the following matters in that capacity.

2.      Attached as Exhibit A to this affidavit is a copy of the Cox Press Release dated November 1, 2005, referred to at page 5, footnote 22, of the Opposition.  I downloaded this document from Cox Communications' website on January 10, 2007.

**AFFIDAVIT OF ANTHONY JOSEPH MAGEE - Page 1**

3.    Attached as Exhibit B to this affidavit is a copy of the document entitled "About Cox - Our History" referred to at page 5, foot note 23, of the Opposition. I downloaded this document from Cox Communications' website on January 10, 2007.

4.    Attached as Exhibits C-I to this affidavit are copies of Cox's 10-K Annual Reports filed with the SEC for the periods ending December 31, 1999 through December 31, 2005, respectively. I downloaded these documents from Cox Communications' website on January 8 and 9, 2007.

5.    Attached as Exhibit J to this affidavit is a copy of an excerpt from Cox's 2003 Annual Report entitled "Cox At A Glance" referred to at page 6, footnote, of the Opposition. I downloaded this document from Cox Communications' website on January 8, 2007.

6.    Attached as Exhibit K to this affidavit is a copy of an article written by Rachael Hedgcoth, Associate Editor, Expansion Management Magazine, dated July 1, 2000, entitled "Lone Star Companies Round Up Texas-Sized Success." I downloaded this article from Expansion Magazine's website on January 10, 2007.

7.    Attached as Exhibit L to this affidavit is a copy of Cox's document entitled "WHITEPAPER: Circuit Switch to VoIP Evolution Plan" (March 2005), referred to at page 6, footnote 26 of the Opposition. This document is referred to in a news release posted on Cox Communications' website, a copy of which is attached as Exhibit M. I downloaded this Whitepaper and the news release from the internet on January 9 and 10, 2007.

8.    Attached as Exhibit N to this affidavit are copies of excerpts from the deposition of John Spalding taken in the USA Video case. These excerpts were attached as Exhibit B to USA Video Technology Corporation's (1) Supplemental Opposition To Cox Communication, Inc.'s Motion To Dismiss And (2) Reply In Support Of Its Motion To Amend and Exhibit 1 to Cox Communications, Inc.'s Response To Plaintiff's Supplemental Opposition And Surreply In Support Of Its Motion To Dismiss respectively filed in the USA Video case.

9.    Attached as Exhibit O to this affidavit is a copy of John Spalding's Supplemental Declaration dated September 6, 2006, which was filed in support of Cox Communications, Inc.'s

**AFFIDAVIT OF ANTHONY JOSEPH MAGEE** - Page 2

Consolidated (1) Reply In Support Of Its Motion To Dismiss And (2) Opposition To Plaintiff's Motion To Amend in the USA Video case.

10.  Attached as Exhibit P to this affidavit are pages from Cox Communications' website, which I downloaded from the internet on various dates, as appearing on the face of each document.

11.  Attached as Exhibit Q to this affidavit is a copy Cox Communication's Consolidated (1) Reply in Support Of Its Motion To Dismiss And (2) Opposition To Plaintiff's Motion To Amend filed in the USA Video case.

12.  Attached as Exhibit R to this affidavit are copies of pages from the Henderson Area Chamber of Commerce website, which I downloaded from the internet on January 2, 2007.

13.  Attached as Exhibit S to this affidavit is a copy of Cox's document entitled "WHITEPAPER: Voice over Internet Protocol: Ready For Prime Time" (May 2004), referred to at page 9, footnote 39 of the Opposition. This document is referred to in a news release posted on Cox Communications' website, a copy of which is also attached as Exhibit T. I downloaded this Whitepaper and the news release from the internet on January 9 and 10, 2007.

14.  Attached as Exhibit U to this affidavit is a copy of Cox Enterprises' 2005 Annual Report, which I downloaded from Cox Enterprises' website on January 8, 2007.

15.  Attached as Exhibit V to this affidavit is a copy of Cox Communications, Inc.'s Motion To Dismiss For Lack Of Personal Jurisdiction Or In The Alternative, To Transfer To The District Of Delaware filed in the USA Video case.

**AFFIDAVIT OF ANTHONY JOSEPH MAGEE** - Page 3

FURTHER AFFIANT SAYETH NOT

_____
Anthony Joseph Magee

BEFORE ME, a notary public, on this day personally appeared Anthony Joseph Magee, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are true and correct.

SWORN TO AND SUBSCRIBED BEFORE ME on the 10th day of January, 2007

_____
Notary Public, State of Texas

ANGELA KAY IVY
Notary Public
State of Texas
My Comm Expires 10-18-2007

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP, <br><br> Plaintiff, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, COXCOM, INC., CSC HOLDINGS, INC., and CABLEVISION SYSTEMS CORPORATION, <br><br> Defendants. | CASE NO. 2-06CV-223 TJW |

**CONSENT MOTION FOR EXTENSION OF TIME FOR DEFENDANT COXCOM, INC. TO FILE A REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendant CoxCom, Inc. ("CoxCom"), with the consent of Plaintiff's attorney and pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, moves the Court for an extension of time in which to file a reply in further support of its motion to dismiss for lack of personal jurisdiction. In support of this Motion, CoxCom shows the Court that:

1. CoxCom filed its Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(2) ("Motion to Dismiss") on December 14, 2006. Plaintiff filed and served electronically its response and opposition to the Motion to Dismiss on January 10, 2007; therefore, CoxCom's reply is due on January 23, 2007.

2. Defendant CoxCom requires a brief extension of time to properly reply to Plaintiff's response and opposition.

3. This Motion is made in good faith and not for the purpose of delay.

4.      Counsel for Plaintiffs has agreed, subject to the Court's approval, to the request for extension of time.

WHEREFORE, Defendant CoxCom, Inc. respectfully requests that the Court grant an extension through and including January 26, 2007, in which to file a reply in further support of its Motion to Dismiss.

This the 22nd day of January 2007.

/s/ Michael E. Jones
Mitchell G. Stockwell
Lead Attorney
Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555
MStockwell@KilpatrickStockton.com

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Allen F. Gardner
State Bar No. 24043679
allengardner@potterminton.com
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500 (75702)
PO Box 359
Tyler, Texas  75710
Telephone:  903-597-8311
Facsimile:  903-593-0846

**Attorneys for CoxCom, Inc.**

2

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and contemporaneously served upon all counsel who have consented to electronic service on this the 22nd day of January 2007.  Other counsel shall be served by first class mail.

*/s/ Michael E. Jones*
Michael E. Jones.

US2000 9720361.2 C8490-331049

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

               Plaintiff,

   v.

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS
OPERATING, LLC, COXCOM, INC., CSC
HOLDINGS, INC., and CABLEVISION
SYSTEMS CORPORATION,

               Defendants.

CASE NO. 2-06CV-223 TJW

**ORDER GRANTING CONSENT MOTION FOR EXTENSION
OF TIME FOR DEFENDANT COXCOM, INC. TO FILE A REPLY
IN SUPPORT OF MOTION TO DISMISS**

FOR GOOD CAUSE SHOWN, IT IS HEREBY ORDERED that Defendant

CoxCom, Inc. may have to and including January 26, 2007, in which to file a reply in further

support of its Motion to Dismiss.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP,<br><br>        Plaintiff,<br><br>  v.<br><br>CHARTER COMMUNICATIONS, INC.,<br>CHARTER COMMUNICATIONS<br>OPERATING, LLC, COXCOM, INC., CSC<br>HOLDINGS, INC., and CABLEVISION<br>SYSTEMS CORPORATION,<br><br>        Defendants. | CASE NO. 2-06CV-223 TJW |

**ORDER GRANTING CONSENT MOTION FOR EXTENSION
OF TIME FOR DEFENDANT COXCOM, INC. TO FILE A REPLY
IN SUPPORT OF MOTION TO DISMISS**

FOR GOOD CAUSE SHOWN, IT IS HEREBY ORDERED that Defendant

CoxCom, Inc. may have to and including January 26, 2007, in which to file a reply in further

support of its Motion to Dismiss.

SIGNED this 23rd day of January, 2007.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, L.P.<br><br>Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, COX COMMUNICATIONS, INC., COXCOM, INC., COX ENTERPRISES, INC., CSC HOLDINGS, INC. and CABLEVISION SYSTEMS CORPORATION,<br><br>Defendants. | CASE NO. 2:06-CV-223 [TJW] |

## DEFENDANT COXCOM, INC.'S REPLY TO PLAINTIFF'S OPPOSITION AND FURTHER SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendant CoxCom, Inc. ("Defendant" or "CoxCom"), files this memorandum in reply to Plaintiff Rembrandt Technologies, L.P.'s ("Plaintiff" or "Rembrandt") Opposition and in further support of CoxCom's Motion to Dismiss for Lack of Personal Jurisdiction.

## I.     INTRODUCTION

Several years ago, and before Rembrandt bought the rights to the Patents in Suit,[1] CoxCom made a business decision to stop doing business in Texas (Suppl. Decl. of John Spalding in Supp. of Def. CoxCom's Mot. to Dismiss Pursuant to Rule 12(b)(2) ¶ 1 [hereinafter Spalding Suppl. Decl.].)  As a result, and contrary to the assertions made by Rembrandt in its Opposition, CoxCom has no presence in Texas but for a POP node that has nothing to do with

---

[1] Rembrandt became the assignee of U.S. Patent No. 5,243,627 (the "'627 Patent") on March 30, 2005; of U.S. Patent No. 5,852,631 (the "'631 Patent") on March 30, 2005; of U.S. Patent No. 5,719,858 (the "'858 Patent") on March 30, 2005; and of U.S. Patent No. 4,937,819 (the "'819 Patent") on February 3, 2005 (collectively, the "Patents in Suit").   A true and correct copy of the assignment chains of each of the Patents in Suit is attached hereto as Exhibit 1.

1

the accused activity and which, under established controlling precedent, is insufficient to establish jurisdiction. Moreover, while Cox Southwest, a subsidiary of Cox Communications, Inc., still owns (for two more months anyway) a franchise (but not the physical assets needed to operate the franchise) in Texas, the actions of Cox Southwest cannot establish jurisdiction over CoxCom—an unrelated entity. Rembrandt is in error in arguing that they do.

## II.     ARGUMENT AND LEGAL AUTHORITY

### A.     CoxCom is Not Purposefully Directing Activity at Texas or Toward the Residents of Texas.

Several years ago, CoxCom made a strategic business decision to exit from Texas. (Suppl. Decl. ¶ 1.) As a result, in 2003, with the exception of the POP node, CoxCom assigned all of its assets that were located in Texas to Cox Southwest (thereafter Cox Southwest sold almost all of its assets to Cebridge). (Spalding Decl. ¶ 7.) As a result, CoxCom does no business in Texas, owns no assets in Texas, keeps no records in Texas, has no employees in Texas, and does not own or operate any cable systems in Texas. (*Id.* ¶¶ 4,6.)

In its Opposition, Rembrandt argues that this Court should exercise jurisdiction over CoxCom because CoxCom was doing business in Texas as recently as 2006. (Opp'n at 6.) As support for this argument, Rembrandt relies on the 2006 asset purchase agreement in which Cox Southwest sold assets to Cebridge and which identifies CoxCom as a "Seller". (*Id.* at 8.) Rembrandt also relies on press releases and SEC filings discussing the transaction. (*Id.* at 6, n.20; 8, n.34.) Rembrandt is simply in error. As Mr. Spalding explained in his Declaration, CoxCom has not done business in Texas in several years, having assigned its assets to Cox Southwest in 2003. (Spalding Decl. ¶¶ 3, 4, 7.) CoxCom is identified as a "Seller" in the asset purchase agreement and publications regarding the transaction because, in addition to purchasing Cox Southwest's assets, Cebridge purchased assets from several other Cox Communications'

2

subsidiaries, including CoxCom—assets that were not located in Texas. (Spalding Suppl. Decl. ¶ 4.)

Rembrandt also points to the POP node in Dallas as evidence that CoxCom is directing activity toward Texas sufficient to justify the exercise of personal jurisdiction. Again, however, Rembrandt is in error. The POP node cannot support the exercise of jurisdiction because it is not a continued activity directed toward a Texas resident. (Spalding Decl. ¶ 5.) Moreover, the internet node is not related to the DOCSIS communications that occur between a cable modem and the cable modem termination system in the head-end (*Id.* ¶ 5), which are the methods and systems at issue in this litigation (*see* Compl. ¶¶ 17, 23, 29, and 35 (describing the Patents in Suit)). The purpose of the node, which is implemented by computer servers in leased space in Dallas, is to connect with CoxCom's national internet backbone to carry traffic from and to its cable systems that are located in several (non-Texas) metro areas throughout the country. Interconnecting national or international networks through assets in Texas does not support personal jurisdiction. *See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717-718 (5th Cir. 1999) (holding that leasing [telephone] lines in Texas "for the purpose of connecting two points in Mexico . . . [did] not constitute doing business in Texas"); *Applewhite v. Metro Aviation, Inc.*, 875 F.2d 491, 717-18 (5th Cir. 1989) (holding interconnections, even though crossing the border into a forum, are insufficient to confer jurisdiction under the Due Process Clause). The purchase of the computer servers used by the POP node and the purchase of related services (such as the space occupied by the servers) also do not support personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ("mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of . . . jurisdiction over a nonresident corporation in a cause of action not related to

3

those purchase transactions"); *Shaffer v. Heitner*, 433 U.S. 186, 213 (1977) (ownership of property in forum state unrelated to claim did not support jurisdiction).

**B.     The Activities of Affiliates of Cox Communications are Irrelevant to Whether This Court Should Exercise Jurisdiction Over CoxCom.**

Rembrandt's assertions regarding the role of Cox Communications and other Cox Communications' affiliates and subsidiaries also are in correct—and irrelevant.

First, Rembrandt argues that this Court should exercise jurisdiction over CoxCom because the Henderson Area Chamber of Commerce lists Cox Communications as having an office in Henderson and employing eleven people in the city. (Opp'n at 9.) Regardless of what the Henderson Area Chamber of Commerce says, Cox Communications does not have an office in Henderson, Texas (or anywhere else in Texas) and does not employ any people in Henderson (or anywhere else in Texas). (Spalding Suppl. Decl. ¶ 5.) In fact, Cox Communications has not done business in Texas for more than ten years. (*Id.*) The fact that a local chamber of commerce directory lists Cox Communications as being a "Major Employer" (Opp'n at 9), does not make it so.

Second, Rembrandt argues that CoxCom is subject to jurisdiction in Texas because Cox Southwest owns a franchise located in Texas. (Opp'n at 9.) While Cox Southwest does own a franchise in Henderson, Texas (until March 25, 2007 anyway), it is not a voluntary ownership. In fact, in connection with Cox Southwest's sale of assets to Cebridge, Cox Southwest sold all of the physical assets associated with the cable television franchise and attempted to transfer the franchise itself. (Spalding Suppl. Decl. ¶ 2.) However, the City of Henderson refused to consent to the transfer of the franchise and, as a result, Cox Southwest was prohibited from immediately transferring the franchise. (*Id.*) After the franchise expires in March, Cox Southwest will have no assets in Texas. (*Id.*)

4

Moreover, even if the alleged activities regarding Cox Communications and Cox Southwest were true, they are irrelevant as to whether CoxCom is subject to personal jurisdiction in Texas. Rembrandt attempts to spin the parties' Stipulation into an agreement that CoxCom would not oppose personal jurisdiction in Texas. (Opp'n at 1-2.) That is simply not correct. The Stipulation was reached and Cox Communications and Cox Enterprises, Inc. were dismissed from this action because they are holding companies whereas CoxCom actually owns and operates the systems accused in this action (though not in Texas). CoxCom stipulated only that it was the proper entity to answer any infringement claims. (Carter Decl. Ex. A.) As evidenced by the Stipulation itself, there was no agreement that CoxCom would consent to personal jurisdiction in Texas. (*Id.*)

There also was no agreement that personal jurisdiction could be exercised over CoxCom based on the alleged Texas activities of Cox Communications and other Cox Communications' affiliates and subsidiaries. In fact, this is contrary to case law which holds that, absent evidence of an alter ego arrangement, the activities of a parent company are irrelevant in establishing personal jurisdiction over a subsidiary—and vice versa. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1380 (Fed. Circ. 1998) (examining jurisdiction based on the specific activities of the respective companies "[o]n its own"); *Hanson Pipe & Prods., Inc. v. Bridge Tech. LLC*, 351 F. Supp.2d 603, 611-12 (E.D. Tex. 2004), *aff'd*, 160 Fed. Appx. 380, No. 05-40161, 2005 WL 3525581 (5th Cir. 2005).

## C. Exercising Personal Jurisdiction Over CoxCom Would be Unreasonable and Does Not Comply With Due Process.

Even if the Court were to find that CoxCom is subject to personal jurisdiction in Texas (which CoxCom denies), the exercise of such jurisdiction would be both unreasonable and unfair. *See HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304 (Fed. Cir. 1999); *Red Wing Shoe Co.,*

*Inc. v. Hockerson-Halberstadt, Inc.* 148 F.3d 1355 (Fed. Cir. 1998); *Colida v. LG Elec., Inc.*, 77 Fed. Appx. 523, 526, No. 03-1399, 2003 WL 22319221 (Fed. Cir. 2003).

In evaluating the reasonableness of personal jurisdiction, courts consider several factors including, *inter alia*, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interstate judicial system's interest in obtaining the most efficient resolution of controversies. *Id*. (quoting *Burger King v. Rudezewicz*, 471 U.S. 462, 477 (1985)). Generally speaking, Texas' "interest[s] [are] preventing patent infringement within its borders and in protecting the patent rights of its citizens. . . [and] . . . furthering commerce and scientific development, especially within its technology sector, which is promoted by patent laws." *Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc.*, No. 6:05CV295, 2006 WL 871015, at *5 (E.D. Tex. Mar. 24, 2006). However, unlike the plaintiff in *Marshall Packaging* (which was a Texas corporation doing business in Texas), Rembrandt is a patent troll organized under the laws of New Jersey and with a principal place of business in Pennsylvania. (Compl. ¶ 1, *see also* Def. CoxCom's Mot. to Dismiss at 4-5, Ex. 3 (discussing Rembrandt's business model).) Rembrandt has not attempted to practice, develop, or otherwise advance the technology covered by its patents in Texas. Therefore, exercising jurisdiction over CoxCom will do nothing to protect the patent rights of Texas citizens or to further commerce and scientific development in Texas. Finally, since CoxCom is not doing business in Texas, exercising jurisdiction over CoxCom does nothing to prevent patent infringement within Texas. Simply, Texas has no interest in Rembrandt's claims against CoxCom.

When considering the plaintiff's interest in obtaining convenient and effective relief, courts examine "the convenience and effectiveness of relief from the plaintiff's perspective, as generally the first party to file suit chooses the forum." *Breckenridge Pharm., Inc.*, 444 F.3d at

6

Id. at 1367, 1368. However, when the plaintiff's and State's interest in litigating in a particular forum is particularly attenuated, as in this case, the Court should not exercise personal jurisdiction over a non-resident defendant. *See Colida*, 77 Fed. App'x at 526. Here, Rembrandt was *not* the first party to file suit or choose a forum—CoxCom was, and it filed suit in Delaware. Moreover, the United States District Court for the District of Delaware, located in Wilmington, Delaware, is approximately 30 miles from Rembrandt's headquarters. *See* Exhibit 2 attached hereto. Presumably, much more convenient than Texas. Furthermore, Rembrandt has already expressed its desire and willingness to litigate in Delaware, having filed multiple patent litigation matters there involving the same patents at issue in this case.[2]

When considering the interstate judicial system's interest in obtaining the most efficient resolution of controversies, courts compare the alternative forums and may consider the case load of the courts as well as their familiarity with the type of litigation. *Amoco Egypt Oil Co., v. Leonis Nav. Co.*, 1 F.3d 848, 852 (9th Cir. 1993); *Breckenridge Pharm., Inc.*, 444 F.3d at 1368. In that regard, according to the Statistical Tables for the Federal Judiciary, in 2005, there were 1,190 total filings in the District of Delaware for four judges, or 298 cases per judge; and 3,583 filings in the Eastern District of Texas for eight judges, or 448 cases per judge. Judicial Caseload Profile Reports for the District of Delaware and the Eastern District of Texas, http://www.uscourts.gov/fcmstat/index.html. (In the "other" category, which includes patent litigation matters, 13 cases were filed in the District of Delaware and 110 in the Eastern District of Texas. U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During

---

[2] On October 13, 2006, Rembrandt filed an action against Cablevision Systems Corporation, *et al.* (case no. 1:06-0CV-00635-GMS), asserting the same patents that are at issue in this action, as well as one additional patent. A true and correct copy of this complaint is attached hereto as Exhibit 3. Rembrandt has also brought other patent infringement suits in Delaware against CBS (case no. 1:06-00727), ABC (case no. 1:06-00730), NBC (case no. 1:06-00729) and Fox (case no. 1:06-00731) for infringement of U.S Patent No. 5,243,627; true and correct copies of each complaint are attached hereto as Exhibits 4A-4D.

the 12-Month Period Ending June 30, 2005, http://www.uscourts.gov/stats/june05/index.html.)
The lighter case load of the Delaware court suggests that this case may be resolved just as
efficiently in Delaware.  Further, the time for disposition of the cases is almost identical—10.9
months in Delaware versus 10.3 months in the Eastern District of Texas.  Therefore, the statistics
do not substantially favor Texas, and just as sound a resolution can be had in Delaware.

CoxCom does not have systematic and continuous contacts with the State of Texas
sufficient for this Court to exercise general personal jurisdiction over it.  It ceased any business
and operations in Texas in 2003, making any contacts non-existent.  In addition, there are no
minimum contacts with Texas to support specific jurisdiction with respect to the Patents in Suit.
CoxCom has no activities, employees, operations, or assets in Texas that are directed to the
technology of the Patents in Suit.  The only asset, the POP node, supports internet backbone
traffic and *not* any cable modem or high-speed internet traffic of Texas subscribers because there
are none.  However, if this Court should find sufficient minimum contacts to support personal
jurisdiction, it should find that the assertion of such jurisdiction is both unfair and unreasonable
based on the above factors.  Rembrandt has no business or contacts with Texas, other than filing
suit here, and does not practice or otherwise make use of its patents.  CoxCom is no longer
located here, and Delaware, where both parties are amenable to suit and where Rembrandt
already has pending matters involving the same patents, can provide as just and efficient a
resolution to the matter as this Court.

## III.    CONCLUSION

For the reasons set forth above, CoxCom respectfully submits that it would be improper
for this Court to exercise personal jurisdiction over it and renews its request to be dismissed from
this action.

8

This the 26th day of January 2007.

/s/ Michael E. Jones
Mitchell G. Stockwell
Lead Attorney
Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555
MStockwell@KilpatrickStockton.com

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Allen F. Gardner
State Bar No. 24043679
allengardner@potterminton.com
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500 (75702)
PO Box 359
Tyler, Texas  75710
Telephone:  903-597-8311
Facsimile:  903-593-0846

***Attorneys for CoxCom, Inc.***

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and contemporaneously served upon all counsel who have consented to electronic service on this the 26th day of January 2007.  Other counsel shall be served by first class mail.

/s/ Michael E. Jones
Michael E. Jones

# EXHIBIT 1

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > **Patent Query**

# Patent Assignment Abstract of Title
## *NOTE:Results display only for issued patents and published applications.*
## *For pending or abandoned applications please consult USPTO staff.*

**Total Assignments: 10**
   **Patent #:** <u>5243627</u>   **Issue Dt:** 09/07/1993   **Application #:** 07748594   **Filing Dt:** 08/22/1991
**Inventors:** WILLIAM L. BETTS, EDWARD S. ZURANSKI
      **Title:** SIGNAL POINT INTERLEAVING TECHNIQUE
**Assignment: 1**
   **Reel/Frame:** <u>005817/0920</u>     **Recorded:** 08/21/1991       **Pages:** 3
  **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
    **Assignors:** <u>OBATA, KIJURO</u>              **Exec Dt:** 07/28/1991
               <u>SHIMIZU, TAKESHI</u>        **Exec Dt:** 07/28/1991
     **Assignee:** <u>ALPINE ELECTRONICS INC.</u>
              A CORPORATION OF JAPAN
              1-1-8 NISHI-GOTANDA, SHINAGAWA-KU, TOKYO, JAPAN
**Correspondent:** GUY W. SHOUP
              SKJERVEN, MORRILL, MACPHERSON
              FRANKLIN & FRIEL
              25 METRO DRIVE, SUITE 700
              SAN JOSE, CA 95110
**Assignment: 2**
   **Reel/Frame:** <u>005825/0886</u>     **Recorded:** 08/22/1991       **Pages:** 4
  **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
    **Assignors:** <u>BETTS, WILLIAM L.</u>         **Exec Dt:** 08/13/1991
               <u>ZURANSKI, EDWARD S.</u>    **Exec Dt:** 08/13/1991
     **Assignee:** <u>AMERICAN TELEPHONE AND TELEGRAPH COMPANY, A CORP. OF NY</u>
              550 MADISON AVE. NEW YORK, NY 10022-3201
**Correspondent:** P. V. D. WILDE
              AT&T BELL LABORATORIES
              600 MOUNTAIN AVE.
              P.O. BOX 636
              MURRAY HILL, NJ 07974-0636
**Assignment: 3**
   **Reel/Frame:** <u>008366/0651</u>     **Recorded:** 02/13/1997       **Pages:** 4
  **Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).
      **Assignor:** <u>AMERICAN TELEPHONE & TELEGRAPH COMPANY</u>   **Exec Dt:** 04/20/1994
     **Assignee:** <u>AT&T CORPORATION</u>
              P.O. BOX 636
              600 MOUNTAIN AVENUE

MURRAY HILL, NEW JERSEY 07974

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER, ET AL.
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1500
ATLANTA, GA 30339

## Assignment: 4

**Reel/Frame:** <u>008178/0161</u>    **Recorded:** 11/12/1996    **Pages:** 81

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** <u>AT&T CORP.</u>    **Exec Dt:** 03/29/1996

**Assignee:** <u>LUCENT TECHNOLOGIES INC.</u>
600 MOUNTAIN AVENUE - P.O. BOX 636
MURRAY HILL, NEW JERSEY 07974

**Correspondent:** BRUCE S. SCHNEIDER
DOCKET ADMINISTRATOR - ROOM 3C-512
600 MOUNTAIN AVENUE
P.O. BOX 636
AMURRAY HILL, NEW JERSEY 07974-0636

## Assignment: 5

**Reel/Frame:** <u>008167/0408</u>    **Recorded:** 10/10/1996    **Pages:** 24

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** <u>LUCENT TECHNOLOGIES, INC.</u>    **Exec Dt:** 07/31/1996

**Assignee:** <u>PARADYNE CORPORATION (FORMERLY KNOWN AS AT&T PARADYNE CORPORATION)</u>
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773

**Correspondent:** COOLEY GODWARD CASTRO HUDDLESON & TATUM
CRAIG P. OPPERMAN
FIVE PALO ALTO SQUARE
3000 EL CAMINO REAL
PALO ALTO, CALIFORNIA 94306

## Assignment: 6

**Reel/Frame:** <u>008261/0384</u>    **Recorded:** 12/11/1996    **Pages:** 14

**Conveyance:** SECURITY AGREEMENT

**Assignor:** <u>PARADYNE CORPORATION</u>    **Exec Dt:** 07/31/1996

**Assignee:** <u>BANKAMERICA BUSINESS CREDIT, INC.</u>
2 NORTH LAKE AVENUE
SUITE 200
PASADENA, CALIFORNIA 91101

**Correspondent:** MORRISON & FOERSTER LLP
GARY E. CANN
345 CALIFORNIA STREET
SAN FRANCISCO, CA 94104-2675

## Assignment: 7

**Reel/Frame:** <u>012211/0350</u>    **Recorded:** 10/16/2001    **Pages:** 40

**Conveyance:** SECURITY AGREEMENT

**Assignor:** <u>PARADYNE CORPORATION</u>    **Exec Dt:** 07/16/2001

**Assignee:** <u>FOOTHILL CAPITAL CORPORATION</u>

SUITE 3000W
2450 COLORADO AVE.
SANTA MONICA, CALIFORNIA 90404

**Correspondent:** BROBECK, PHLEGER & HARRISON LLP
DENISE HINDS
550 SO. HOPE ST.
LOS ANGELES, CA 90071

**Assignment: 8**

**Reel/Frame:** <u>015711/0596</u>      **Recorded:** 07/28/2004                    **Pages:** 4

**Conveyance:** RELEASE OF SECURITY INTEREST

**Assignors:** <u>BANK OF AMERICA, N.A.</u>                      **Exec Dt:** 07/22/2004

<u>BANKAMERICA BUSINESS CREDIT, INC.</u>        **Exec Dt:** 07/22/2004

**Assignee:** <u>PARADYNE CORPORATION</u>
8545 126 AVENUE, N.
LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GEORGIA 30339-5948

**Assignment: 9**

**Reel/Frame:** <u>015972/0276</u>      **Recorded:** 03/30/2005                    **Pages:** 27

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** <u>PARADYNE CORPORATION</u>                  **Exec Dt:** 12/09/2004

**Assignee:** <u>REMBRANDT TECHNOLOGIES LP</u>
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA

**Correspondent:** FISH & RICHARDSON P.C.
TIMOTHY DEVLIN
1425 K STREET, N.W.
11TH FLOOR
WASHINGTON, DC 20005-3500

**Assignment: 10**

**Reel/Frame:** <u>015503/0087</u>      **Recorded:** 12/20/2004                    **Pages:** 3

**Conveyance:** AGREEMENT REGARDING RELEASE OF SECURITY INTERESTS

**Assignor:** <u>WELLS FARGO FOOTHILL, INC., FORMELY KNOWN</u>   **Exec Dt:** 12/20/2004
<u>AS FOOTHILL CAPITAL CORPORATION</u>

**Assignee:** <u>PARADYNE CORPORATION</u>
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1750
ATLANTA, GA 30339-5948

Search Results as of: 01/26/2007 09:37 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=5243627...    1/26/2007

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title
### NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Total Assignments:** 4
**Patent #:** 5852631   **Issue Dt:** 12/22/1998   **Application #:** 08780762   **Filing Dt:** 01/08/1997
**Inventor:** ROBERT EARL SCOTT
**Title:** SYSTEM AND METHOD FOR ESTABLISHING LINK LAYER PARAMETERS BASED ON PHYSICAL LAYER MODULATION
**Assignment: 1**
  **Reel/Frame:** 008389/0221   **Recorded:** 01/08/1997   **Pages:** 3
  **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
  **Assignor:** SCOTT, ROBERT EARL   **Exec Dt:** 01/07/1997
  **Assignee:** PARADYNE CORPORATION
            8545 126 AVENUE, N.
            LARGO, FLORIDA 33773
  **Correspondent:** THOMAS KAYDEN HORSTEMEYER & RISLEY LLP
            DAVID P. KELLEY, ESQ.
            100 GALLERIA PARKWAY, SUITE 1500
            ATLANTA, GA 30339
**Assignment: 2**
  **Reel/Frame:** 012211/0350   **Recorded:** 10/16/2001   **Pages:** 40
  **Conveyance:** SECURITY AGREEMENT
  **Assignor:** PARADYNE CORPORATION   **Exec Dt:** 07/16/2001
  **Assignee:** FOOTHILL CAPITAL CORPORATION
            SUITE 3000W
            2450 COLORADO AVE.
            SANTA MONICA, CALIFORNIA 90404
  **Correspondent:** BROBECK, PHLEGER & HARRISON LLP
            DENISE HINDS
            550 SO. HOPE ST.
            LOS ANGELES, CA 90071
**Assignment: 3**
  **Reel/Frame:** 015972/0276   **Recorded:** 03/30/2005   **Pages:** 27
  **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
  **Assignor:** PARADYNE CORPORATION   **Exec Dt:** 12/09/2004
  **Assignee:** REMBRANDT TECHNOLOGIES LP
            401 CITY AVENUE
            BALA CYNWYD, PENNSYLVANIA
  **Correspondent:** FISH & RICHARDSON P.C.

TIMOTHY DEVLIN
1425 K STREET, N.W.
11TH FLOOR
WASHINGTON, DC 20005-3500

**Assignment: 4**

**Reel/Frame:** 015503/0087          **Recorded:** 12/20/2004                              **Pages:** 3

**Conveyance:** AGREEMENT REGARDING RELEASE OF SECURITY INTERESTS

**Assignor:** WELLS FARGO FOOTHILL, INC., FORMELY KNOWN          **Exec Dt:** 12/20/2004
AS FOOTHILL CAPITAL CORPORATION

**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1750
ATLANTA, GA 30339-5948

Search Results as of: 01/26/2007 09:38 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



**United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

### NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Total Assignments: 6**

**Patent #:** 5719858    **Issue Dt:** 02/17/1998    **Application #:** 08509309    **Filing Dt:** 07/31/1995

**Inventor:** WAYNE T. MOORE

**Title:** TIME-DIVISION MULTIPLE-ACCESS METHOD FOR PACKET TRANSMISSION ON SHARED SYNCHRONOUS SERIAL BUSES

**Assignment: 1**

**Reel/Frame:** 008755/0196    **Recorded:** 07/31/1997    **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** MOORE, WAYNE T.    **Exec Dt:** 07/24/1995

**Assignee:** AT&T PARADYNE CORP.
8545 126TH AVENUE N.
LARGO, FLORIDA 34643

**Correspondent:** AT&T BELL LABORATORIES
MR. S. H. DWORETSKY
600 MOUNTAIN AVENUE
P.O. BOX 636
MURRAY HILL, NJ 07974-0636

**Assignment: 2**

**Reel/Frame:** 008172/0984    **Recorded:** 10/10/1996    **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** LUCENT TECHNOLOGIES, INC.    **Exec Dt:** 07/31/1996

**Assignee:** PARADYNE CORPORATION (FORMERLY KNOWN AS AT&T PARADYNE CORPORATION)
8545 126TH AVENUE N.
LARGO, FLORIDA 33773

**Correspondent:** COOLEY GODWARD CASTRO, ET AL.
CRAIG P. OPPERMAN
FIVE PALO ALTO SQUARE
3000 EL CAMINO REAL
PALO ALTO, CA 94306

**Assignment: 3**

**Reel/Frame:** 008431/0524    **Recorded:** 01/21/1997    **Pages:** 5

**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignor:** AT&T PARADYNE CORP.    **Exec Dt:** 08/05/1996

**Assignee:** PARADYNE CORPORATION
8545 126 AVENUE NORTH
LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER ET AL
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1500
ATLANTA, GA 30339

**Assignment: 4**

| | | |
|---|---|---|
| **Reel/Frame:** 012211/0350 | **Recorded:** 10/16/2001 | **Pages:** 40 |

**Conveyance:** SECURITY AGREEMENT

**Assignor:** PARADYNE CORPORATION   **Exec Dt:** 07/16/2001

**Assignee:** FOOTHILL CAPITAL CORPORATION
SUITE 3000W
2450 COLORADO AVE.
SANTA MONICA, CALIFORNIA 90404

**Correspondent:** BROBECK, PHLEGER & HARRISON LLP
DENISE HINDS
550 SO. HOPE ST.
LOS ANGELES, CA 90071

**Assignment: 5**

| | | |
|---|---|---|
| **Reel/Frame:** 015972/0276 | **Recorded:** 03/30/2005 | **Pages:** 27 |

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** PARADYNE CORPORATION   **Exec Dt:** 12/09/2004

**Assignee:** REMBRANDT TECHNOLOGIES LP
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA

**Correspondent:** FISH & RICHARDSON P.C.
TIMOTHY DEVLIN
1425 K STREET, N.W.
11TH FLOOR
WASHINGTON, DC 20005-3500

**Assignment: 6**

| | | |
|---|---|---|
| **Reel/Frame:** 015503/0087 | **Recorded:** 12/20/2004 | **Pages:** 3 |

**Conveyance:** AGREEMENT REGARDING RELEASE OF SECURITY INTERESTS

**Assignor:** WELLS FARGO FOOTHILL, INC., FORMELY KNOWN   **Exec Dt:** 12/20/2004
AS FOOTHILL CAPITAL CORPORATION

**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773

**Correspondent:** THOMAS, KAYDEN, HORSTEMEYER & RISLEY LLP
SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY, SUITE 1750
ATLANTA, GA 30339-5948

Search Results as of: 01/26/2007 09:38 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=5719858...  1/26/2007

 **United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



## Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title
## *NOTE:Results display only for issued patents and published applications.*
## *For pending or abandoned applications please consult USPTO staff.*

**Total Assignments:** 8
**Patent #:** <u>4937819</u>    **Issue Dt:** 06/26/1990    **Application #:** 07249450    **Filing Dt:** 09/26/1988
**Inventor:** JOSEPH B. KING
    **Title:** TIME ORTHOGONAL MULTIPLE VIRTUAL DCE FOR USE IN ANALOG AND DIGITAL NETWORKS
**Assignment: 1**
    **Reel/Frame:** <u>004996/0203</u>    **Recorded:** 10/17/1988    **Pages:** 2
    **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
    **Assignor:** <u>KING, JOSEPH B.</u>    **Exec Dt:** 10/04/1988
    **Assignee:** <u>PARADYNE CORPORATION, 8550 ULMERTON ROAD, LARGO, FL 33541, A CORP. OF FL</u>
**Correspondent:** KANE, DALSIMER, SULLIVAN, ET AL
    711 THIRD AVENUE
    NEW YORK, NEW YORK 10017
**Assignment: 2**
    **Reel/Frame:** <u>004999/0675</u>    **Recorded:** 12/29/1988    **Pages:** 1
    **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
    **Assignor:** <u>KING, JOSEPH B.</u>    **Exec Dt:** 12/15/1988
    **Assignee:** <u>PARADYNE CORPORATION, 8550 ULMERTON ROAD, LARGO, FLORIDA 33541, A CORP.</u>
    <u>OF FL</u>
**Correspondent:** JOSEPH C. SULLIVAN
    711 THIRD AVENUE
    NEW YORK, NY 10017
**Assignment: 3**
    **Reel/Frame:** <u>008167/0408</u>    **Recorded:** 10/10/1996    **Pages:** 24
    **Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
    **Assignor:** <u>LUCENT TECHNOLOGIES, INC.</u>    **Exec Dt:** 07/31/1996
    **Assignee:** <u>PARADYNE CORPORATION (FORMERLY KNOWN AS AT&T PARADYNE CORPORATION)</u>
    8545 126TH AVENUE NORTH
    LARGO, FLORIDA 33773
**Correspondent:** COOLEY GODWARD CASTRO HUDDLESON & TATUM
    CRAIG P. OPPERMAN
    FIVE PALO ALTO SQUARE
    3000 EL CAMINO REAL
    PALO ALTO, CALIFORNIA 94306
**Assignment: 4**
    **Reel/Frame:** <u>008261/0384</u>    **Recorded:** 12/11/1996    **Pages:** 14
    **Conveyance:** SECURITY AGREEMENT

**Assignor:** PARADYNE CORPORATION                    **Exec Dt:** 07/31/1996
**Assignee:** BANKAMERICA BUSINESS CREDIT, INC.
2 NORTH LAKE AVENUE
SUITE 200
PASADENA, CALIFORNIA 91101
**Correspondent:** MORRISON & FOERSTER LLP
GARY E. CANN
345 CALIFORNIA STREET
SAN FRANCISCO, CA 94104-2675

**Assignment: 5**
**Reel/Frame:** 012211/0350        **Recorded:** 10/16/2001            **Pages:** 40
**Conveyance:** SECURITY AGREEMENT
**Assignor:** PARADYNE CORPORATION                    **Exec Dt:** 07/16/2001
**Assignee:** FOOTHILL CAPITAL CORPORATION
SUITE 3000W
2450 COLORADO AVE.
SANTA MONICA, CALIFORNIA 90404
**Correspondent:** BROBECK, PHLEGER & HARRISON LLP
DENISE HINDS
550 SO. HOPE ST.
LOS ANGELES, CA 90071

**Assignment: 6**
**Reel/Frame:** 018047/0105        **Recorded:** 08/03/2006            **Pages:** 3
**Conveyance:** RELEASE BY SECURED PARTY (SEE DOCUMENT FOR DETAILS).
**Assignor:** BANKAMERICA BUSINESS CREDIT, INC.        **Exec Dt:** 07/22/2004
**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

**Assignment: 7**
**Reel/Frame:** 018047/0133        **Recorded:** 08/03/2006            **Pages:** 3
**Conveyance:** RELEASE BY SECURED PARTY (SEE DOCUMENT FOR DETAILS).
**Assignor:** WELLS FARGO FOOTHILL, INC., F/K/A FOOTHILL    **Exec Dt:** 12/16/2004
CAPITAL CORPORATION
**Assignee:** PARADYNE CORPORATION
8545 126TH AVENUE NORTH
LARGO, FLORIDA 33773
**Correspondent:** SCOTT A. HORSTEMEYER
100 GALLERIA PARKWAY
SUITE 1750
ATLANTA, GA 30339

**Assignment: 8**
**Reel/Frame:** 016761/0965        **Recorded:** 09/12/2005            **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** PARADYNE CORPORATION                    **Exec Dt:** 02/03/2005

**Assignee:** REMBRANDT TECHNOLOGIES LP
401 CITY AVENUE
BALA CYNWYD, PENNSYLVANIA 19004

**Correspondent:** TIMOTHY DEVLIN
FISH & RICHARDSON P.C.
1425 K STREET, N.W.
11TH FLOOR
WASHINGTON, DC 20005-3500

Search Results as of: 01/26/2007 09:39 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: July 26, 2006 v.1.10

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT 2





you're headed towards
a great night's **sleep**.

Cloud Nine.
the Hampton bed experience.

now in all our hotels.

**stay with us**

*Hampton*

We Love Having You Here.®

**Start:** Bala-cynwyd, PA US

**End:** Wilmington, DE US

**Notes:**

**Directions**

**Total Est. Time:** 46 minutes   **Total Est. Distance:** 31.41 miles   **Distance**

| | | |
|---|---|---|
| START | 1: Start out going SOUTHEAST on CYNWYD RD toward CONCORD CIR. | 0.2 miles |
| ↑ | 2: Turn RIGHT onto N HIGHLAND AVE. | <0.1 miles |
| ↓ | 3: Turn LEFT onto BRYN MAWR AVE. | 0.3 miles |
| ↑ | 4: Turn RIGHT onto W CITY AVE / US-1 / CITY LINE AVE. Continue to follow US-1. | 3.9 miles |
| 3 | 5: Turn SLIGHT RIGHT onto WEST CHESTER PIKE / PA-3 W. | 2.5 miles |
| 476 | 6: Merge onto I-476 S toward CHESTER. | 8.6 miles |
| 95 | 7: Merge onto I-95 S toward CHESTER (Crossing into DELAWARE). | 14.7 miles |
| 7A EXIT | 8: Take EXIT 7A toward SR-52 S / DELAWARE AVE.. | 0.1 miles |

Driving Directions from Bala-cynwyd, PA to Wilmington, DE

**9:** Stay STRAIGHT to go onto W 11TH ST.                     0.5 miles

**10:** Turn RIGHT onto N KING ST / US-13 BR S.               <0.1 miles

**11:** End at **Wilmington, DE US**

**Total Est. Time: 46 minutes      Total Est. Distance: 31.41 miles**

Tylenol GoTabs. Fast pain relief for people on the go.



**Start:**
Bala-cynwyd, PA US

**End:**
Wilmington, DE US

Driving Directions from Bala-cynwyd, PA to Wilmington, DE



All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road
conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting from such use.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

REMBRANDT TECHNOLOGIES, LP

        Plaintiff,

    v.

CABLEVISION SYSTEMS CORPORATION,
and CSC HOLDINGS, INC.

        Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

For its complaint plaintiff Rembrandt Technologies, LP ("Rembrandt"), by and through the undersigned attorneys, alleges as follows:

### THE PARTIES

1.    Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2.    Defendant Cablevision Systems Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 1111 Stewart Avenue, Bethpage, NY 11714.

3.    Defendant CSC Holdings, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1111 Stewart Avenue, Bethpage, NY 11714

### JURISDICTION AND VENUE

4.    This is an action for patent infringement, arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*

5. Subject matter jurisdiction is proper in this Court under 28 U.S C. §§ 1331 and 1338(a).

6. Because Defendants are incorporated in this district, this Court has personal jurisdiction over Defendants.

7. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 5,243,627

8. Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-7 of this Complaint.

9. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,243,627, entitled "Signal Point Interleaving Technique" ("the '627 patent.") (Exhibit A).

10. The '627 patent was duly and legally issued by the United States Patent and Trademark Office on September 7, 1993.

11. Defendants are operators of cable television systems throughout the United States.

12. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '627 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '627 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '627 patent by their receipt and retransmission over their cable television systems of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

13. Upon information and belief, Defendants will continue to infringe the '627 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and

will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 5,852,631

14. Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-13 of this Complaint.

15. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,852,631, entitled "System and Method for Establishing Link Layer Parameters Based on Physical Layer Modulation" ("the '631 patent.") (Exhibit B).

16. The '631 patent was duly and legally issued by the United States Patent and Trademark Office on December 22, 1998.

17. Defendants are operators of cable systems and providers of Internet service throughout the United States.

18. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '631 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '631 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '631 patent by providing high speed internet service to subscribers.

19. Upon information and belief, Defendants will continue to infringe the '631 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

3

### COUNT III – INFRINGEMENT OF U.S. PATENT NO. 5,719,858

20.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-19 of this Complaint.

21.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,719,858, entitled "Time-Division Multiple-Access Method for Packet Transmission on Shared Synchronous Serial Buses" ("the '858 patent.") (Exhibit C).

22.     The '858 patent was duly and legally issued by the United States Patent and Trademark Office on February 17, 1998.

23.     Defendants are operators of cable systems and providers of Internet service throughout the United States.

24.     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '858 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '858 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '858 patent by their provision of high speed internet services, including such services as Voice over IP (VoIP), to subscribers.

25.     Upon information and belief, Defendants will continue to infringe the '858 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U. S. C. §§ 284 and 285.

4

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 4,937,819

26.    Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-25 of this Complaint.

27.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 4,937,819, entitled "Time Orthogonal Multiple Virtual DCE for Use in Analog and Digital Networks" ("the '819 patent.") (Exhibit D).

28.    The '819 patent was duly and legally issued by the United States Patent and Trademark Office on June 26, 1990.

29.    Defendants are operators of cable systems and providers of Internet service throughout the United States.

30.    Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '819 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '819 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '819 patent by their provision of high speed internet services, such as Voice over IP (VoIP) services, to cable television subscribers.

31.    Upon information and belief, Defendants will continue to infringe the '819 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT V – INFRINGEMENT OF U.S. PATENT NO. 5,008,903

32.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-31 of this Complaint.

33.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,008,903, entitled "Adaptive Transmit Pre-Emphasis For Digital Modem Computed From Noise Spectrum" ("the '903 patent.") (Exhibit E).

34.     The '903 patent was duly and legally issued by the United States Patent and Trademark Office on April 16, 1991.

35.     Defendants are operators of cable systems and providers of Internet service throughout the United States.

36.     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '903 patent by practicing or causing others to practice (by inducement and/or contributorily) the inventions claimed in the '903 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '903 patent by providing high speed internet service to subscribers.

37.     Upon information and belief, Defendants will continue to infringe the '903 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt prays that it have judgment against Defendants for the following:

(1)     A decree that the Defendants have infringed the patents-in-suit;

6

(2)     A permanent injunction enjoining and restraining Defendants and their agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

(3)     An award of damages;

(4)     An award of increased damages pursuant to 35 U.S.C. § 284;

(5)     An award of all costs of this action, including attorneys' fees and interest; and

(6)     Such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

## JURY DEMAND

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury.

WOMBLE CARLYLE SANDRIDGE &
RICE, PLLC

/s/ Kevin M. Baird
George Pazuniak (# 478)
Gerard M. O'Rourke (# 3265)
Kevin M. Baird (# 4219)
James M. Lennon (#4570)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Tel:  (302) 252-4320
Fax:  (302) 661-7722

*Counsel for Plaintiff Rembrandt Technologies, LP*

Dated:  October 13, 2006

7

# EXHIBIT 4A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

REMBRANDT TECHNOLOGIES, LP,       )
                                  )
         Plaintiff,               )
                                  )
    v.                            )       C.A. No. _____
                                  )
CBS CORPORATION,                  )
                                  )
         Defendant.               )
                                  )

**COMPLAINT FOR PATENT INFRINGEMENT**
**AND DEMAND FOR JURY TRIAL**

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against CBS

Corporation ("CBS" or "Defendant"), alleges as follows:

**PARTIES**

1.      Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.      CBS is a corporation organized under the laws of the State of Delaware,

having its principal place of business at 51 West 52nd Street, 35th Floor, New York, NY 10019.

**JURISDICTION AND VENUE**

3.      This is an action arising under the patent laws of the United States, Title

35, United States Code.  This Court has subject matter jurisdiction over this case under 28 U.S.C.

§§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over CBS.  Defendant is incorporated in the State of Delaware, and has conducted and does conduct business within the State of Delaware.  Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below.  Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6.      Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7.      United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993.  A copy of the '627 patent is annexed hereto as Exhibit A.

8.      Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9.      CBS operates television systems and provides television services throughout the United States.

2

10.    Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.    Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.    Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)    the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)    a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)    an award of damages;

(4)    an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## <u>JURY DEMAND</u>

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

_(signature)_

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

_Attorneys for Plaintiff_

_Of Counsel:_

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175613.1

4

# EXHIBIT 4B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP,                )<br><br>    Plaintiff,        )<br><br>      v.        )<br><br>ABC, INC.,         )<br><br>    Defendant.     )<br>             ) | C.A. No. _____ |

**COMPLAINT FOR PATENT INFRINGEMENT
AND DEMAND FOR JURY TRIAL**

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against ABC, Inc. ("ABC" or "Defendant""), alleges as follows:

**PARTIES**

1.  Rembrandt is a limited partnership organized under the laws of the State of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004.

2.  ABC is a corporation organized under the laws of the State of New York, having its principal place of business at 77 W. 66th Street, New York, NY 10023-6201.

**JURISDICTION AND VENUE**

3.  This is an action arising under the patent laws of the United States, Title 35, United States Code. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has personal jurisdiction over ABC. Defendant has conducted and does conduct business within the State of Delaware. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below. Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6. Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7. United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

8. Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9. ABC operates television systems and provides television services throughout the United States.

10. Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or

contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11.     Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12.     Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

3

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## <u>JURY DEMAND</u>

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
Fax: (212) 415-8701
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175612.1

4

# EXHIBIT 4C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. _____ |
| | ) | |
| NBC UNIVERSAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**
**AND DEMAND FOR JURY TRIAL**

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against NBC

Universal, Inc. ("NBC" or "Defendant"), alleges as follows:

**PARTIES**

1.    Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.

2.    NBC is a corporation organized under the laws of the State of Delaware,

having its principal place of business at 30 Rockefeller Plaza, New York, NY 10019.

**JURISDICTION AND VENUE**

3.    This is an action arising under the patent laws of the United States, Title

35, United States Code.  This Court has subject matter jurisdiction over this case under 28 U.S.C.

§§ 1331 and 1338(a).

4. This Court has personal jurisdiction over NBC. Defendant is incorporated in the State of Delaware, and has conducted and does conduct business within the State of Delaware. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, advertises, and markets products and services that infringe the patent-in-suit, as described more specifically below. Therefore, because Defendant has committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendant.

5. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

6. Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-5 of this Complaint.

7. United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993. A copy of the '627 patent is annexed hereto as Exhibit A.

8. Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

9. NBC operates television systems and provides television services throughout the United States.

2

10. Defendant has directly or indirectly infringed the '627 patent, and is continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendant has infringed, and continues to infringe, the '627 patent by its transmission, or receipt and retransmission, over its television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

11. Rembrandt has been damaged by Defendant's infringement and will suffer additional and irreparable damage unless this Court enjoins Defendant from continuing its infringement under 35 U.S.C. § 283.

12. Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt respectfully requests the following relief:

(1) the entry of judgment in favor of Rembrandt, and against Defendant, that Defendant has infringed the '627 patent;

(2) a permanent injunction enjoining and restraining Defendant and its officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3) an award of damages;

3

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

## JURY DEMAND

Rembrandt hereby respectfully requests a jury trial on all issues so triable.


ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated:  December 1, 2006
175611.1

4

# EXHIBIT 4D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

REMBRANDT TECHNOLOGIES, LP,        )
                                    )
          Plaintiff,                )
                                    )
    v.                              )        C.A. No. _____
                                    )
FOX ENTERTAINMENT GROUP, INC., and  )
FOX BROADCASTING COMPANY,           )
                                    )
          Defendants.               )


**COMPLAINT FOR PATENT INFRINGEMENT
AND DEMAND FOR JURY TRIAL**

Rembrandt Technologies, LP ("Rembrandt"), for its complaint against Fox

Entertainment Group, Inc. ("Fox Entertainment") and Fox Broadcasting Company ("Fox

Broadcasting") (sometimes jointly referred to herein as "FOX" or "Defendants"), alleges as

follows:


**PARTIES**

1.       Rembrandt is a limited partnership organized under the laws of the State

of New Jersey, having its principal place of business at 401 City Avenue, Suite 815, Bala

Cynwyd, PA 19004.


2.       Fox Entertainment is a corporation organized under the laws of the State

of Delaware, having its principal place of business at 10201 W. Pico Blvd, Los Angeles, CA

90035-2606.

3.     Fox Broadcasting is a subsidiary of Fox Entertainment and is a corporation organized under the laws of the State of Delaware, having its principal place of business at 10201 W. Pico Blvd, Los Angeles, CA 90035-2606.

## JURISDICTION AND VENUE

4.     This is an action arising under the patent laws of the United States, Title 35, United States Code.  This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over FOX.  Defendants are incorporated in the State of Delaware, and have conducted and do conduct business within the State of Delaware.  Defendants, directly or through subsidiaries or intermediaries, offer for sale, sell, advertise, and market products and services that infringe the patent-in-suit, as described more specifically below.  Therefore, because Defendants have committed acts of patent infringement in this district, or are otherwise present or doing business in this district, this Court has personal jurisdiction over Defendants.

6.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## INFRINGEMENT OF U.S. PATENT NO. 5,243,627

7.     Rembrandt realleges and incorporates herein by reference the allegations stated in paragraphs 1-6 of this Complaint.

8.  United States Patent No. 5,243,627 entitled "Signal Point Interleaving Technique" ("the '627 patent") was duly and legally issued by the United States Patent & Trademark Office on September 7, 1993.  A copy of the '627 patent is annexed hereto as Exhibit A.

9.  Rembrandt is the owner of all right, title and interest in the '627 patent, with the right to sue, enforce and recover damages for infringement.

10.  FOX operates television systems and provides television services throughout the United States.

11.  Defendants have directly or indirectly infringed the '627 patent, and are continuing to do so, by practicing the inventions claimed therein, and/or by inducing or contributing to the practice by others of the inventions claimed therein, in this judicial district. For example, Defendants have infringed, and continue to infringe, the '627 patent by their transmission, or receipt and retransmission, over their television systems, of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard.

12.  Rembrandt has been damaged by Defendants' infringement and will suffer additional and irreparable damage unless this Court enjoins Defendants from continuing their infringement under 35 U.S.C. § 283.

13.  Upon information and belief, such infringement has been, and will continue to be, willful and deliberate, entitling Rembrandt to increased damages under 35 U.S.C. § 284 and making this an exceptional case entitling Rembrandt to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

3

**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt respectfully requests the following relief:

(1)     the entry of judgment in favor of Rembrandt, and against Defendants, that Defendants have infringed the '627 patent;

(2)     a permanent injunction enjoining and restraining Defendants and their officers, agents, servants, employees, affiliates, divisions, units and subsidiaries, and those in association therewith, from further acts of infringement of the '627 patent;

(3)     an award of damages;

(4)     an award of increased damages pursuant to 35 U.S.C. § 284;

(5)     an award of all costs and expenses of this action, including reasonable attorneys' fees, pre-judgment interest, and post-judgment interest; and

(6)     such other and further relief, at law and in equity, as the Court deems just and proper.

**JURY DEMAND**

Rembrandt hereby respectfully requests a jury trial on all issues so triable.

ASHBY & GEDDES

_Steven J. Balick_

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*

4

*Of Counsel:*

John F. Sweeney
Joseph A. DeGirolamo
Michael O. Cummings
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY 10281-2101
Telephone: (212) 415-8700
Fax: (212) 415-8701
jsweeney@morganfinnegan.com
jdegirolamo@ morganfinnegan.com
mcummings@morganfinnegan.com

Dated: December 1, 2006
175610.1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

        Plaintiff,

v.

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS
OPERATING, LLC, COXCOM, INC., CSC
HOLDINGS, INC., and CABLEVISION
SYSTEMS CORPORATION,

        Defendants.

CASE NO. 2-06CV-223 [TJW]

## SUPPLEMENTAL DECLARATION OF JOHN SPALDING IN SUPPORT OF DEFENDANT COXCOM, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(2)

1. In 2003, CoxCom, Inc. ("CoxCom") made a business decision to transfer the

assets it owned in Texas, to no longer offer services to residents of Texas and to no longer do

business in Texas.

2. In connection with Cox Southwest Holdings, L.P.'s ("Cox Southwest") sale of

assets to Cebridge Acquisition, L.P. ("Cebridge"), Cox Southwest sold all of the physical

assets associated with the cable television system located in Henderson, Texas and attempted

to immediately transfer the system itself. However, the City of Henderson refused to consent

to the transfer of the system and, as a result, Cox Southwest was prohibited from

immediately transferring the franchise. The franchise expires on or about March 25, 2007.

After that date, Cox Southwest will have no remaining assets in Texas.

3.      In connection with Cox Southwest's sale to Cebridge (now known as Suddenlink Communications), CoxCom agreed to provide transition back-office services, including maintaining a website, while the former Cox Southwest customers are transitioned to Cebridge. Those transition services are scheduled to be terminated on April 30, 2007.

4.      In the same transaction in which it purchased assets from Cox Southwest, Cebridge also purchased assets from several other Cox Communications, Inc. ("Cox Communications") subsidiaries, including CoxCom. Accordingly, CoxCom is identified in the Asset Purchase Agreement, SEC filings and press releases as a "Seller" in the transaction. None of the assets sold by CoxCom in that transaction were located in Texas. As I stated in my declaration filed on December 14, 2006, with the exception of the POP node, all assets of CoxCom that were located in Texas were assigned to Cox Southwest on or about December 31, 2003/January 1, 2004.

5.      Cox Communications was incorporated in Delaware, has its principal place of business in Atlanta, Georgia, and does not do business in Texas. Indeed, for at least the past ten years, Cox Communications has not done business in Texas and has not provided any services in Texas. Cox Communications has no assets, maintains no office, has no employees and keeps no books or records in Texas.

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this the 26th day of January 2007.

John Spalding

3

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-CV-223 |
| | ) | |
| CHARTER COMMUNICATIONS, INC., | ) | |
| CHARTER COMMUNICATIONS | ) | Judge T. John Ward |
| OPERATING, LLC, COX | ) | |
| COMMUNICATIONS, INC., COXCOM, INC., | ) | |
| COX ENTERPRISES, INC., CSC HOLDINGS, | ) | |
| INC., and CABLEVISION SYSTEMS | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL FOR DEFENDANTS CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC

Defendants, Charter Communications, Inc. and Charter Communications Operating, LLC, files this their Notice of Appearance of Additional Counsel, and hereby notifies the Court that Allen F. Gardner of the law firm Potter Minton, A Professional Corporation, 110 N. College, Suite 500, Tyler, Texas 75702, is appearing as additional counsel for Charter Communications, Inc. and Charter Communications Operating, LLC in the above-referenced matter. All pleadings, discovery, correspondence and other material should be served upon counsel at the address referenced above.

Respectfully submitted,

**POTTER MINTON**
A Professional Corporation
110 N. College, Suite 500 (75702)
P. O. Box 359
Tyler, Texas  75710
(903) 597 8311
(903) 593 0846 (Facsimile)


By: ____*/s/ Allen F. Gardner*_____
       ALLEN F. GARDNER
       State Bar No. 24043679
       allengardner@potterminton.com

**ATTORNEYS FOR DEFENDANT**
**CHARTER COMMUNICATIONS, INC.**
**AND CHARTER COMMUNICATIONS**
**OPERATING, LLC**


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on January 29, 2007. Any other counsel of record will be served by first class mail on this same date.


/s/ Allen F. Gardner_____
Allen F. Gardner

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-CV-223 |
| | ) | |
| CHARTER COMMUNICATIONS, INC., | ) | |
| CHARTER COMMUNICATIONS | ) | Judge T. John Ward |
| OPERATING, LLC, COX | ) | |
| COMMUNICATIONS, INC., COXCOM, INC., | ) | |
| COX ENTERPRISES, INC., CSC HOLDINGS, | ) | |
| INC., and CABLEVISION SYSTEMS | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL FOR DEFENDANT COXCOM, INC.

Defendant, Coxcom, Inc. files this its Notice of Appearance of Additional Counsel, and hereby notifies the Court that Allen F. Gardner of the law firm Potter Minton, A Professional Corporation, 110 N. College, Suite 500, Tyler, Texas 75702, is appearing as additional counsel for Coxcom, Inc. in the above-referenced matter. All pleadings, discovery, correspondence and other material should be served upon counsel at the address referenced above.

Respectfully submitted,

**POTTER MINTON**
A Professional Corporation
110 N. College, Suite 500 (75702)
P. O. Box 359
Tyler, Texas  75710
(903) 597 8311
(903) 593 0846 (Facsimile)


By: ___*/s/ Allen F. Gardner*_____
      ALLEN F. GARDNER
      State Bar No. 24043679
      allengardner@potterminton.com

**ATTORNEYS FOR DEFENDANT
COXCOM, INC.**


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on January 29, 2007. Any other counsel of record will be served by first class mail on this same date.


/s/ Allen F. Gardner_____
      Allen F. Gardner

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **REMBRANDT TECHNOLOGIES, LP,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CASE NO. 2:06-CV-223 [TJW]** |
| | § | **JURY TRIAL REQUESTED** |
| **CHARTER COMMUNICATIONS, INC.,** | § | |
| **CHARTER COMMUNICATIONS** | § | |
| **OPERATING, LLC, COX** | § | |
| **COMMUNICATIONS, INC., COXCOM,** | § | |
| **INC., COX ENTERPRISES, INC., CSC** | § | |
| **HOLDINGS, INC. AND CABLEVISION** | § | |
| **SYSTEMS CORPORATION,** | § | |
| | § | |
| **Defendants.** | § | |

**REMBRANDT TECHNOLOGIES, LP'S SURREPLY IN OPPOSITION
TO COXCOM INC.'S MOTION TO DISMISS COMPLAINT
<u>FOR LACK OF PERSONAL JURISDICTION</u>**

This Court has personal jurisdiction over CoxCom.  Rembrandt has met its burden of showing that CoxCom has contacts with Texas sufficient to support both specific and general personal jurisdiction.  CoxCom has failed to meet its burden of making a compelling showing that it would be unreasonable for this Court to exercise personal jurisdiction over it.

**A.**     **Coxcom Has Sufficient Contacts with Texas for Personal Jurisdiction.**

The record before the Court shows that CoxCom has had purposeful contacts with Texas out of which Rembrandt's claims arise, thereby warranting specific personal jurisdiction. CoxCom does not deny, nor could it deny, that its contacts with Texas were purposeful and intended, or that Rembrandt's cause of action for patent infringement arises out of those purposeful contacts.  The record also shows that CoxCom has had continuous and systematic contacts with the State of Texas, thereby warranting general personal jurisdiction.  CoxCom has had a long history of substantial, continuous and systematic contacts with Texas, directing its cable operations at Texas residents since the 1970s.  Opposition Brief at pp. 5-9.  CoxCom concedes, as it must, that it operated a cable business in Texas until the end of 2003.  Reply Brief at 2.  The record further shows that CoxCom's cable operations in Texas continued until, at least, May 2006.  Opposition Brief at 6-8.  Contrary to Mr. Spalding's Declaration, the Asset Purchase Agreement with Cebridge stated that CoxCom and Cox Communications "owned and operated" the cable television systems being sold in Texas.  Opposition Brief at 9 & n. 34.

CoxCom suggests that this Court lacks personal jurisdiction because it no longer has cable operations in Texas.  CoxCom states that it made a "business decision" in 2003 to stop operating cable companies in Texas and another Cox entity "assumed ownership" of those assets in December 2003.  Whether CoxCom divested its Texas assets at the end of 2003 or in mid-2006, as the Asset Purchase Agreement suggests, does not matter.  Neither transaction allows

CoxCom to avoid personal jurisdiction in this instance. Rembrandt asserts claims against CoxCom for patent infringement, including patent infringement that CoxCom committed in Texas prior to its decision to stop doing business here.

The federal courts have not recognized a "business decision" exception to the personal jurisdiction rules. Once a defendant has created purposeful contacts with a state, it cannot erase those contacts by leaving that state. "[O]ne cannot defeat personal jurisdiction by a move away from the state in which the underlying events took place." *Steel v. United States,* 813 F.2d 1545, 1549 (9th Cir. 1987). General jurisdiction may be assessed by evaluating the defendant's contacts with the state over a reasonable number of years up to the date the suit was filed. *Alpine View Co, Ltd. v. Atlas Capco AB,* 205 F.3d 208, 217 (5th Cir. 2000). Similarly, in the context of specific personal jurisdiction, "the determination of amenability to suit takes place at the time of the relevant contacts." *Steel v. United States,* 813 F.2d at 2549.[1] In fact, accepting CoxCom's suggestion that moving out of state renders one's past contacts with the state effectively null and

---

[1] The cases cited by CoxCom (Reply Brief at 3-4) are inapposite, and CoxCom's "backbone" argument is a red-herring. The crux of the matter is that CoxCom is clearly subject to *specific* personal jurisdiction in this case regardless of the "backbone." In its Reply, CoxCom did not attempt to rebut that argument. Rather, CoxCom's cases address only the issue of when limited, isolated contacts may constitute "continuous and systematic" contacts sufficient to establish *general* personal jurisdiction. Rembrandt does not rely solely on the "backbone," however, as a basis for asserting *general* personal jurisdiction. The "backbone" is only one of a myriad of CoxCom's contacts with Texas dating back to the 1970s: cable systems, interactive website services, Internet services, etc. Opposition Brief at pp. 5-9 and accompanying notes. Together, these contacts support general personal jurisdiction. CoxCom contends that, for jurisdictional purposes, its prior contacts "disappeared" when it left the state. The federal cases addressing this issue support Rembrandt. See *Harlow v. Children's Hosp.*, 432 F.3d 50, 61 (1st Cir. 2005); *Alpine View Co., Ltd. v. Atlas Copco AB*, 205 F.3d 208, 217 (5th Cir. 2000); *Steel v. United States,* 813 F.2d 1545, 1549 (9th Cir. 1987). Finally, lest CoxCom's Reply Brief be read to contend otherwise, it is not the law that isolated contacts cannot support *specific* personal jurisdiction. *See*, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S. Ct. 2174 (1985), *citing McGee v. Int'l Life Ins. Co., 355 U.S., at 223* ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction.").

---

void - as if they never occurred - would eliminate specific jurisdiction.  Specific jurisdiction allows redress for an injury caused in the state by a party no longer doing business in that state.[2]

**B.**    **This Court's Exercise of Personal Jurisdiction over CoxCom Is Reasonable.**

Having purposefully directed its activities at Texas residents, CoxCom must, in order to defeat jurisdiction, "present a ***compelling*** case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King* 471 U.S. at 476-477 (emphasis added).  The law affords this opportunity to defendants so that "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent."  *Id.*  CoxCom has not come close to making such a showing.

CoxCom suggests that jurisdiction in this Court is unreasonable because Texas has no greater interest than Delaware in trying this case and that this case could be conveniently tried in Delaware, where Rembrandt has filed other suits.  This Court's interest in exercising jurisdiction over unlawful acts of patent infringement that have occurred within its territorial jurisdiction over a prolonged period is neither attenuated nor lost because CoxCom thereafter left the State.  Nor is this Court's interest in adjudicating Rembrandt's claims attenuated because Rembrandt is not a citizen of Texas.  Rembrandt is not a citizen of Delaware, either.

Moreover, the judicial case management statistics cited by CoxCom do not establish that Rembrandt's claims against CoxCom would be resolved more expeditiously in Delaware.  To the

---

[2]  *Harlow v. Children's Hosp.*, 432 F.3d at 61 ("'For purposes of specific jurisdiction, contacts should be judged when the cause of action arose, regardless of a later lessening or withdrawal.' A defendant cannot avoid jurisdiction by shrinking its contacts with the forum after the tort."); *see also, Burger King,* 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.")

**REMBRANDT'S SURREPLY IN OPPOSITION TO COXCOM'S MOTION TO DISMISS**         Page 3

contrary, the statistics suggest that this Court has more experience than the Delaware court in adjudicating patent cases and that this Court is able to dispose of a much heavier caseload in less time than the Delaware court.[3]  Moreover, neither case cited by CoxCom holds that the relative caseloads of the forum court and some other court in which the suit is not pending, but in which it might be filed, is a significant factor in determining whether exercise of personal jurisdiction by the forum court is unreasonable.

The critical facts are that CoxCom chose to do business in this State for many years; Rembrandt's cause of action arises out of that business; Rembrandt chose to bring its action in this forum; and this suit will continue in this Court against the other defendants regardless of the outcome of this Motion.  The interstate judicial system's interest in obtaining the most efficient resolution of this controversies is best served, therefore, by denying the Motion and allowing this suit to proceed with CoxCom as a party to it.

### C.    The Agreement Does Matter.

CoxCom is wrong when it suggests that the August 25, 2006 Agreement between Rembrandt, Cox Enterprises, Inc., Cox Communications, and CoxCom (collectively, the "Cox Parties") had nothing to do with personal jurisdiction and has no bearing on the issues before the Court.  The genesis of the Agreement was personal jurisdiction.  It is undisputed that the Cox Parties asked Rembrandt to dismiss Cox Enterprises and Cox Communications "on the grounds that (i) the Court does not have personal jurisdiction over [them] and (ii) CoxCom is the Cox entity that operates and/or oversees the various cable businesses and franchises."  Carter Aff. ¶ 2.

---

[3]  CoxCom's Reply at 7-8.  Moreover, CoxCom ignores the fact that this case has been on file since June 2006, that it was transferred to this Court in September 2006, that CoxCom answered in October 2006, and that CoxCom did not move to dismiss until December 2006.  If this case were dismissed and Rembrandt had to file elsewhere, it would lose the benefit of its time on this docket and would start at the end of the line on the next court's docket.

---

**REMBRANDT'S SURREPLY IN OPPOSITION TO COXCOM'S MOTION TO DISMISS**          Page 4

Rembrandt agreed to dismiss CoxCom's parents in exchange for an agreement that CoxCom is the proper Cox entity to respond to Rembrandt's claims of infringement in this case, that Rembrandt could reach all of Cox's cable operations through CoxCom, and that Rembrandt did not need to add any other Cox entities or affiliates to assert its infringement claims against Cox's cable operations.  CoxCom and its parents entered this agreement in August 2006 despite knowing that Cox Southwest had "assumed ownership" of CoxCom's cable assets at the end of 2003, and that CoxCom and Cox Southwest had sold those assets in May 2006.  CoxCom should not be able to avoid the bargain it made by now claiming that the asset transfer to Cox Southwest insulates it from personal jurisdiction.  Rembrandt is entitled to the benefit of its bargain.[4]

In conclusion, due process is clearly satisfied in this case.  The fact that CoxCom allegedly decided to stop doing business in Texas in 2003 does not divest this Court of personal jurisdiction.  Rembrandt has sued CoxCom for patent infringement, including infringement that occurred in Texas before CoxCom made or implemented that decision.  The record contains no basis for concluding that CoxCom should not have reasonably anticipated having to defend in a Texas court claims arising out of its extensive cable operations in Texas.  Moreover, CoxCom agreed to be the proper party to answer Rembrandt's patent infringement claims in this action and to be the party through whom all of Cox's cable operations could be reached.

---

[4] The Agreement also allows this Court to consider all Cox cable operations in Texas in deciding whether it is fair to require CoxCom to defend against Rembrandt's infringement claims in this Court.  This Court has jurisdiction over CoxCom based on its concession that it operated cable companies in Texas through 2003.  The Asset Purchase Agreement with Cebridge establishes that CoxCom continued to have an interest in cable operations in Texas until May 2006.  But even if it did not, the Court may consider the cable operations of any other Cox entity from 2004 to the present in determining whether it is fair to require CoxCom to defend against Rembrandt's infringement claims in this Court.  The cases cited by CoxCom do not preclude the Court from considering the contacts of other Cox entities.  CoxCom and its parents agreed that it is the proper party to defend all of Cox's cable operations against Rembrandt's infringement claims.

DATED:  February 5, 2007          Respectfully submitted,


/s/ Sam Baxter_____
Sam Baxter
State Bar No. 01938000
**McKOOL SMITH, P.C.**
505 E. Travis, Suite 105
Marshall, Texas  75670
Telephone:  (903) 927-2111
Telecopier:  (903) 927-2622
sbaxter@mckoolsmith.com

Jeffrey A. Carter
State Bar No. 03919400
**McKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas  75201
Telephone:  (214) 978-4006
Telecopier:  (214) 978-4044
jcarter@mckoolsmith.com

Travis Gordon White
State Bar No. 21333000
**McKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, Texas  78701
Telephone:  (512) 692-8700
Telecopier:  (512) 692-8744
gwhite@mckoolsmith.com

Robert M. Parker
State Bar No. 15498000
Robert Christopher Bunt
State Bar No. 00787165
**PARKER & BUNT, P.C.**
100 E. Ferguson, Suite 1114
Tyler, Texas  75702
Telephone:  (903) 531-3535
Telecopier:  (903) 533-9687
cbunt@cox-internet.com
rmparker@cox-internet.com

Franklin Jones, Jr.
State Bar No. 00000055
**JONES & JONES, INC.**
201 W. Houston Street
P.O. Drawer 1249
Marshall, Texas  75670
Telephone:  (903) 938-4395
Telecopier:  (903) 938-3360
maizieh@millerfirm.com

**ATTORNEYS FOR PLAINTIFF**
**REMBRANDT TECHNOLOGIES, LP**


# CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. mail, on this the 5th day of February, 2007.


/s/ Sam Baxter_____
Sam Baxter

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:06 CV 223 [TJW] |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| CHARTER COMMUNICATIONS OPERATING, | § | |
| LLC, COX COMMUNICATIONS, INC., | § | |
| COXCOM, INC., COX ENTERPRISES, INC., | § | |
| CSC HOLDINGS, INC., and CABLEVISION | § | |
| SYSTEMS CORPORATION, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:06 CV 224 [TJW] |
| | § | |
| TIME WARNER CABLE INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANTS' MOTION TO CONSOLIDATE
CASES FOR PRETRIAL PROCEEDINGS**

Charter Communications, Inc., CoxCom, Inc., Charter Communications Operating, LLC, and all other defendants in Case No. 2:06 CV 223 (collectively, "Charter")[1] and Time Warner Cable Inc. ("TWC"), the defendant in Case No. 2:06 CV 224, hereby move the Court, pursuant to Fed. R. Civ. P. 42(a), to consolidate these actions with Case No. 2:05 CV 443 (in which Comcast Corporation and its related entities (collectively, "Comcast") are the defendants) for all pretrial proceedings. As shown below, pretrial consolidation of these three cases, which involve identical infringement allegations regarding the same four patents, will promote efficiency, will conserve the resources of the Court and the parties, and will allow each of the similarly situated defendants to have a full opportunity to address this Court on critical pretrial matters such as patent claim construction.

## PROCEDURAL BACKGROUND

Plaintiff Rembrandt Technologies, LP ("Rembrandt") filed three separate, identical lawsuits in this Court. On September 16, 2005, Rembrandt filed suit against Comcast alleging that Comcast infringes four patents by virtue of its compliance with the DOCSIS and ATSC industry standards. On June 1, 2006, Rembrandt filed two new, separate complaints in this Court against Charter and TWC alleging infringement of the same four patents at issue in the *Comcast* litigation by virtue of Charter's and TWC's compliance with the exact same two industry standards. In all three complaints, compliance with the ATSC standard is alleged to infringe United States Patent No.

---

[1] Cox Communications, Inc. and Cox Enterprises, Inc. were dismissed from the 2:06cv223 action. CoxCom, Inc. has moved to dismiss the 2:06cv223 action because it believes this Court lacks personal jurisdiction over CoxCom. Nonetheless, without prejudice to its pending motion and in the event that the Court denied CoxCom's motion to dismiss, CoxCom believes that the Court should consolidate these matters for the reasons stated herein. In addition, although still listed in the caption for the 2:06cv223 action, Cablevision Systems Corporation and CSC Holdings, Inc. ("Cablevision") are no longer parties to this action. In an Order dated October 16, 2006, this Court granted Rembrandt's motion to dismiss its claims against Cablevision in this action. Rembrandt filed a separate action against Cablevision in the District of Delaware on October 13, 2006; that action is currently pending before Judge Sleet as case number 1:06cv635.

5,243,627, and compliance with the DOCSIS standard is alleged to infringe United States Patent Nos. 5,852,631, 4,937,819, and 5,719,858. *See Comcast* Complaint ¶¶ 11, 23, 29; *Charter* Complaint ¶¶ 17, 29, 35; *TWC* Complaint ¶¶ 10, 22, 28. Accordingly, based on the complaints, the infringement, validity and enforceability issues raised by all three cases are identical.

On August 30, 2006, TWC filed a motion to disqualify Rembrandt's counsel in the *Comcast* case, Fish & Richardson ("F&R"), after obtaining leave to intervene for the limited purpose of filing that motion. TWC argued that F&R had a conflict of interest because, *inter alia*, F&R would be advancing positions on behalf of Rembrandt in the *Comcast* case that, if successful, would undoubtedly be used by Rembrandt in its action against TWC. (F&R also initially represented Rembrandt in the *Charter* case, but voluntarily withdrew from that action after TWC objected to F&R's participation.)

By Order dated February 8, 2007, the Court granted TWC's motion and disqualified F&R. The Court recognized that:

> The practical significance of Rembrandt's infringement theory is to indict for patent infringement all major cable companies who follow the industry standards. A finding of infringement and an injunction issued by this court against a cable company for compliance with industry standards would have a significant practical effect on Time Warner.

Order at 6. The Court further pointed out that:

> Rembrandt filed its cases in the same district. Its case against Time Warner is pending before the same judge at roughly the same time as this case, but this case was filed first. Although it is true that the claim construction rulings in this case would not be binding on Time Warner, there is a likelihood that the positions taken by F&R in this case could, as a practical matter, prejudice Time Warner in subsequent proceedings.

The parties to the Comcast action have fully briefed their claim construction positions, but the Court

has continued the *Markman* hearing in view of the F&R disqualification.[2]

## **ARGUMENT**

Fed. R. Civ. P. 42(a) empowers the Court to consolidate "any or all the matters in issue" in actions having "a common question of law or fact."  These actions plainly satisfy the requirement of a "common question of law or fact," because Rembrandt is asserting the same patents against all of the defendants based on all of the defendants' use of the same industry-wide standards using equipment supplied by the same group of vendors.

The Fifth Circuit has recognized that Rule 42(a) "is a broad grant of authority" and "has been applied liberally."  *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1013 (5th Cir. 1977).   District Courts in the Fifth Circuit are encouraged to consolidate actions to promote efficiency.  "In this Circuit, district judges have been 'urged to make good use of Rule 42(a) . . . in order to expedite the trial and eliminate unnecessary repetition and confusion.'" *Gentry v. Smith*, 487 F.2d 571, 581 (5th Cir. 1973) (citation omitted).  *Accord, Attala Hydratane Gas, Inc. v. Lowry Tims Co.*, 41 F.R.D. 164, 165 (N.D. Miss. 1966) (Rule 42(a) "is designed and intended to encourage the consolidation of actions").

This Court has consolidated actions involving claims based on the same patents.  *See Epicrealm Licensing, LLC v. Autoflex Leasing, Inc.* Orders dated November 2 and 16, 2005, attached as Exhibit A.  Similarly, in *3M Co. v. Moldex-Metric, Inc.*, 2006 WL 3759758, at *2 (D. Minn. Dec. 21, 2006), the court recently consolidated patent infringement cases even though they were at "very different stages."  That court explained that "much of the same discovery can be used" in both

---

[2] Movants also understand that the Court held a Case Management Conference in Case No. 2:06 CV 47 on February 20, 2006.  In that action, Rembrandt accuses Sharp Corporation of infringing only U.S. Patent No. 5,243,627.  The Court is currently scheduled to hold a claim construction hearing in that action on November 20, 2007.

actions; that "there would be overlap in the claim construction analysis"; that a revised scheduling order could be issued that would "lead to a quicker resolution of these actions than if they remained separate"; and that consolidation "would eliminate the risk of inconsistent results." *Id.* The same is true here.

Many other courts have consolidated actions involving claims by the same plaintiff based on the same patents. *See, e.g., Ovadia v. Top Ten Jewelry Corp.*, 2005 WL 1337792 (S.D.N.Y. June 6, 2005); *Paxonet Comm., Inc. v. Transwich Corp.*, 303 F. Supp. 2d 1027 (N.D. Cal. 2003); *Sage Products, Inc. v. Devon Industries, Inc.*, 148 F.R.D. 213, 215 (N.D. Ill. 1993) ("The enhanced efficiency of jointly handling the numerous, complex issues involved in these cases outweighs any possible inconvenience to the plaintiff"); *Magnavox Co. v. APF Electronics, Inc.*, 496 F. Supp. 29 (N.D. Ill. 1980). *See also Solaia Technology, Inc. v. Rockwell Automation, Inc.*, 2003 WL 22057092, at *2 (N.D. Ill. Sept. 2, 2003) (the possibility of consolidating the action with another patent case pending in another district supported transfer of the action).

In *Russo v. Alamosa Holdings, Inc.*, 2004 WL 579378, at *1 (N.D. Tex. Feb. 27, 2004), the court set forth the following factors that courts "should consider in determining if consolidation is proper":

> (1) the cases proposed for consolidation are pending either before the same court for all purposes or before two different courts within the same judicial district; (2) the cases involve a common party; (3) the cases involve common issues of law and/or fact; (4) there is no risk of prejudice or possible confusion if the cases are consolidated, or if there is any risk, it is outweighed by the risk of inconsistent adjudications of factual and legal issues if the cases are tried separately; (5) consolidation will not result in an unfair advantage; (6) consolidation will conserve judicial resources; (7) consolidation will reduce the time for resolving the cases when compared to separate trials; and (8) consolidation will reduce the expense of trying the cases separately.

All of those factors are fully satisfied here. These cases are all in the same court, were all filed by Rembrandt, and all involve common issues of law and fact. Plaintiff would not be

prejudiced by consolidation, and defendants will not obtain any unfair advantage thereby (indeed, as discussed below, defendants Charter and TWC will be prejudiced if the actions are not consolidated). Consolidation will also conserve judicial resources and save time and expense in the long run. Although the consolidated *Markman* hearing could not occur until Charter and TWC completed their claim construction-related discovery and briefed their own claim construction positions, all discovery relating to infringement, validity and enforceability could thereafter be coordinated. Rembrandt is also seeking extensive discovery from third parties[3] in the *Comcast* action, and this discovery would be consolidated as well, thereby significantly reducing the burden on non-parties. It is difficult to think of facts whereby consolidation could lead to more efficiencies than the facts presented here, where the identical patents are asserted in different actions against the same industry standards, such that the patentee is not relying on any differences between the operations of the different defendants.

Just as importantly, consolidation will avoid the prejudice to TWC and Charter that would result if the Court proceeds with a separate *Markman* hearing in the *Comcast* case in the first instance. TWC and Charter have not had the opportunity to take discovery on claim construction issues or to brief their own positions on those issues. As this Court recognized in its Order of February 8, 2007, "there is a likelihood" that the claim construction proceedings in the *Comcast* action "could, as a practical matter, prejudice Time Warner in subsequent proceedings" and that a finding of infringement in the *Comcast* case "would have a significant practical effect on Time Warner" (as well as on Charter). Defendants Charter and TWC are simply requesting an opportunity to meaningfully participate in proceedings critical to Rembrandt's actions against them. It is

---

[3] The vendors that have received third party discovery requests from Rembrandt include: Cisco, Scientific-Atlanta, Motorola, Arris, Thompson, Terayon and a number of other DOCSIS-compliant equipment suppliers. Each of these vendors sells to several, if not all, of the defendants.

respectfully suggested that absent undue delay, it is preferable for the Court to hear from all of the defendants on claim construction, and to then issue one claim construction order which accounts for positions taken by all of the implicated defendants.

Thus, while Rembrandt has informed the defendants that it is not presently prepared to consent to consolidation, any disadvantage to Rembrandt from continuing proceedings in the Comcast action until Charter and TWC complete their pre-*Markman* hearing activities (e.g. claim construction discovery, exchange of claim construction positions, claim construction briefing, etc.) is far outweighed by (i) the prejudice to TWC and Charter if consolidation is denied; and (ii) the efficiencies afforded by consolidated discovery and a single *Markman* hearing.

## <u>CONCLUSION</u>

For all of these reasons, this motion to consolidate should be granted. Thereafter, in order to expedite the consolidated proceedings, movants respectfully request that a Case Management Conference be scheduled in the consolidated action at the Court's earliest convenience.

Dated: March 2, 2007                          Respectfully submitted,

                                              /s/ Diane V. DeVasto
                                              Michael E. Jones
                                              Texas State Bar No. 10929400
                                              mikejones@potterminton.com
                                              Diane V. DeVasto
                                              Texas State Bar No. 05784100
                                              dianedevasto@potterminton.com
                                              POTTER MINTON, P.C.
                                              110 North College
                                              500 Plaza Tower
                                              Tyler, Texas 75702
                                              Telephone:  (903) 597-8311
                                              Facsimile:   (903) 593-0846

                                              **ATTORNEYS FOR CHARTER
                                              COMMUNICATIONS, INC., LLP,
                                              CHARTER COMMUNICATIONS
                                              OPERATING, LLC, COXCOM, INC.,
                                              AND TIME WARNER CABLE INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on March 2, 2007.  Any other counsel of record will be served by first class on this same date.

                                              /s/ Diane V. DeVasto

## CERTIFICATE OF CONFERENCE

The undersigned certifies that Plaintiff is opposed to this Motion.

                                              /s/ Diane V. DeVasto

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:06 CV 223 [TJW] |
| | § | |
| CHARTER COMMUNICATIONS, INC., | § | |
| CHARTER COMMUNICATIONS OPERATING, | § | |
| LLC, COX COMMUNICATIONS, INC., | § | |
| COXCOM, INC., COX ENTERPRISES, INC., | § | |
| CSC HOLDINGS, INC., and CABLEVISION | § | |
| SYSTEMS CORPORATION, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:06 CV 224 [TJW] |
| | § | |
| TIME WARNER CABLE INC., | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING MOTION TO CONSOLIDATE CASES
FOR PRETRIAL PROCEEDINGS**

Pursuant to FED. R. CIV. P. 42(a), Defendants moved to consolidate Cause Nos. 2:06-cv-223 and 2:06-CV-224.  Having considered the matter, the Court GRANTS the motion.

It is ORDERED that the action styled *Rembrandt Technologies, LP v. Time Warner Cable, Inc.*, Cause No. 2:06-cv-224 (TJW) E.D. Tex. is hereby consolidated in *Rembrandt Technologies, LP v. Charter Communications, Inc., et al.*, Cause No. 2:06-cv-223 (TJW) E.D. Tex. for all pretrial proceedings.

AO 456 (Rev. 5/85)  Notice

# UNITED STATES DISTRICT COURT

EASTERN _____ DISTRICT OF _____ TEXAS

REMBRANDT TECHNOLOGIES, LP

V.

CHARTER COMMUNICATIONS, INC., ET AL.

**NOTICE**

CASE NUMBER:   2:06-CV-223(TJW)

TYPE OF CASE:

X   **CIVIL**          **CRIMINAL**

X   **TAKE NOTICE** that a proceeding in this case has been set for the place, date, and time set forth below:

| PLACE<br>United States District Court<br>100 E. Houston Street<br>**MARSHALL, TX 75670** | ROOM NO.<br>Judge T. John Ward's Courtroom<br>DATE AND TIME<br>**April 3, 2007 @ 2:00 p.m.** |
|---|---|

TYPE OF PROCEEDING

**SCHEDULING  CONFERENCE**

        **TAKE NOTICE** that a proceeding in this case has been continued as indicated below:

| PLACE | DATE AND TIME PREVIOUSLY SCHEDULED | CONTINUED TO DATE AND TIME |
|---|---|---|
|  |  |  |

David J. Maland
US MAGISTRATE JUDGE OR CLERK OF COURT

March 8, 2007
DATE

Sonja H. Dupree
(BY) DEPUTY CLERK

TO:       ALL COUNSEL OF RECORD

**ACKNOWLEDGMENT**

**NOTICE TO COUNSEL:** Please sign in the space provided below and return to the court by facsimile, **(903) 935-2295**, within three (3) days of your receipt of the enclosed notice.

---

**I acknowledge receipt of the indicated notice on the date shown below.**

Case No. _____

Signature of Atty._____

                                                              Date

Print Name of Atty._____

Counsel for _____
                   (Name of Party)

Type of Proceeding: _____
                      (e.g., Scheduling Conference)

Date of Proceeding: _____

Time of Proceeding: _____

Location of Proceeding: _____